## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ROBERT GREENE, *et al.*** | : | |
| | : | |
| Plaintiffs | : | |
| | : | |
| v. | : | Civil Action No. 1:24-cv-00021-CB |
| | : | |
| **MERRICK B. GARLAND, *et al.*** | : | |
| | : | |
| Defendants | : | |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# Table of Contents

**I.    INTRODUCTION** ........................................................................... 1

**II.   STATEMENT OF FACTS** ........................................................... 4

**III.  ARGUMENT** ................................................................................ 8

   a.    Standard .................................................................................... 8

   b.    Plaintiffs Will Succeed on the Merits of Their Claims ........................... 9

      i.    *The Proper Test to be Applied* ................................................ 9

      ii.   *Plaintiffs, and SAF's Similarly Situated Member's, Conduct is Covered by the Second Amendment's Plain Text* ................................. 10

      iii.  *18 U.S.C. § 922(g)(3) Lacks any Historical Analogue, Particularly as it Relates to Medicinal Marijuana* ........................................... 11

         1.    The Correct Historical Period in Examining the Public's Understanding of the Right to Keep and Bear Arms is 1791 ......... 11

         2.    History is Devoid of Any Laws Demonstrating a Tradition of Disarming Individuals for Using a Particular Type of Medicine ... 13

         3.    Alcohol and Firearms in America ...................................... 16

            a.    Colonial Laws ............................................. 17

            b.    Founding Era ............................................... 19

            c.    Reconstruction ............................................. 20

   c.    The Destruction of Constitutional Rights Constitutes Irreparable Injury ........................................................................................ 21

   d.    Greater Injury Will Result From Refusing the Injunction Than Granting It ............................................................................... 24

   e.    Granting of the Preliminary Injunction is in the Public Interest ........ 25

   f.    No Bond or Other Security Payment is Required as a Condition of Relief ........................................................................................ 27

   g.    The Court Should Advance the Trial On the Merits and Consolidate It With the Preliminary Injunction, Or, In the Alternative, Grant Summary Judgment to Plaintiffs. ................................................ 27

**IV.    CONCLUSION** ............................................................................................ 28

# Table of Authorities

## Cases

*Acierno v. New Castle County*, 40 F.3d 645 (3d Cir. 1994)........................................ 22

*ACLU of Ky. v. McCreary County, Ky.*, 354 F.3d 438 (6th Cir. 2003)....................... 22

*Adams v. Freedom Forge Corp.*, 204 F.3d 475 (3d Cir. 2000) ................................... 22

*Amalgamated Transit Union Local 85 v. Port Auth. of Allegheny Cty.*, 39 F.4th 95
   (3d Cir. 2022)......................................................................................................... 9

*AT&T v. Winback & Conserve Program*, 42 F.3d 1421 (3d Cir. 1994) ..................... 25

*B.H. ex rel. Hawk v. Easton Area Sch. Dist.*, 725 F.3d 293 (3d Cir. 2013) ............... 22

*Buck v. Stankovic*, 485 F. Supp. 2d 576 (M.D. Pa. 2007) .................................... 22, 24

*Citizens To End Animal Suffering And Exploitation, Inc. v. Faneuil Hall
   Marketplace, Inc.*, 745 F. Supp. 65 (D. Mass. 1990) ............................................... 24

*Deerfield Med. Center v. City of Deerfield Beach*, 661 F.2d 328 (5th Cir. 1981) ....... 22

*District of Columbia v. Heller,* 554 U.S. 570 (2008) ................................... 2, 11, 12, 23

*Elam Constr., Inc. v. Regional Transp. Dist.,* 129 F.3d 1343 (10th Cir. 1997) ......... 26

*Elrod v. Burns*, 427 U.S. 347 (1976)................................................................... 22, 23

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011)......................................... 24, 28

*Frank's GMC Truck Ctr., Inc. v. Gen Motors Corp.*, 847 F.2d 100 (3d Cir. 1988)..... 27

*Fulton v. City of Philadelphia*, 320 F.Supp.3d 661 (E.D. Pa. 2018) ......................... 21

*G & V Lounge, Inc. v. Mich. Liquor Control Com'n,* 23 F.3d 1071 (6th Cir. 1994)... 25

*Gamble v. United States*, 139 S. Ct. 1960 (2019) ...................................................... 12

*Gordon v. Holder*, 721 F.3d 638 (D.C. Cir. 2013)..................................................... 22

*Homans v. Albuquerque*, 264 F.3d 1240 (10th Cir. 2001) ......................................... 26

*Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797 (3d Cir. 1989) .......... 22

*Iowa Right to Life Comm'e, Inc. v. Williams*, 187 F.3d 963 (8th Cir. 1999) ............. 26

*Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121 (3d Cir. 2017)..................................... 25

Lambert v. Polk County, Iowa, 723 F. Supp. 128 (S.D. Iowa 1989) ......................... 24

*Lara v. Comm'r Pennsylvania State Police*, 91 F.4th 122 (3d Cir. 2024).................. 12

*Leary v. United States*, 395 U.S. 6 (1969) ................................................................ 14

*Lynch v. Donnelly*, 465 U.S. 668 (1984) .................................................................. 12

*Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012) ................................................. 28

*New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022) .....passim

*Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer Pharms. Co.*, 290 F.3d 578 (3d Cir. 2002) ............................................................................... 24

*Range v. Att'y Gen. United States of Am.,* 69 F.4th 96 (3d Cir. 2023) (en banc) ....... 10

*Reilly v. City of Harrisburg*, 858 F.3d 173 (3d Cir. 2017) ............................................ 9

*Socialist Workers Party v. Ill. State Bd. of Elections*, 566 F.2d 586, 587 (7th Cir. 1977), *aff'd*, 440 U.S. 173 (1979) .................................................................................... 28

*Suster v. Marshall,* 149 F.3d 523 (6th Cir. 1998) ....................................................... 26

*Swartzwelder v. McNeilly*, 297 F.3d 228 (3d Cir. 2002) .............................................. 9

*Temple University v. White*, 941 F.2d 201 (3d Cir. 1991) ............................................ 27

*United States v. Daniels*, 77 F.4th 337 (5th Cir. 2023) .................................... 15, 20, 21

*United States v. Watson*, 423 U.S. 411 (1976) ............................................................ 12

*Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017) ................................................. 22

*Zambelli Fireworks Mfg. Co., Inc. v. Wood*, 592 F.3d 412 (3d Cir. 2010) .................. 27

**Statutes**

Controlled Substances Act, Pub. L. No. 91-513, 84 Stat. 1236 (1970)....................... 15

Federal Firearms Act, Pub. L. No. 75-785, 52 Stat. 1250 (1938)............................... 15

Gun Control Act, Pub. L. No. 90-618, 82 Stat. 1213-2 (1968) ................................... 15

Marihuana Tax, Act, Pub. L. No. 75-238, 50 Stat. 551 (1937)................................... 14

**Other Authorities**

BACKGROUNDS OF SELECTIVE SERVICE: MILITARY OBLIGATION: THE AMERICAN TRADITION, Parts 3, 5, 8, 11 (Arthur Vollmer ed., 1947) ......................................... 18

Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, Federal Practice and Procedure § 2948.1 (2d ed. 1995)............................................................................... 22

Hening, William Waller, THE STATUES AT LARGE BEING A COLLECTION OF THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, vol. 1 (1823) ................................................................................................................... 17

Mark W. Smith, *"Not all History is Created Equal": In the Post-Bruen World, the Critical Period for Historical Analogues is when the Second Amendment was Ratified in 1791, and not 1868* (Oct. 1, 2022)........................................................... 12

MITCH EARLEYWINE, UNDERSTANDING MARIJUANA A NEW LOOK AT THE SCIENTIFIC

EVIDENCE (Oxford University Press, Inc. 2002) ....................................................... 13

ROBERT DEITCH, HEMP – AMERICAN HISTORY REVISITED, THE PLANT WITH A DIVIDED HISTORY (Algora Publishing 2003) ............................................................................. 13

THE COLONIAL LAWS OF NEW YORK FROM THE YEAR 1664 TO THE REVOLUTION, vol. 5 (1894) .................................................................................................................. 18

*The Diaries of George Washington* (Houghton Mifflin Pub. 1925)............................. 13

W.J. RORABAUGH, THE ALCOHOLIC REPUBLIC: AN AMERICAN TRADITION (1981) ....... 16

*Washington's Diary Notes*, Library of Congress, Volume 33. .................................... 13

Plaintiffs Robert Greene ("Greene"), James Irey ("Irey") and Second Amendment Foundation ("SAF"), by and through their attorneys, hereby file this brief in support of their motion for preliminary injunction to enjoin Defendants' enforcement of 18 U.S.C. §§ 922(g)(3), (d)(3), and all related laws, regulations, policies, and procedures, including, but not limited to, 27 C.F.R. §§ 478.32(a)(3), (d)(3).

## I.    INTRODUCTION

Plaintiffs are law-abiding, responsible, peaceable citizens who wish to use medical marijuana for treatment, pursuant to Pennsylvania law and as recommended by a doctor, without forfeiting their fundamental right to keep and bear arms. However, 18 U.S.C. §§ 922(g)(3), (d)(3), along with 27 C.F.R. §§ 478.32(a)(3), (d)(3), set forth a regime of regulations that prohibit individuals who are "unlawful users of" a controlled substance from acquiring or possessing firearms[1] and ammunition. As marijuana is currently listed as a schedule 1 narcotic under the Controlled Substance Act ("CSA")[2], even if a state has legalized its consumption for medicinal purposes, as Pennsylvania has, individuals who choose to find relief for their symptoms using medical marijuana are considered "unlawful

---

[1] As specified in the Amended Complaint and as used herein, Plaintiffs define "firearm" or "firearms" to mean handguns, rifles, and/or shotguns, including the frame or receiver of such, as set-forth by 18 U.S.C. § 921(a)(3).
[2] https://www.dea.gov/drug-information/drug-scheduling#:~:text=Schedule%20I%20drugs%2C%20substances%2C%20or,)%2C%20methaqualone%2C%20and%20peyote.

users" of a controlled substance for the purposes of the Gun Control Act ("GCA"),

even if their use of medical marijuana does not coincide with their use of a firearm.

Under this regulatory scheme, individuals who obtain a Pennsylvania

Medical Marijuana ID card ("MMID") pursuant to Pennsylvania law, and use

medical marijuana for treatment, are barred from exercising their Second

Amendment rights. This is an action to uphold Plaintiffs Greene and Irey's, along

with SAF's similarly situated members, right to keep and bear arms as guaranteed

by the Second Amendment to the United States Constitution. This right "elevates

above all other interests the right of law-abiding, responsible citizens to use arms in

defense of hearth and home." *District of Columbia v. Heller,* 554 U.S. 570, 635

(2008). To be sure, other than the federal government's broadly cast net found in

Section 922(g)(3), Plaintiffs are "law-abiding, responsible" citizens. Under the

current regulatory scheme, individuals such as Plaintiff Greene are unable to

lawfully use arms in defense of their hearth and home, cutting at the core of the

right to keep and bear arms. "The very enumeration of the right [to keep and bear

arms] takes out of the hands of government—even the Third Branch of

Government—the power to decide on a case-by-case basis whether the right is really

worth insisting upon." *Heller*, 554 U.S. at 634. Indeed, stripping individuals of their

Second Amendment rights merely because they have opted to seek relief for medical

conditions pursuant to a state law in conflict with an overbroad, historically

baseless federal law cannot be a basis for the total deprivation of the right to keep

and bear arms. "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Id*. at 634-35. As explained *infra*, history does not support this total bar on the right to keep and bear arms.

The "central" – but not the only – holding of the Supreme Court in *Heller* was "that the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home." *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010). The Supreme Court confirmed that the rights protected by the Second Amendment are "among those fundamental rights necessary to our system of ordered liberty," *McDonald*, 561 U.S. at 778, and "[t]he constitutional right to [keep and bear arms] is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1, 70 (2022) (quoting *McDonald*, 561 U. S., at 780).

Defendants have prohibited a particular class of persons, including Plaintiffs Greene and Irey, along with SAF's similarly situated members, from possessing or obtaining a MMID, and utilizing medical marijuana for treatment, while possessing firearms and ammunition in direct violation of the Second Amendment to the United States Constitution, as held by *Heller*, *McDonald*, and *Bruen*.

The current restrictions found in 18 U.S.C. §§ 922(g)(3), (d)(3), along with 27 C.F.R. §§ 478.32(a)(3), (d)(3) infringe upon the individual right to Keep and Bear Arms. And to be explicitly clear, Plaintiffs do not seek to be able to utilize firearms and ammunition while under the effects of medicinal marijuana; rather, they solely seek an ability to purchase, possess and utilize firearms and ammunition, when not utilizing doctor-recommended medicinal marijuana, no different than a patient that has been prescribed dilaudid, diamorphine, hydrocodone, morphine or oxycodone.

## II.    STATEMENT OF FACTS

Plaintiffs Greene and Irey are United States citizens and residents of Pennsylvania. Greene Dec. ¶¶ 1-2, Irey Dec. ¶¶ 1-2. Greene and Irey are over the age of 21. *Id* at ¶ 1. Greene and Irey are not under indictment, never been convicted of a felony or misdemeanor crime of domestic violence, and has not been convicted of a crime punishable by more than one year. *Id.* Plaintiff Greene is not a fugitive from justice, an unlawful user, pursuant to Pennsylvania law, of, or addicted to, any controlled substance and has not been adjudicated a mental defective or been committed to a mental institution. Greene Dec. ¶ 1. Plaintiff Irey is not a fugitive from justice, an unlawful user of, or addicted to, any controlled substance and has not been adjudicated a mental defective or been committed to a mental institution. Irey Dec. ¶ 1. Greene and Irey have not been discharged from the Armed Forces under dishonorable conditions, has never renounced their citizenship and is not the subject of a restraining order relating to an intimate partner. Greene Dec. ¶ 1, Irey

4

Dec. ¶ 1. Greene and Irey are members of the Second Amendment Foundation. *Id.* at ¶ 3.

Plaintiff Greene is also the duly elected District Attorney of Warren County, Pennsylvania, having been elected to office in 2013, with his current term expires in December of 2025. *Id.* at 4. In May of 2023, Greene applied for, and received, a Pennsylvania Medical Marijuana ID card ("MMID"), pursuant to Pennsylvania's Medical Marijuana Act, 35 P.S. § 10231.101, *et seq. Id.* at ¶ 5. Greene currently uses medical marijuana on an intermittent basis to treat his symptoms as they arise, but never while in his official capacity or duties as District Attorney of Warren County. *Id.* at 6.

Plaintiff Irey honorably served in the United States Army as an Indirect Fire Infantryman and earned numerous awards and medals. Irey Dec. ¶¶ 4-5 He also qualified as an expert qualification using rifles, pistols, mortars, and grenades. *Id.* ¶ 6. During his service, Irey injured his back, neck, and knees during jumps at Airborne School, broke his foot during infantry training, tore his left shoulder weightlifting in preparation for selection for Special Forces, and re-injured his neck while deployed to Kosovo. *Id.* at ¶ 7. These service-related injuries resulted in a 100% disability rating from the VA. *Id.* at ¶ 8.

Greene presently desires and intends to purchase, possess, and utilize firearms and ammunition so that he may exercise his constitutionally guaranteed right to keep and bear arms for self-defense and other lawful purposes, without

being subjected to criminal sanction and the loss of his liberty and rights under Defendants' laws. Greene Dec. at ¶ 13. Irey consulted with an approved physician under Pennsylvania's Medical Marijuana Program to determine his eligibility for participation. Irey Dec. at ¶ 10. The physician confirmed that Irey qualified to participate in the program for treatment of his chronic pain and associated neuropathy stemming from his service-related injuries and that he would approve him for a MMID should he want to receive one but understood his wished to abstain at this time due to concerns over his ability to continue to exercise his right to keep and bear arms. *Id.* at 11-12. Irey presently desires and intends to apply for, and receive, a MMID and utilize medical marijuana for treatment while continuing to possess and use firearms and ammunition so that he may exercise my constitutionally guaranteed right to keep and bear arms for self-defense and other lawful purposes, without being subjected to criminal sanction and the loss of his liberty and rights under Defendants' laws. Irey Dec. at ¶ 13.

However, because of Defendant's active enforcement of 18 U.S.C. §§ 922(g)(3) and 27 C.F.R. § 478.32(a)(3), if Greene attempts to purchase, possess, or utilize firearms and ammunition, he will be subject to criminal prosecution and potential incarceration for a period of up to 10 years and a fine of up to $250,000. Greene Dec. at ¶ 9. As such, Plaintiff Greene is currently abstaining from attempting to purchase, possess, or utilize a firearm or ammunition for fear of arrest, prosecution, incarceration and/or a fine. *Id.* at ¶ 10.

6

Similarly, because of Defendant's active enforcement of 18 U.S.C. §§ 922(g)(3) and 27 C.F.R. § 478.32(a)(3), if Irey applies for, and receives a MMID, and uses medical marijuana for treatment while continuing to possess and use firearms and ammunition, he will be subject to criminal prosecution and potential incarceration for a period of up to 10 years and a fine of up to $250,000. Irey Dec. at ¶¶ 14-15. As such, Plaintiff Irey is currently abstaining from applying for, and receiving, a MMID and using medical marijuana for treatment while continuing to possess and use firearms and ammunition for fear of arrest, prosecution, incarceration, and/or a fine. *Id*. at ¶ 16.

Thus, although Plaintiffs Greene and Irey can vote, serve on a jury, hold public office, join or potentially be drafted into the armed forces or called upon for state militia service, and am afforded all of their other constitutionally guaranteed rights, Defendants contend they should be barred, by operation of 18 U.S.C. §§ 922(g)(3) and 27 C.F.R. § 478.32(a)(3), from being able to purchase, possess, or utilize firearms and ammunition, while holding a MMID and using medical marijuana for treatment, which eviscerates Plaintiffs constitutionally guaranteed right to keep and bear arms. Greene Dec. at ¶ 11, Irey Dec. at ¶ 17.

Plaintiff SAF is a nonprofit educational foundation incorporated under the laws of Washington with its principal place of business in Bellevue, Washington. (Gottlieb Dec. ¶ 3). SAF seeks to preserve the effectiveness of the Second Amendment through education, research, publishing, and legal action programs

focused on the Constitutional right to possess firearms, and the consequences of gun control. *Id.* at ¶ 4. SAF has members and supporters throughout the United States, whom reside both within and outside Pennsylvania. *Id.* at ¶ 5. SAF represents its members and supporters, which include gun owners, prospective gun owners, licensed firearms retailers, and others. SAF brings this action on behalf of itself, Plaintiffs Greene and Irey, and its similarly situated members. *Id.* at ¶ 6. SAF's similarly members have been adversely and directly harmed by Defendants' enforcement of the laws, regulations, policies, practices, and customs challenged herein. *Id.* at ¶¶ 7-10. SAF fears the prosecution of its similarly situated members, by Defendant's enforcement of the laws, regulations, policies, practices, and customs challenged herein. *Id* at 11. SAF has expended and diverted resources because of the Defendant's enforcement and resultant policies, practices, and customs challenged herein. *Id.* at 12.

## III.   ARGUMENT

### a.  Standard

The prerequisites for the issuance of a preliminary injunction require the moving party to demonstrate: "(1) whether the movant has a reasonable probability of success on the merits; (2) whether irreparable harm would result if the relief sought is not granted; (3) whether the relief would result in greater harm to the non-moving party[;] and (4) whether the relief is in the public interest." *Amalgamated Transit Union Local 85 v. Port Auth. of Allegheny Cty.*, 39

F.4th 95, 102-03 (3d Cir. 2022) (quoting *Swartzwelder v. McNeilly*, 297 F.3d 228, 234 (3d Cir. 2002)). The first two factors are the "most critical." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017) (citation omitted).

      b.  Plaintiffs Will Succeed on the Merits of Their Claims

The statutes at issue prohibit nearly half a million Pennsylvanians[3] from exercising rights guaranteed by the Second Amendment for which there is no historical analogue.

      *i.   The Proper Test to be Applied*

In *Bruen*, the Supreme Court explicitly stated that "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms," 579 U.S. at 19 and confirmed that interest-balancing inquiries were expressly rejected in the Second Amendment context. *Id*. at 22. Indeed, the Supreme Court highlighted the appropriate test to be applied to Second Amendment challenges, not once, *but twice* to ensure that the lower courts faithfully applied its edict.

> "*We reiterate that the standard for applying the Second Amendment is as follows*: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with

---

[3]

*See* https://www.health.pa.gov/topics/Documents/Programs/Medical%20Marijuana/ MMAB%20Program%20Update%20Data-Nov%2015,%202023.pdf (last visited Jan. 29, 2024) (showing 433,638 Active Patient Certifications as of 10/31/2023).

> the Nation's historical tradition of firearm regulation. Only then
> may a court conclude that the individual's conduct falls outside
> the Second Amendment's 'unqualified command.'"

*Id*. at 24 (internal citations omitted) (emphasis added).

Thus, it is the *Government's* burden to show its laws and/or regulations are constitutional by proffering laws or regulations to demonstrate the challenged law is consistent with this nation's history and tradition of regulating firearms. To be sure, when a challenge law regulates circumstance that existed at the time of the Founding, the lack of a distinctly similar regulation addressing that circumstance is evidence that the challenge law is unconstitutional. *Id*. at 26. For unique circumstances that did not exist at the time of the Founding, the Government may meet its burden through an analogical analysis. *Id*. at 27-28. And for an analogue to be relevant, the Government must demonstrate how and why the historical regulations are distinctly similar to the modern-day restriction. *Id*. at 29. *See also Range v. Att'y Gen. United States of Am.,* 69 F.4th 96, 103 (3d Cir. 2023) (en banc); *id*. at 138-39 (Roth, J., dissenting).

> ### ii. *Plaintiffs, and SAF's Similarly Situated Member's, Conduct is Covered by the Second Amendment's Plain Text*

If the Plaintiffs' proposed conduct falls within the Second Amendment's plain text, then "the Constitution presumptively protects that conduct." *Id*. at 17. "[T]he 'textual elements' of the Second Amendment's operative clause— 'the right of the people to keep and bear Arms, shall not be infringed'—'guarantee the individual

10

right to possess and carry weapons in case of confrontation.'" *Id*. at 32. (citing *Heller*, 554 U.S. at 592).

To be sure, the Supreme Court undertook an exhaustive analysis of the meaning of the operative clause and determined that "The people" means "all Americans" and "Arms" includes "all instruments that constitute bearable arms" *Heller*, 554 U.S. at 580, 582.

There can be no dispute that the Plaintiffs' proposed conduct – possessing firearms and ammunition for self-defense and other lawful purposes – falls within the ambit of the Second Amendment's plain text.

> ### iii.    *18 U.S.C. § 922(g)(3) Lacks any Historical Analogue, Particularly as it Relates to Medicinal Marijuana*

Though it is the Defendants' burden to produce the history to justify their restrictions, several courts have already issued decisions relating to Section 922(g)(3), and Plaintiffs submit the following as support for their position.

> ### 1.  The Correct Historical Period in Examining the Public's Understanding of the Right to Keep and Bear Arms is 1791

For this Court to properly apply the test spelled out in *Bruen*, it is imperative that it look to the proper historical period to ascertain what similar laws, or historical analogues, were in existence that the Defendants may rely upon to justify their ban. "Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Heller*, 554 U. S. at 634-35. (emphasis

added). The Second Amendment was adopted in 1791. *See* generally Mark W.

Smith, *"Not all History is Created Equal": In the Post-Bruen World, the Critical*

*Period for Historical Analogues is when the Second Amendment was Ratified in*

*1791, and not 1868*, (Oct. 1, 2022, available at SSRN:

https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4248297.

To begin, Supreme Court precedent has made clear that with respect to the

federal government, 1791 is the proper period to examine to determine the original

meaning of the various provisions in the Bill of Rights. *See, e.g.*, *Heller*, 554 U.S. at

634–35 ("Constitutional rights are enshrined with the scope they were understood

to have when the people adopted them."); *Gamble v. United States*, 139 S. Ct. 1960,

1975–76 (2019) (explaining that *Heller* sought to determine "the public

understanding in 1791 of the right codified by the Second Amendment"); *United*

*States v. Watson*, 423 U.S. 411, 421 (1976) (citing the Second Congress's

understanding and grant of arrest powers for a felony without a warrant to federal

marshals as consistent with the Fourth Amendment)*; cf. Lynch v. Donnelly*, 465

U.S. 668, 674 (1984) ("The interpretation of the Establishment Clause by Congress

in 1789 takes on special significance.").

Recently, the Third Circuit in *Lara v. Comm'r Pennsylvania State Police*, 91

F.4th 122, 134 (3d Cir. 2024) agreed that 1791 was the appropriate time period to

examine, even when considering claims against a state government. Having set the

stage for the proper historical period, attention must be turned to this nation's

history and tradition of firearms regulation.

2.  History is Devoid of Any Laws Demonstrating a
    Tradition of Disarming Individuals for Using a
    Particular Type of Medicine

"When a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 597 U.S. at 26.

The effects of marijuana were not unknown to the American people. Prior to the start of the Revolutionary War, medical uses for cannabis appeared in *The New England Dispensatory*, published in 1764. MITCH EARLEYWINE, UNDERSTANDING MARIJUANA A NEW LOOK AT THE SCIENTIFIC EVIDENCE 28 (Oxford University Press, Inc. 2002). Washington's diaries indicated he grew hemp at Mount Vernon for about 30 years and that he may have had a particular interest in the medicinal use of Cannabis. ROBERT DEITCH, HEMP – AMERICAN HISTORY REVISITED, THE PLANT WITH A DIVIDED HISTORY 25 (Algora Publishing 2003) (citing *Washington's Diary Notes*, Library of Congress (Volume 33, page 270) and *The Diaries of George Washington*, Houghton Mifflin Pub., 1925).

The recognition of medicinal uses of marijuana continued through the 19th century. In 1850, cannabis was added to *The U.S. Pharmacopoeia* where it remained until 1941. EARLEYWINE, at 28. Ten years later, in 1860, the Ohio State Medical Society met and summarized medical uses of cannabis, which included

treatments for pain, inflammation, and cough. *Id.* at 14. The 1868 version of *U.S. Dispensatory* included pages of medical uses for tinctures of cannabis, including improved appetite, sexual interest, mental disorders, gout, cholera, hydrophobia, and insomnia. *Id.*

By the turn of the 20th century, marijuana infused medical products were more widely available. *Id.* at 14. Use of cannabis as a recreational drug was relatively uncommon through most of the 19th century in the United States. The first mention of marijuana by an American author appeared in a poem written by John Greenleaf Whittier in 1854. Subsequent mentions of hashish[4] appear in two books authored by Bayard Taylor, a popular writer at the time, in the mid 1850s. The use of hashish was also documented in Fitz Hugh Ludlow's book, *The Hasheesh Eater*, in 1857 but few U.S. residents had any exposure to the recreational use of cannabis for many years. *Id.* at 23, 223-24.

Yet, historical evidence shows that marijuana was not regulated by any state until the 20th century. *Id.* at 223-24. It was not until 1937, that the federal government attempted to regulate marijuana, with the passage of the Marihuana Tax Act, which was ultimately found to be unconstitutional. Pub. L. No. 75-238, 50 Stat. 551 (1937). *See also Leary v. United States*, 395 U.S. 6 (1969) (finding the Act to violate the Fifth Amendment's protection against self-incrimination). Congress

---

[4] "A hallucinogenic drug preparation derived from the resin secreted by the flowering tops of cultivated female plants of the genus *Cannabis*." https://www.britannica.com/science/hashish (last visited Jan. 9, 2024).

ultimately responded with the Controlled Substances Act in 1970. Pub. L. No. 91-513, 84 Stat. 1236 (1970).

While marijuana may have been regulated early in the 20th century, it was not until 1938 that the first federal prohibition against individuals from possessing firearms or ammunition were codified in the Federal Firearms Act of 1938 ("FFA"). Pub. L. No. 75-785, 52 Stat. 1250 (1938). The FFA was devoid of any prohibition against individuals who used marijuana. It was not until 1968, with the passage of the Gun Control Act ("GCA") that the federal government expressly included a prohibition against the possession of firearms and ammunition by individuals who were "an unlawful user of or addicted to marihuana…" Pub. L. No. 90-618, 82 Stat. 1213-2 (1968).

The Supreme Court made clear that "even if a modern-day regulation is not a dead ringer for historical precursors," it still may pass constitutional muster. *Bruen*, 597 U.S. at 30. As the Fifth Circuit recognized, "[b]ecause there was little regulation of drugs (related to guns or otherwise) until the late-19th century, intoxication via alcohol is the next-closest comparator." *United States v. Daniels*, 77 F.4th 337, 344-45 (5th Cir. 2023). Thus, Plaintiffs turn their attention to historical statutes relating to firearms and alcohol to demonstrate that the Government finds no quarter in those laws.

15

3.  Alcohol and Firearms in America

Even attempting to utilize alcohol as an analogous substance to demonstrate that Section 922(g)(3) is constitutional in the immediate context, the Government will be unable to demonstrate how and why the regulations are similar.

To be sure, Americans have always loved their alcohol. W.J. RORABAUGH, THE ALCOHOLIC REPUBLIC: AN AMERICAN TRADITION 10 (1981) ("[I]n 1770 the annual per capita intake of alcohol from all sources was 3.5 gallons. In the years following the Revolution the amount declined . . . . But after 1800, as the quantity of spirits consumed increased, the total quantity of alcohol consumed from all sources increased until it reached a peak of nearly 4 gallons per capita in 1830."). Yet, the regulation of alcohol and firearms during the pertinent time period (1791 and the surrounding years) is rather limited. It is difficult to imagine that the dangers of an intoxicated individual with a firearm differed at the time of the Founding as compared to today. However, Section 922(g)(3) *does not deal with an intoxicated person*[5], but rather an *unlawful user of* a controlled substance.

Regardless, from a historical perspective, there were few laws addressing alcohol and firearms. And the ones that did exist were namely concerned with the

---

[5] In an abundance of caution, Plaintiffs note that they are not advocating that laws relating to firearms and individuals under the influence are somehow unconstitutional, nor is that at issue in the instant matter. The instant matter merely deals with whether an individual who uses a substance, in this case medical marijuana, may be subjected to a total bar on the exercise of their constitutional right to keep and bear arms, regardless of how frequent they utilize it.

16

misuse of firearms while intoxicated or the discipline of militias, neither of which satisfy the "how" and "why" in comparison to Section 922(g)(3). None restricted firearms use or possession by people who were sober at the time, but otherwise used intoxicants (*i.e.* alcohol).

a.   Colonial Laws

Colonial history yields a handful of laws pertaining to firearms and alcohol. However, these are only useful to the extent that they inform the original understanding of the Second Amendment. *Bruen*, 597 U.S. at 44-49.

A 1623-4[6] Virginia law provided that "[n]o commander of any plantation, shall either himself or suffer others to spend powder unnecessarily, that is to say, in drinking or entertainments." 1 William Waller Hening, THE STATUES AT LARGE BEING A COLLECTION OF THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, at 127 (1823).[7] Other laws enacted at the time demonstrate the purpose was to preserve gunpowder for emergencies. *Id*. Virginia later enacted a law in 1655-6 which restricted the "frequent" practice of discharging

---

[6] The dual years for some colonial statutes (e.g., 1623-4) are used to account for the change from the Old Style (Julian) calendar to the New Style (Gregorian) calendar. Under the New Style, the new year begins on January 1. Under the Old Style, the new year began on March 25 (the date of the Annunciation to the Virgin Mary). So what we today call "February 1624" was considered by colonists of the time to be "February 1623." The English and their colonies adopted the New Style in 1752.
[7] Available at https://www.google.com/books/edition/The_Statutes_at_large/yDIMAQAAMAAJ?hl=en&gbpv=1.

firearms while drinking, with some exceptions, for the purpose of preserving gunpowder and preventing false alarms that Indians were attacking. *Id*. at 401-02. Notably, neither of these laws disposed an individual of their right to keep and bear arms.

In 1771, New York passed a law which prohibited the discharge of any gun or pistol during New Year's Eve and the first two days of January, namely because "great Damages" were "frequently done…by persons going armed from House to House, with Guns and other Fire Arms and being often intoxicated with Liquor." 5 THE COLONIAL LAWS OF NEW YORK FROM THE YEAR 1664 TO THE REVOLUTION 244–45 (1894).[8] Notably, this law did not pertain to the possession of firearms, so its utility for a historical analogue in this context is nonexistent.

A 1746 New Jersey militia law gave authority to a "Captain or Commanding Officer to disarm" a soldier who "appear[ed] in Arms disguised in Liquor," and forbid the sale of strong liquor to militiamen prior to the completion of training absent approval from a captain or commanding officer. 2 BACKGROUNDS OF SELECTIVE SERVICE: MILITARY OBLIGATION: THE AMERICAN TRADITION, Part 8, at 25, 35 (Arthur Vollmer ed., 1947). Similarly, a 1756 Maryland law fined individuals in the militia who got "drunk on any Muster-day before or at Muster," along with individuals selling liquor at places of training or within five miles of such place to

---

[8] Available at
https://www.google.com/books/edition/The_Colonial_Laws_of_New_York_from_the_Y/r4g0AQAAMAAJ?hl=en&gbpv=1.

individuals in the militia, with certain exceptions. *Id.*, Part 5, at 93. Delaware, at the same time, also prohibited the sale of any "strong liquor" from being brought to or sold at musters. *Id.*, Part 3, at 13. Regardless, none of these laws applied to the general populace, nor did they erect a complete barrier to individuals possessing firearms. They merely existed to ensure a competent military.

b. Founding Era

Turning to the period which carries the most weight – the Founding era – the Government will be unable to find any help. The sole law pertaining to firearms and alcohol is a 1780 Pennsylvania militia law. The law provided that "any non-commissioned officer or private," who in the course of militia duty was "found drunk" would be "disarmed and put under guard...until the company [was] dismissed." BACKGROUNDS OF SELECTIVE SERVICE, Part 11, at 97. The law further provided that "[n]o company or battalion" could meet at a tavern on any days which they were training nor march to a tavern before being discharged. *Id.* at 100. Additionally, individuals who brought any liquor to training were required to forfeit them. *Id.* Once again, this law, like the ones from the colonies, only applied to militia service and not the general populace and provide no analogous reasoning to the prohibitions found in Section 922(g)(3).

c.  Reconstruction[9]

Between 1868 and 1883, three states prohibited carrying firearms while

intoxicated: Kansas, Missouri, and Wisconsin. *Daniels*, 77 F.4th at 346. (internal

citations omitted). To reiterate, as mentioned *supra* in footnote 4, Plaintiffs are not

challenging potential prohibitions on carrying of arms while intoxicated, but the

total bar on their ability to even possess firearms and ammunition for merely using

a "controlled substance" at some point in time that is not necessarily

contemporaneous with their physical possession of a firearm.[10] Even if this Court

were to accept these laws were somehow more analogous to Section 922(g)(3), the

modern-day restriction is significantly broader in nature – namely a total

prohibition on the exercise of the right to keep and bear arms. Moreover, as the

Fifth Circuit noted, the Supreme Court "doubted that three colonial-era laws could

---

[9] For clarity, Plaintiffs, consistent with Supreme Court precedent and the Third
Circuit's decision in *Lara*, note that laws from this time period are immaterial to
the analysis, but provide the information for the Court to further demonstrate that
*even if* the Court were to look beyond the prescribed time period for Second
Amendment analyses, the Government would be unable to meet its burden.
[10] Moreover, arguments in this vein fall short of their mark, when compared to
alcohol. The chief difference being that alcohol is not listed as a controlled
substance, but the dangers of intoxicated individuals utilizing firearms and
ammunition still exist. Even more problematic for the Government is that a
substance which is listed on DEA's schedule, which may be prescribed to an
individual, would be lawful for a prescription holder to possess firearms and
ammunition, but prohibiting for an individual who lacks a prescription. History has
shown that merely being a prescription holder does not equate to lack of abuse. *See*
https://www.justice.gov/archive/ndic/pubs/651/abuse.htm (OxyContin is, however,
relatively inexpensive for those covered by health insurance, since the insurance
provider covers most costs associated with doctor visits and the prescription.).

suffice to show a tradition, let alone three laws passed eighty to ninety years after the Second Amendment was ratified." *Id*. at 347. (citing *Bruen*, 597 U.S. at 44-46).

Simply put, throughout this nation's history, there was no tradition of limiting an individual's Second Amendment rights by virtue of their use of marijuana – let alone their use of alcohol, an intoxicant widely known and used by the American populace. As the Fifth Circuit recognized "[t]hroughout American history, laws have regulated the combination of guns and intoxicating substances. But at no point in the 18th or 19th century did the government disarm individuals who uses drugs or alcohol at one time from possessing guns at another." *Daniels*, 77 F.4th at 340. As such, the Government will be unable to find any historical support for prohibiting lawful users of medical marijuana from being able to possess firearms and ammunition.

    c.  The Destruction of Constitutional Rights Constitutes Irreparable Injury

Plaintiffs will continue to suffer irreparable harm if preliminary relief is not granted. The analysis for determining whether Plaintiffs would suffer irreparable harm is comparatively straightforward. "It is hornbook law that the 'irreparable harm requirement is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot adequately be compensated after the fact by monetary damages ... this is not an easy burden.'" *Fulton v. City of Philadelphia*, 320 F.Supp.3d 661, 701 (E.D. Pa. 2018) (quoting *Adams v. Freedom*

*Forge Corp.*, 204 F.3d 475, 484-85 (3d Cir. 2000)). "In general, to show irreparable harm a plaintiff must 'demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial.'" *Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir. 1994) quoting *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir.1989). A finding that a constitutional right "'is either threatened or in fact being impaired'… mandates a finding of irreparable injury." *Deerfield Med. Center v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976). See also *Washington v. Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017) (finding that "the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'"); *ACLU of Ky. v. McCreary County, Ky.*, 354 F.3d 438, 445 (6th Cir. 2003) (internal citations omitted) (When constitutional rights are threatened or impaired, irreparable injury is presumed.); *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ("'[A] prospective violation of a constitutional right constitutes irreparable injury.'"). *See also* 11A Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, Federal Practice and Procedure § 2948.1 (2d ed. 1995) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."), *quoted in Buck v. Stankovic*, 485 F. Supp. 2d 576, 586 (M.D. Pa. 2007). The Third Circuit has held that if an alleged violation constitutes harm to Plaintiffs' First Amendment rights, such harm is almost unquestionably irreparable. *B.H. ex rel. Hawk v. Easton Area Sch. Dist.*, 725 F.3d 293, 323 (3d Cir. 2013) (citing *Elrod*,

427 U.S. at 373).

The same analysis applies to this matter. Just as this and other courts have consistently held that even temporally *de minimis* violations of the fundamental rights guaranteed under the First Amendment represent irreparable harm, the violation of Plaintiffs Greene and Irey's, along with SAF's similarly situated members', fundamental rights under the Second Amendment is likewise irreparable. Clearly, there are no other constitutional rights that are as directly linked to the ability to defend one's self as the right to keep and bear arms secured by the Second Amendment. The interest in self-defense is the "central component of the [Second Amendment] right itself." *Heller*, 554 U.S. at 599 (emphasis original). Further, "[b]y the time of the founding, the right to have arms had become fundamental for English subjects." *Heller*, 554 U.S. at 593.

If the Court does not issue a preliminary injunction, Plaintiffs Greene and Irey, along with SAF's similarly situated members would continue to suffer irreparable harm. They are currently being deprived and would continue to be deprived of their fundamental right to keep and bear arms. Because Plaintiffs Greene and Irey, along with SAF's similarly situated members, wish to exercise their fundamental constitutional right to keep and bear arms – including the right to do so for the purpose of self-defense and to protect hearth and home – compensation in money after a lengthy trial does not provide an adequate remedy. "Infringements of this right cannot be compensated by damages." *Ezell v. City of*

*Chicago*, 651 F.3d 684, 699 (7th Cir. 2011).

###### d. Greater Injury Will Result From Refusing the Injunction Than Granting It

To determine which way the balance of the hardships tips, a court must identify the possible harm caused by the preliminary injunction against the possibility of the harm caused by not issuing it. *See, Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer Pharms. Co.*, 290 F.3d 578, 596–97 (3d Cir.2002); *Buck*, 485 F. Supp. 2d at 586 (M.D. Pa. 2007) (finding the deprivation of the Constitutional right to marry trumped municipality's concern over being deluged with new marriage applications).

If the irreparable harm the movant will suffer in the absence of a preliminary injunction is the deprivation of a constitutional right, the balance of harms test will generally favor the movant. *Citizens To End Animal Suffering And Exploitation, Inc. v. Faneuil Hall Marketplace, Inc.*, 745 F. Supp. 65 (D. Mass. 1990) (plaintiffs who were arrested on defendant's complaint after distributing leaflets outside defendant commercial establishment sought preliminary injunction under § 1983 prohibiting defendant from interfering with plaintiff's activities; balance of harms test favored plaintiff, since harm to plaintiff was deprivation of First Amendment rights and potential harm to defendant was merely loss of business). *Lambert v. Polk County, Iowa,* 723 F. Supp. 128 (S.D. Iowa 1989) (after plaintiff videotaped fatal fight, police took videotape to aid in prosecution of accused murderer; balance

24

of harms test favored preliminary injunction requiring return of videotape to plaintiff since potential harm to plaintiff was deprivation of First Amendment rights, and only potential harm to defendant was possibility that if videotape was shown on television prosecution of accused murderer would be more difficult).

In the instant matter, there can be no question that the balance of equities favors the Plaintiffs. Should this Honorable Court fail to issue an injunction, the Plaintiffs, and SAF's similarly situated members, are either forced to abandon their Second Amendment rights and continue treatment using medical marijuana pursuant to Pennsylvania law or seek alternative treatments in order to exercise their constitutionally guaranteed right to keep and bear arms at the expense of their own health. Such a prospect is not only constitutionally unsound but impermissible as explained by *Heller*.

e.   Granting of the Preliminary Injunction is in the Public Interest

"As a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff." *Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 143 (3d Cir. 2017) (citing, *AT&T v. Winback & Conserve Program,* 42 F.3d 1421, 1427 n. 8 (3d Cir. 1994). Moreover, many courts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding Constitutional principles. *See G & V Lounge, Inc. v. Mich. Liquor Control Com'n,* 23 F.3d 1071, 1079 (6th Cir. 1994) (noting "it is always

in the public interest to prevent the violation of a party's constitutional rights"); *Homans v. Albuquerque*, 264 F.3d 1240, 1244 (10th Cir. 2001) ("We believe that the public interest is better served by following binding Supreme Court precedent and protecting the core First Amendment right of political expression."); *Iowa Right to Life Comm., Inc. v. Williams*, 187 F.3d 963, 970 (8th Cir. 1999) (finding a district court did not abuse its discretion in granting a preliminary injunction because "the potential harm to independent expression and certainty in public discussion of issues is great and the public interest favors protecting core First Amendment freedoms"); *Suster v. Marshall,* 149 F.3d 523, 530 (6th Cir. 1998) (holding candidates for judicial office were entitled to preliminary injunction of expenditure limit given likelihood of success on the merits, irreparable harm and lack of public interest in enforcing a law that curtailed political speech); *Elam Constr., Inc. v. Regional Transp. Dist.,* 129 F.3d 1343, 1347 (10th Cir. 1997)(stating, in context of a request for injunctive relief, that "the public interest ... favors plaintiffs' assertion of their First Amendment rights").

In the instant matter, there can be no question that upholding Plaintiffs' constitutional right to bear arms is in the public interest. To deprive any member of the public the ability to exercise their constitutional rights cannot conceivably be construed as "within the public interest".

f.  No Bond or Other Security Payment is Required as a Condition of Relief

The Third Circuit has stated that a "district court should consider the impact that a bond requirement would have on enforcement of [an important federal right or public interest] in order to prevent undue restriction [of them]." *Temple University v. White*, 941 F.2d 201, 220 (3d Cir. 1991). The Third Circuit seems to have adopted a general rule that "'[w]hile there are exceptions, the instances which a bond may not be required are so rare that the requirement is almost mandatory.'" *Zambelli Fireworks Mfg. Co., Inc. v. Wood*, 592 F.3d 412, 426 (3d Cir. 2010) (quoting *Frank's GMC Truck Ctr., Inc. v. Gen Motors Corp.*, 847 F.2d 100, 103 (3d Cir. 1988)). Fortunately for the Plaintiffs, the impact of a bond requirement of an important federal right or public interest is one of those rare exceptions.

Further, any injunction would not financially harm the Defendants. As such, this Honorable Court should waive the bond or security requirement found in Fed. R. Civ. P. 65(c). In the alternative, if this Court would disagree, Plaintiff would respectfully request that any bond be nominal and be set as $1.00 United States currency.

g.  The Court Should Advance the Trial On the Merits and Consolidate It With the Preliminary Injunction, Or, In the Alternative, Grant Summary Judgment to Plaintiffs.

In this case none of the material facts can be reasonably disputed. The deprivation of Second Amendment rights for merely using a medicinal substance has no basis in this nation's history or tradition and is unconstitutional, full stop.

27

*See Ezell*, 651 F.3d at 697 ("Once standing is established, the plaintiff's personal situation becomes irrelevant. It is enough that we have only the statute itself and the statement of basis and purpose that accompanied its promulgation." (cleaned up)); *see also Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012) ("The constitutionality of the challenged statutory provisions does not present factual questions for determination in a trial."). Because the issues in this case are purely legal, there is no reason to delay and final judgment should be entered in Plaintiffs' favor. *See Socialist Workers Party v. Ill. State Bd. of Elections*, 566 F.2d 586, 587 (7th Cir. 1977), *aff'd*, 440 U.S. 173 (1979).

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court issue a preliminary injunction, enjoining Defendants from enforcing 18 U.S.C. §§ 922(g)(3), (d)(3), and all related laws, regulations, policies, and procedures, including, but not limited to, 27 C.F.R. §§ 478.32(a)(3), (d)(3), against Plaintiffs Greene and Irey, along with SAF's similarly situated members.

Dated: March 19, 2024                       Respectfully Submitted,

                                            /s/ Adam Kraut

                                            Adam Kraut, Esq.
                                            SECOND AMENDMENT FOUNDATION
                                            12500 N.E. Tenth Place
                                            Bellevue, WA 98005
                                            Akraut@SAF.org
                                            (425) 454-7012

28

Joshua Prince, Esq.
CIVIL RIGHTS DEFENSE FIRM, P.C.
646 Lenape Road
Bechtelsville, PA 19505
Joshua@Civilrightsdefensefirm.com
(888) 202-9297 ext 81114
(610) 400-8439 (f)