IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROBERT GREENE, JAMES IREY, and | ) | |
| SECOND AMENDMENT FOUNDATION, | ) | CIVIL ACTION NO. 1:24-cv-00021 |
| Plaintiffs, | ) | |
| | ) | JUDGE BISSOON |
| v. | ) | |
| | ) | *(Electronically Filed)* |
| MERRICK B. GARLAND, Attorney General | ) | |
| of the United States, STEVEN M. DETTELBACH, | ) | |
| Director, Bureau of Alcohol, Tobacco, Firearms, | ) | |
| and Explosives, CHRISTOPHER WRAY, Director | ) | |
| of the Federal Bureau of Investigation, and | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT'S MEMORANDUM IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................. 2

    I.    Statutory and Regulatory Background ....................................................... 2

          A.    The Gun Control Act of 1968 .................................................... 2

          B.    The Controlled Substances Act ................................................. 4

    II.    Factual Background ................................................................................... 5

LEGAL STANDARD .......................................................................................... 7

ARGUMENT ....................................................................................................... 8

    I.    Plaintiff SAF Lacks Standing ................................................................... 8

    II.    Plaintiffs Are Unlikely To Succeed On The Merits................................. 10

          A.    The Challenged Provisions Are Facially Constitutional.......................... 12

               1.    Courts Interpret the Second Amendment Based on Text and Historical Tradition ................................................ 13

               2.    The Challenged Provisions Address An Unprecedented Societal Concern .................................................... 16

               3.    The Challenged Provisions Are Analogous To Laws Disarming The Intoxicated .............................................. 17

               4.    Laws Disarming Those Deemed Dangerous Justify Any Reach Beyond The Historical Scope Of Intoxication Statutes ................................................................ 24

          B.    The Challenged Provisions Are Constitutional As Applied ..................... 30

    III.    Plaintiffs Fail To Demonstrate A Likelihood Of Irreparable Harm ..................... 34

    IV.    The Balance Of Equities And Public Interest Weigh Against Injunctive Relief................................................................................................... 36

    V.    Any Injunctive Relief Should Be Appropriately Limited....................................... 38

    VI.    The Court Should Not Consolidate Plaintiffs' Motion With A Trial On The Merits Or Grant Summary Judgment ................................................. 40

CONCLUSION................................................................................................. 41

# TABLE OF AUTHORITIES

**Cases**

*Acierno v. New Castle County,*
    40 F.3d 645 (3d Cir. 1994) ............................................................................................. 8, 35

*Am. Chiropractic Ass'n v. Am. Specialty Health Inc.,*
    625 F. App'x 169 (3d Cir. 2015) ......................................................................................... 9

*Am. Red Cross v. Palm Beach Blood Bank, Inc.,*
    143 F.3d 1407 (11th Cir. 1998) ........................................................................................ 39

*AT & T v. Winback & Conserve Program, Inc.,*
    42 F.3d 1421 (3d Cir. 1994) ............................................................................................... 7

*Auker v. Wetzel,*
    No. 2:14-cv-179-CB, 2014 WL 3401702 (W.D. Pa. July 10, 2014) ................................. 8

*B.H. ex rel. Hawk v. Easton Area Sch. Dist.,*
    725 F.3d 293 (3d Cir. 2013) ............................................................................................. 34

*Ball v. Beard,*
    396 F. App'x 826 (3d Cir. 2010) ....................................................................................... 7

*Barrett v. United States,*
    423 U.S. 212 (1976) ...................................................................................................... 2, 20

*Calvin Klein Cosms. Corp. v. Parfums de Coeur, Ltd.,*
    824 F.2d 665 (8th Cir. 1987) ........................................................................................... 39

*Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.,*
    664 F. Supp. 3d 584 (D. Del. 2023) ................................................................................. 35

*Dickerson v. New Banner Inst., Inc.,*
    460 U.S. 103 (1983) ...................................................................................................... 3, 37

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ................................................................................................. *passim*

*Elrod v. Burns,*
    427 U.S. 347 (1976) .................................................................................................... 34, 35

*Emile v. Sci–Pittsburgh,*
    No. CIV A 04-974, 2006 WL 2773261 (W.D. Pa. Sept. 24, 2006) ................................... 8

*ERISA Indus. Comm. v. Asaro-Angelo*,
  No. CV2010094-ZNQ-TJB, 2023 WL 2808105 (D.N.J. Apr. 6, 2023) ................... 10

*Fair Hous. Council of Suburban Philadelphia v. Montgomery Newspapers*,
  141 F.3d 71 (3d Cir. 1998) ........................................................................................ 10

*Ferring Pharms., Inc. v. Watson Pharms., Inc.*,
  765 F.3d 205 (3d Cir. 2014) ...................................................................................... 34

*Folajtar v. Attorney General*,
  980 F.3d 897 (3d Cir. 2020) ...................................................................................... 29

*Fried v. Garland*,
  640 F. Supp. 3d 1252 (N.D. Fla. 2022) ............................................................. *passim*

*Gill v. Whitford*,
  138 S. Ct. 1916 (2018) .............................................................................................. 40

*Gonzales v. Raich*,
  545 U.S. 1 (2005) ................................................................................................. 4, 36

*Harmelin* v. *Michigan*,
  501 U.S. 957 (1991) .................................................................................................. 29

*Heller v. District of Columbia*,
  670 F.3d 1244 (D.C. Cir. 2011) ................................................................................ 27

*Hohe v. Casey*,
  868 F.2d 69 (3d Cir. 1989) ....................................................................................... 34

*Huddleston v. United States*,
  415 U.S. 814 (1974) .................................................................................................. 27

*Hunt v. Wash. State Apple Advert. Comm'n*,
  432 U.S. 333 (1977) .................................................................................................... 9

*Kanter v. Barr*,
  919 F.3d 437 (7th Cir. 2019) .............................................................................. 27, 30

*Lara v. Commissioner Pennsylvania State Police*,
  91 F.4th 122 (3d Cir. 2024) ...................................................................................... 15

*Lanin v. Borough of Tenafly*,
  515 F. App'x 114 (3d Cir. 2013) ......................................................................... 34, 35

*Madison Square Garden Corp. v. Braddock*,
  90 F.2d 924 (3d Cir. 1937)..................................................................... 8

*Madsen v. Women's Health Ctr., Inc.*,
  512 U.S. 753 (1994)........................................................................... 40

*Marcus v. BMW of N. Am., LLC*,
  687 F.3d 583 (3d Cir. 2012)................................................................ 10

*McCloskey v. United States*,
  No. 4:22-cv-246, 2023 WL 5095701 (S.D. Ga. Aug. 9, 2023)................................. 11

*Melendres v. Arpaio*,
  695 F.3d 990 (9th Cir. 2012) .............................................................. 35

*N.J. Retail Merchs. Ass'n v. Sidamon-Eristoff*,
  669 F.3d 374 (3d Cir. 2012)................................................................ 35

*Nat'l Ass'n of Chain Drug Stores v. Express Scripts, Inc.*,
  No. 2:12-cv-395-CB, 2012 WL 1416843 (W.D. Pa. Apr. 25, 2012)........................... 7

*Nat'l Shooting Sports Found. v. Att'y Gen. of New Jersey*,
  80 F.4th 215 (3d Cir. 2023) ................................................................ 8

*New York State Rifle & Pistol Ass'n v. Bruen*,
  597 U.S. 1 (2022)...................................................................... *passim*

*Nken v. Holder*,
  556 U.S. 418 (2009).................................................................... 7, 36

*NLRB v. Teamsters*,
  419 F.2d 1282 (6th Cir. 1970) ............................................................ 39

*Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc.*,
  280 F.3d 278 (3d Cir. 2002)................................................................. 9

*Range v. Attorney General*,
  69 F.4th 96 (3d Cir. 2023) ............................................................ 27, 33

*Rehaif v. United States*,
  139 S. Ct. 2191 (2019)................................................................... 37

*Reilly v. City of Harrisburg*,
  858 F.3d 173 (3d Cir. 2017)............................................................ 7, 34

*Schmidt v. Lessard*,
　414 U.S. 473 (1974) ........................................................................................... 39

*Smith v. Turner*,
　48 U.S. 283 (1849) ............................................................................................. 26

*State v. Shelby*,
　2 S.W. 468 (Mo. 1886) ...................................................................................... 20

*TransUnion LLC v. Ramirez*,
　594 U.S. 413 (2021) ............................................................................................. 8

*Tyson Foods, Inc. v. Bouaphakeo*,
　577 U.S. 442 (2016) ............................................................................................. 8

*United States v. Alaniz*,
　69 F.4th 1124 (9th Cir. 2023) ........................................................................... 16

*United States* v. *Alston*,
　No. 23-cr-21, 2023 WL 7003235 (E.D.N.C. Oct. 24, 2023) ............................. 11

*United States v. Black*,
　649 F. Supp. 3d 246 (W.D. La. 2023) ............................................................... 11

*United States v. Blue Bird*,
　No. 22-cr-30112, 2024 WL 35247 (D.S.D. Jan. 3, 2024) .............................. 11, 23

*United States v. Bulltail*,
　No. 22-cr-86, 2023 WL 5458780 (D. Mont. Aug. 24, 2023) ......................... 11, 30

*United States v. Campbell*,
　No. 1:22-cr-159, 2023 WL 5009202 (S.D. Miss. Aug. 4, 2023) ....................... 11

*United States v. Carter*,
　750 F.3d 462 (4th Cir. 2014) ............................................................................. 28

*United States v. Cheeseman*,
　600 F.3d 270 (3d Cir. 2010) .............................................................................. 27

*United States v. Clements*,
　No. 23-cr-1389, 2024 WL 129071 (D.N.M. Jan. 11, 2024) ........................... 11, 30

*United States v. Cobbs*,
　No. 22-cr-4069, 2023 WL 8599708, (N.D. Iowa Dec. 12, 2023) .................... 11, 23

*United States v. Connelly*,
    668 F. Supp. 3d 662 (W.D. Tex. 2023)........................................................... 11-12, 23

*United States v. Cooper*,
    No. 23-cr-2040, 2023 WL 6441943 (N.D. Iowa Sept. 29, 2023) ............................................ 11

*United States v. Crutchfield*,
    No. 22-cr-269, 2023 WL 6976706 (D. Minn. Oct. 23, 2023).................................................. 11

*United States v. Daniels*,
    77 F.4th 337 (5th Cir. 2023) ................................................................................................ 11, 23

*United States v. Danielson*,
    No. 22-cr-299, 2023 WL 5288049 (D. Minn. Aug. 17, 2023)........................................... 11, 23

*United States v. Davey*,
    No. 23-cr-20006, 2024 WL 340763 (D. Kan. Jan. 30, 2024) ........................................... 11, 30

*United States v. Davis*,
    No. 23-cr-3088, 2024 WL 519970 (D. Neb. Feb. 9, 2024) ...................................................... 11

*United States v. Eason*,
    No. 1:22-cr-65, 2024 WL 639350 (N.D. Ind. Feb. 15, 2024)................................................. 25

*United States v. Endsley*,
    No. 21-cr-58, 2023 WL 6476389 (D. Alaska Oct. 5, 2023) ................................. 11, 21, 27, 30

*United States v. Espinoza-Melgar*,
    No. 21-cr-204, 2023 WL 5279654 (D. Utah Aug. 16, 2023) ............................... 11, 23, 27, 30

*United States v. Evenson*,
    No. 23-cr-24, 2023 WL 3947828 (D. Mont. June 12, 2023) ................................................... 11

*United States v. Gardner*,
    No. 22-cr-48, 2023 WL 8099106 (W.D. Mo. Nov. 21, 2023)................................................. 11

*United States v. Giglio*,
    No. 1:23-cr-39, 2023 WL 4918332 (S.D. Miss. Aug. 1, 2023) .............................................. 11

*United States v. Gil*,
    No. 22-cr-773, 2023 WL 4356067 (W.D. Tex. July 5, 2023) ................................................. 11

*United States v. Grubb*,
    No. 23-cr-1014, 2023 WL 6960371 (N.D. Iowa Oct. 20, 2023) ................................. 11, 23, 30

*United States v. Hamlin*,
No. 23-cr-08, 2023 WL 6481146 (D. Mont. Oct. 5, 2023)....................................... 11

*United States v. Harrison*,
654 F. Supp. 3d 1191 (W.D. Okla. 2023) ............................................................ 12, 23

*United States v. Jackson*,
69 F.4th 495 (8th Cir. 2023), *reh'g and reh'g en banc denied*, 85 F. 4th 468 (8th Cir 2023),
*docketing pet. for cert.*, No. 23-6170 (S. Ct. Dec. 6, 2023) ...................................... 25

*United States v. Laureano*,
No. 23-cr-12 (EP), 2024 WL 838887 (D.N.J. Feb. 28, 2024) .................................. 15

*United States v. Ledvina*,
No. 23-cr-36, 2023 WL 5279470 (N.D. Iowa Aug. 16, 2023) ................................. 11

*United States v. Lewis*,
650 F. Supp. 3d 1235 (W.D. Okla. 2023) ................................................................ 11

*United States v. Lewis*,
No. 22-cr-222, 2023 WL 4604563 (S.D. Ala. July 18, 2023) ................................ 11, 23, 28, 30

*United States v. Okello*,
No. 22-cr-40096, 2023 WL 5515828 (D.S.D. Aug. 25, 2023) ........................... 11, 22

*United States v. Ortiz*,
No. 23-cr-506-KSM, 2024 WL 493423 (E.D. Pa. Feb. 8, 2024)............................ 16

*United States v. Overholser*,
No. 3:22-cr-35, 2023 WL 4145343 (N.D. Ind. June 23, 2023) ............................... 11

*United States v. Perry*,
No. 22-cr-1300, 2023 WL 7185622 (S.D. Tex. Nov. 1, 2023) ................................ 11

*United States v. Posey*,
655 F. Supp. 3d 762 (N.D. Ind. 2023) ............................................................. *passim*

*United States v. Pruden*,
No. 23-cr-42, 2023 WL 6628606 (N.D. Iowa Oct. 11, 2023) ................................. 11

*United States v. Rahimi*,
No. 22-915, 143 S. Ct. 2688 (2023)......................................................................... 11

*United States v. Robinson*,
No. 23-cr-40013, 2023 WL 7413088 (D.S.D. Nov. 9, 2023) ............................. 11, 22

*United States v. Salerno*,
    481 U.S. 739 (1987)................................................................................ 12

*United States v. Sanchez*,
    646 F. Supp. 3d 825 (W.D. Tex. 2022)................................................... 11

*United States v. Seiwert*,
    No. 1:20-cr-443, 2022 WL 4534605 (N.D. Ill. Sept. 28, 2022) ............ 11

*United States v. Slone*,
    No. 22-cr-144, 2023 WL 8037044 (E.D. Ky, Nov. 20, 2023)............ 11, 21

*United States v. Smith*,
    No. 2:23-cr-129-22, 2024 WL 896772 (W.D. Pa. Mar. 1, 2024) ....... 15, 25

*United States v. Springer*,
    No. 23-cr-1013, 2023 WL 4981583 (N.D. Iowa Aug. 3, 2023) ............ 11

*United States v. Stennerson*,
    No. 1:22-cr-139, 2023 WL 2214351 (D. Mont. Feb. 24, 2023) ............ 11

*United States v. Strange*,
    No. 23-cr-97, 2023 WL 8458225 (E.D. Ky. Dec. 6, 2023) .................. 11

*United States v. Striplin*,
    No. 4:21-cr-289, 2023 WL 4850753 (W.D. Mo. July 28, 2023)........ 11, 30

*United States v. Walker*,
    No. 8:22-cr-291, 2023 WL 3932224 (D. Neb. June 9, 2023) ............... 11

*United States v. Williams*,
    No. 3:21-cr-34, 2024 WL 665851 (M.D. Pa. Feb. 16, 2024) ............ 15-16

*United States v. Wuchter*,
    No. 23-cr-2024, 2023 WL 4999862 (N.D. Iowa Aug. 4, 2023) ............ 11

*United States v. Yancey*,
    621 F.3d 681 (7th Cir. 2010) ......................................................... 1, 21, 26

*Univ. of Texas v. Camenisch*,
    451 U.S. 390 (1981)............................................................................ 40, 41

*Washington v. Trump*,
    847 F.3d 1151 (9th Cir. 2017) ............................................................... 35

*Wilson v. Lynch,*
    835 F.3d 1083 (9th Cir. 2016) ........................................................................ 28

*Winter v. Nat. Res. Def. Council,*
    555 U.S. 7 (2008) ............................................................................................ 34

**Statutes**

18 U.S.C. § 922 ................................................................................................ *passim*

21 U.S.C. § 802 ........................................................................................................ 17

21 U.S.C. § 811 .......................................................................................................... 5

21 U.S.C. § 812 .......................................................................................................... 4

21 U.S.C. § 844 .......................................................................................................... 4

**Rules**

Fed. R. Civ. P. 12 .................................................................................................... 41

Fed. R. Civ. P. 56 .................................................................................................... 41

Fed. R. Civ. P. 65 ........................................................................................ 2, 38, 40

LCvR 56 .................................................................................................................... 41

**Regulations**

27 C.F.R. § 478.11 ............................................................................................ 3, 23

27 C.F.R. § 478.32 .............................................................................................. 3, 4

81 Fed. Reg. 53,688 (Aug. 12, 2016) .................................................................... 32

**Other Authorities**

1 George I, c.54 (1715) ............................................................................................ 24

1 W. & M. c.2, § 6 .................................................................................................... 24

1 W. & M. c.15, §§ 3-4 (1688) ................................................................................ 24

1 *Records of Governor & Company of the Massachusetts Bay in New England*
    (Nathaniel B. Shurtleff ed., 1853) .............................................................. 25

1 William Waller Hening, *Statutes at Large; Being a Collection of All the Laws of Virginia* (1823) ............................................................................................................ 18, 25

2 Arthur Vollmer, U.S. Selective Serv. Sys., Military Obligation: The American Tradition, pt. 8, New Jersey (1947) ........................................................................................ 18

2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 665 (1971) ........................... 25

2 Edw. 3, c.3 (1328) .................................................................................................. 24

3 Jac. I, c.5, §§ 16-18 (1605-06) ................................................................................ 24

4 *Journals of the Continental Congress* (1906) .............................................................. 25

5 *Colonial Laws of New York* (1894) ......................................................................... 18

6 *Statutes at Large of Pennsylvania from 1682 to 1801* 319-20 (WM Stanley Ray ed., 1898) ... 25

7 Will. III, c.5 (1695) ................................................................................................ 24

9 William Waller Hening, *Statutes at Large; Being a Collection of All the Laws of Virginia* .... 25

11 George I, c.26 (1724) ............................................................................................ 24

15 *The Public Records of the Colony of Connecticut from May, 1775, to June, 1776, Inclusive* (Charles J. Hoadly ed., 1890) ............................................................................ 25

19 George II, c.39 (1746) ........................................................................................... 24

1692-1694 Mass. Acts 11-12 ...................................................................................... 24

1696-1701 N.H. Laws 15 ........................................................................................... 24

1700-1797 Del. Laws 104 .......................................................................................... 25

1723-1730 Conn. Acts. 292 ........................................................................................ 25

1775-1776 Mass. Acts 479 ......................................................................................... 25

1777 Pa. Laws 63 .................................................................................................... 25

1776-1777 N.J. Laws 90 ............................................................................................ 25

1777 N.C. Sess. Laws 231 ......................................................................................... 25

1788 N.Y. Laws Ch. 12 ............................................................................................... 26

1837 Mass. Acts 273 .................................................................................................... 18

1837 Me. Laws 424 ...................................................................................................... 18

1844 R.I. Pub. Laws 503 .............................................................................................. 18

1867 Kan. Sess. Laws 25 ............................................................................................. 19

1878 Miss. Laws 175 ................................................................................................... 19

1890 Okla. Sess. Laws 495 .......................................................................................... 19

1899 S.C. Acts 97, No. 67, § 1 .................................................................................... 19

1909 Idaho Sess. Laws 6, § 1 ...................................................................................... 19

1927 N.J. Laws 745 ...................................................................................................... 20

1929 Mich. Pub. Acts 55 ............................................................................................. 20

1931 Pa. Laws 499 ....................................................................................................... 20

1935 Ind. Acts 161 ....................................................................................................... 20

1935 S.D. Sess. Laws 356 ............................................................................................ 20

1935 Wash. Sess. Laws 601 ......................................................................................... 20

1936 Ala. Acts 52 ......................................................................................................... 20

*Acts & Laws of the English Colony of Rhode-Island & Providence-Plantations* (Hall, 1767) .... 18

Benjamin Rush, An Inquiry into the Effects of Ardent Spirits Upon the Human Body and Mind (1812) ...................................................................................................... 17

Brian F. O'Donnell, Decision Making and Impulsivity in Young Adult Cannabis Users, Frontiers in Psych., 12:679904 (2021) .................................................................................. 32

*Calendar of State Papers, Domestic: William III, 1700-1702* (Edward Bateson ed., 1937) ........ 24

Carlton F.W. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L. J. 1371 (2009) .......................................................... 26

Center for Holistic Medicine, Medical Marijuana Consent, https://www.bewisebewell.com/storage/app/media/medical-marijuana-

consent-form-2020.pdf. ................................................................................. 31-32

*Charter & General Laws of Massachusetts Bay* 133 (1814) ...................................... 25

Christopher Whitlow, Short Communication; Long-Term Heavy Marijuana Users Make Costly
    Decisions on a Gambling Task, 76 (1-2) J. Drug Alcohol Depend. (2004) .......................... 32

Cong. Globe, 39th Cong., 1st Sess. 908-09 (1866) ....................................................... 26

Crim. Justice Info Servs. Div., Fed. Bureau of Investigation, U.S. Dep't of Justice, *Federal
    Denials—Reasons Why the NICS Section Denies, November 30, 1998 – February 29, 2024*.37

Crim. Justice Info. Servs. Div., Fed. Bureau of Investigation, U.S. Dep't of Justice, *National
    Instant Criminal Background Check System 2022 Operational Report* (2023)..................... 37

Daniel J. Fridberg, Cognitive Mechanisms Underlying Risky Decision-Making in Chronic
    Cannabis Users, 54 (1) J. Math Psychol. 28-38 (2010)............................................. 32

David F. Musto, Drugs in America: A Documentary History (2002) .................................. 16, 17

Elizabeth Kelly Gray, Habit Forming: Drug Addiction in America, 1776-1914 (2023).............. 16

Erik Grant Luna, Our Vietnam: The Prohibition Apocalypse,
    46 DePaul L. Rev. 483 (1997)....................................................................... 16

Evelyn H. Wei *et al.*, *Teasing Apart the Developmental Associations Between Alcohol and
    Marijuana Use and Violence*, 20 Journal of Contemporary Criminal Justice 166 (2004)...... 29

Florida Board of Medicine, Medical Marijuana Consent Form,
    https://flboardofmedicine.gov/forms/medical-marijuana-consent-form.pdf.......................... 31

H.R. 8754, 72 Cong., 47 Stat. 650, 652 (1st Sess. 1932)............................................. 20

James Dunlop, *The General Laws of Pennsylvania* 405-06 (2d ed. 1849).................................. 18

John Rublowsky, The Stoned Age: A History of Drugs in America (1974) ............................... 16

Jon Grant, Short Communication; Neuropsychological Deficits Associated with Cannabis Use in
    Young Adults, 121(1-2) J. Drug & Alcohol Depend. 159-162 (2012) ................................... 32

Jorie Casey, Effects of Frequent Marijuana Use on Risky Decision-Making in Young Adult
    College Students, Addictive Behav. Rpts. (2020)..................................................... 32

Lana Harrison & Joseph Gfroerer, *The Intersection of Drug Use and Criminal Behavior: Results
    From the National Household Survey on Drug Abuse*, 38 Crime & Delinquency 422 (1992)29

Mark Edward Lender & James Kirby Martin, *Drinking in America: A History* (1987) .............. 19

Mary P. Becker, Neurocognition in College-Aged Daily Marijuana Users, J. Clin. Exp.
  Neuropsych., 36(4):379-98 (2014) ......................................................................... 32

Md. Laws 117-18 ......................................................................................................... 25

Mo. Rev. Stat. § 1274 (1879) ........................................................................................ 19

N.J. Laws 90 ................................................................................................................ 25

Norman S. Miller, *et al.*, *A Review of Cases of Marijuana and Violence*, 17 Int'l J. of Envtl. Res.
  & Pub. Health, no. 5 (2020) ................................................................................. 32

Office of Justice Programs, *Bureau of Justice Statistics Special Report: Drug Use and
  Dependence, State and Federal Prisoners, 2004* (2006) ....................................... 29

PHA Adult Medicine, Medical Cannabis Use Consent Form,
  https://www.phaadultmedicine.com/_files/ugd/2e54b7_9a91354a3ec543e98af7f381
  ee5eee1b.pdf ............................................................................................................. 31

Randolph Roth, "Why Guns Are and Are Not the Problem," *in* Jennifer Tucker, et al., *A Right to
  Bear Arms?: The Contested Role of History in Contemporary Debates on the Second
  Amendment* (2019) ................................................................................................... 19

Richard J. Bonnie & Charles H. Whitebread, II, The Forbidden Fruit and the Tree of Knowledge:
  An Inquiry into the Legal History of American Marijuana Prohibition,
  56 Va. L. Rev. 971 (1970) ......................................................................................... 17

Robert Dowlut, *The Right to Arms: Does the Constitution or Predilection of Judges Reign?*,
  36 Okla. L. Rev. 65 (1983) ....................................................................................... 26

Sharon M. Boles & Karen Miotto, *Substance abuse and violence: A review of the literature*,
  8 Aggression & Violent Behavior 155 (2003) ....................................................... 32

*Sir John Knight's Case*,
  3 Mod. 117, 87 Eng. Rep. 75, 76 (K.B. 1686) ....................................................... 24

Substance Abuse and Mental Health Services Administration, *National Survey on Drug Use
  and Health Report: Illicit Drug Use among Persons Arrested for Serious Crimes* (2005) ... 29

The Charters & General Laws of the Colony and Province of Massachusetts Bay (1814) .......... 17

Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the
  Legislative Power of the States of the American Union* 28-29 (1868) .................................. 26

William Rawle, *A View of the Constitution of the United States of America* (2d ed. 1829) ........ 26

## INTRODUCTION

"[T]here is no constitutional problem with separating guns and drugs." *United States v. Yancey*, 621 F.3d 681, 687 (7th Cir. 2010).  Congress separated guns and drugs in the Gun Control Act of 1968 by prohibiting "unlawful users" of controlled substances from possessing firearms and prohibiting others from transferring firearms to unlawful drug users.  18 U.S.C. § 922(d)(3), (g)(3).  Plaintiffs ask this Court to preliminarily enjoin the federal government from enforcing these laws on the basis that they violate the Second Amendment, but plaintiffs are not likely to succeed.  These laws, which impose a temporary prohibition on firearms possession and receipt during the time period that a person is actively engaged in unlawful drug use, comport with the Second Amendment because they are "consistent with this Nation's historical tradition of firearm regulation."  *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 17 (2022).  In particular, these laws are consistent with the historical traditions of restricting firearms rights on the basis of intoxication and disarming groups that the legislature determines would pose a danger with firearms.

Sections 922(g)(3) and 922(d)(3) are constitutional not only facially but also as applied to those who use marijuana pursuant to a state medical marijuana program.  Marijuana's physical and mental effects make it dangerous for a person to handle firearms and also impair a person's judgment, including judgment about whether to use firearms.  In addition, possession of marijuana (even under a state medical marijuana program) is a federal crime.  It was within Congress's authority to determine that people who are actively engaged in committing a crime that renders them unable to handle firearms safely are too dangerous to possess or receive firearms.

Plaintiffs also fail to show that they are likely to suffer irreparable harm absent an injunction.  Plaintiffs are not prevented from possessing firearms but merely must choose between firearms possession and unlawful drug use, and no plaintiff has submitted evidence of an

immediate medical need to use marijuana — much less in combination with firearms possession. Moreover, the balance of equities weighs against injunctive relief. Against plaintiffs' minimal showing of harm, Sections 922(g)(3) and 922(d)(3) are vital public safety provisions on which the federal government relies to prevent dangerous individuals from obtaining and possessing firearms.

Although the Court should not order any injunctive relief, plaintiff Second Amendment Foundation's (SAF) request for injunctive relief on behalf of its members who are "similarly situated" to plaintiffs Robert Greene and James Irey, Proposed Order 2, ECF No. 11-5 ("Proposed Order"), is especially improper for several additional reasons. SAF lacks standing to represent its members; its request for relief on behalf of "similarly situated" members necessitates the participation of individual members because the Court cannot determine which members are "similarly situated" without their participation. SAF's request for a vague injunction that potentially could benefit hundreds of thousands of its unidentified members would be unworkable in practice and heightens the concern that the public interest weighs against injunctive relief. And SAF's requested injunction fails the requirement to "describe in reasonable detail . . . the act or acts restrained or required," Fed. R. Civ. P. 65(d)(1)(C), because neither the Court nor defendants would have any way to determine which people are protected by the proposed injunction.

## BACKGROUND

### I.     Statutory and Regulatory Background

#### A.     The Gun Control Act of 1968

The Gun Control Act of 1968 updated earlier federal firearms laws by, among other things, "expand[ing] the categories of persons prohibited from receiving firearms." *Barrett v. United States*, 423 U.S. 212, 220 (1976). Section 922(g) prohibits certain groups from possessing or transporting any firearm with a nexus to interstate commerce, including felons, those adjudicated

mentally ill or involuntarily committed, and those subject to a domestic violence restraining order. 18 U.S.C. § 922(g).  "Congress' intent in enacting §[] 922(g) . . . was to keep firearms out of the hands of presumptively risky people."  *Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 112 n.6 (1983).

As relevant here, "unlawful user[s] of . . . any controlled substance" as defined in the Controlled Substances Act (CSA), cannot possess firearms.  18 U.S.C. § 922(g)(3).  Marijuana is a controlled substance, and all marijuana possession (except for approved research purposes) violates federal law.  *See infra*, p. 4.  Section 922(d) prohibits transferring firearms to someone that the transferor knows or has reasonable cause to believe falls within one of the categories of § 922(g), including unlawful drug users.  *See* 18 U.S.C. § 922(d)(3).  Therefore, Section 922(g)(3) prohibits unlawful drug users from possessing firearms, and § 922(d)(3) prohibits any person from transferring firearms to known or suspected marijuana users.

The Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), a bureau within the Department of Justice, enforces federal firearms laws and issues regulations concerning those laws.  ATF has promulgated a regulation defining an "[u]nlawful user" of a controlled substance as someone who "is a current user" of a controlled substance in a manner other than as prescribed by a physician, meaning that "the unlawful use has occurred recently enough to indicate that the individual is actively engaged in such conduct."  27 C.F.R. § 478.11.  ATF has also promulgated a regulation stating that no person may ship, receive, or possess a firearm in interstate commerce who is an unlawful user of or addicted to any controlled substance as defined in the CSA, *id.* § 478.32(a)(3), or transfer a firearm to a person knowing or having reasonable cause to believe that such a person is such an unlawful drug user or addict, *id.* § 478.32(d)(3).  This brief refers to

18 U.S.C. §§ 922(g)(3), (d)(3), and 27 C.F.R. §§ 478.32(a)(3), (d)(3) together as the "challenged provisions."

**B.     The Controlled Substances Act**

The CSA regulates many drugs, called controlled substances, by categorizing them on schedules in accordance with their potential for abuse, safety, and accepted medical uses, and imposing restrictions based on schedule.  Marijuana (spelled "marihuana" in the CSA) is on Schedule I, the most restrictive schedule.  21 U.S.C. § 812, Sch. I(c)(10).  Accordingly, when Congress enacted the CSA in 1970, it found that marijuana "has a high potential for abuse," "has no currently accepted medical use in treatment in the United States," and has "a lack of accepted safety for use of the drug or other substance under medical supervision."  *Id.* § 812(b)(1).  Some states, including Pennsylvania, have enacted state laws providing that medicinal use of marijuana does not violate state law, under certain circumstances.  However, marijuana possession remains unlawful under federal law.  Because marijuana is a Schedule I drug, possession of marijuana is illegal for all purposes except government-approved research.  *See Gonzales v. Raich*, 545 U.S. 1, 14 (2005).  Unlawful possession of a controlled substance is a crime punishable by up to a year in prison.  21 U.S.C. § 844(a).  A conviction after a previous drug conviction is a felony punishable by up to two years in prison, with increasing penalties for further convictions.  *Id.*

The Attorney General has authority to "transfer between schedules" any drug or "remove any drug or other substance from the schedules" if, after considering scientific and medical evaluations and recommendations from the Secretary of Health and Human Services, he finds that the drug meets criteria for a different schedule or does not meet the requirements for any schedule.

*Id.* § 811(a)(1), (a)(2).  To this point, neither Congress nor the Attorney General have altered marijuana's Schedule I status.[1]

## II.    Factual Background

Plaintiff Robert Greene avers[2] that he is a Pennsylvania resident, and the District Attorney of Warren County, who applied for and obtained a Pennsylvania Medical Marijuana ID card ("MMID") pursuant to Pennsylvania's Medical Marijuana Act in May of 2023.  Decl. of Robert Greene ¶¶ 2, 5, ECF No. 16-2 ("Greene Decl.").  He "currently use[s] medical marijuana on an intermittent basis" to treat unspecified "symptoms as they arise."  *Id.* ¶ 6.  It is his "present intention and desire to purchase, possess, and utilize firearms and ammunition . . . for self-defense and other lawful purposes," but he has refrained from attempting to obtain firearms and ammunition because of the challenged provisions.  *Id.* ¶ 7.  He purportedly is not subject to various other federal prohibitions on firearms possession or receipt.[3]  He is "not, pursuant to state law, an unlawful user of any controlled substance," *id.* ¶ 1(g), suggesting that his only unlawful use of controlled substances is use of medical marijuana.  He further claims that apart from his unlawful use of marijuana, he is "a responsible, law-abiding, peaceable citizen with no history of violent behavior, mental health disqualification, or other conduct that would suggest [he] pose[s] any threat or danger."  *Id.* ¶ 12.

---

[1] The Department of Health and Human Services (HHS) recently recommended rescheduling marijuana to Schedule III.  The Drug Enforcement Administration (DEA) is currently considering that recommendation.

[2] This section describes the factual averments in plaintiffs' declarations.  Defendants do not concede the veracity of these averments and reserve the right to challenge their veracity.

[3] He is a United States citizen over the age of 21 who is not under indictment, has never been convicted of a crime of domestic violence or punishable by more than one year in prison, is not a fugitive, is not addicted to any controlled substance, has not been adjudicated a mental defective or committed to a mental institution, has not been dishonorably discharged from the military, has not renounced his citizenship, and is not subject to a domestic violence restraining order.  *See id.* ¶ 1(a)-(f), (h)-(l).

Plaintiff James Irey avers that he is a Pennsylvania resident who currently possesses firearms and ammunition for self-defense and other lawful purposes. Decl. of James Irey ¶¶ 2, 9, ECF No. 16-3 ("Irey Decl."). He is not subject to various federal prohibitions on firearms possession or receipt.[4] An approved physician under Pennsylvania's Medical Marijuana Program has confirmed that he would approve Mr. Irey for an MMID to obtain marijuana to treat his chronic pain and neuropathy. *Id.* ¶¶ 10-11. However, he does not allege or provide evidence that he has any pressing medical need to obtain marijuana or that he cannot treat his conditions with other medications. It is his "present intention and desire to apply for, and receive, a MMID and utilize medical marijuana for treatment while continuing to possess and use firearms and ammunition," *id.* ¶ 13, but he has abstained from applying for an MMID and obtaining and using medical marijuana because he does not want to violate the challenged provisions if he continues to possess firearms and ammunition, *id.* ¶ 16. He claims that he is "a responsible, law-abiding, peaceable citizen with no history of violent behavior, mental health disqualification, or other conduct that would suggest [he] pose[s] any threat or danger." *Id.* ¶ 18.

Plaintiff Second Amendment Foundation (SAF) is a nonprofit corporation whose mission is "focused on the Constitutional right to possess firearms, and the consequences of gun control." Decl. of Alan Gottlieb ¶ 4, ECF No. 16-1 ("Gottlieb Decl."). "SAF has over 720,000 members and supporters nationwide, inclusive of the Plaintiffs Greene and Irey," *id.* ¶ 5, but SAF does not identify any other members or provide any evidence of the specific circumstances of any other

---

[4] He avers that he is a United States citizen over the age of 21 who is not under indictment, has never been convicted of a crime of domestic violence or punishable by more than one year in prison, is not a fugitive, is not an unlawful user of or addicted to any controlled substance, has not been adjudicated a mental defective or committed to a mental institution, has not been dishonorably discharged from the military, has not renounced his citizenship, and is not subject to a domestic violence restraining order. *See id.* ¶ 1(a)-(k).

members.  It appears that any person — including felons, domestic abusers, people who wish to use firearms to commit crimes and violent acts, and other potentially dangerous people — may join SAF on its website simply by submitting a $15 annual membership fee or a $150 lifetime membership fee.  *See* Second Amendment Foundation, Join Now, saf.org/join-saf/.  SAF purports to bring this lawsuit "on behalf of itself and its similarly situated members and supporters," Gottlieb Decl. ¶ 6, and plaintiffs' proposed injunction would enjoin defendants from enforcing the challenged provisions against SAF's members who are "similarly situated" to Mr. Greene and Mr. Irey.  Proposed Order at 2.

## LEGAL STANDARD

"The grant of injunctive relief is an extraordinary remedy which should be granted only in limited circumstances."  *Nat'l Ass'n of Chain Drug Stores v. Express Scripts, Inc.*, No. 2:12-cv-395-CB, 2012 WL 1416843, at *1 (W.D. Pa. Apr. 25, 2012) (cleaned up) (quoting *AT & T v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1426-27 (3d Cir. 1994)).  "A party seeking a preliminary injunction must show: '"(1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief."'"  *Id.* (quoting *Ball v. Beard*, 396 F. App'x 826, 827 (3d Cir. 2010)).  Because the first two factors are the "most critical," a movant "must demonstrate" that it can satisfy those factors.  *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017).  "If these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief."  *Id.*  The last two factors (harm to the nonmoving party and the public interest) merge when the government is the opposing party.  *See Nken v. Holder*, 556 U.S. 418, 435 (2009).  "As a corollary to the principle that preliminary injunctions should issue only in a clear and plain case, the Court of Appeals for the

Third Circuit has observed that 'upon an application for a preliminary injunction to doubt is to deny.'" *Auker v. Wetzel*, No. 2:14-cv-179-CB, 2014 WL 3401702, at *2 (W.D. Pa. July 10, 2014) (quoting *Emile v. Sci–Pittsburgh*, No. CIV A 04-974, 2006 WL 2773261 at *6 (W.D. Pa. Sept. 24, 2006) (quoting *Madison Square Garden Corp. v. Braddock*, 90 F.2d 924, 927 (3d Cir. 1937))).

In asking this Court to enjoin the enforcement of Sections 922(g)(3) and (d)(3), which have been in effect for decades, plaintiffs are seeking to alter the status quo.  A "party seeking a mandatory preliminary injunction that will alter the status quo bears a particularly heavy burden in demonstrating its necessity." *Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir. 1994).

## ARGUMENT

### I.     Plaintiff SAF Lacks Standing

The Court should deny preliminary injunctive relief to SAF because SAF lacks standing to sue.  "[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).  "Article III does not give federal courts the power to order relief to any uninjured plaintiff." *Id.* at 431 (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 466 (2016) (Roberts, C. J., concurring)).  "For a preliminary injunction, bare allegations" of standing "are not enough; the [plaintiff] must produce evidence showing" standing. *Nat'l Shooting Sports Found. v. Att'y Gen. of New Jersey*, 80 F.4th 215, 219 (3d Cir. 2023).

SAF appears to rely primarily on a theory of associational standing, asserting that it "brings this action on behalf of" members who are "similarly situated" to Mr. Greene and Mr. Irey.  Mem. in Supp. of Pls.' Mot. for Prelim. Inj. 8, ECF No 16 ("Mem.").  "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose;

and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). SAF's claim to associational standing founders on the third requirement.[5]   Although courts sometimes conclude the participation of individual members "may be unnecessary" when an association seeks injunctive relief, associational standing "is permitted only where the claims do not require 'a fact-intensive-individual inquiry.'" *Am. Chiropractic Ass'n v. Am. Specialty Health Inc.*, 625 F. App'x 169, 176 (3d Cir. 2015) (quoting *Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 283, 284 n.3 (3d Cir. 2002)).

Here, the nature of the injunctive relief requested would require such a fact-intensive individualized inquiry.   SAF seeks preliminary and permanent injunctive relief on behalf of its members who are "similarly situated" to Mr. Greene and Mr. Irey.   *See* Proposed Order at 2; First Am. Compl., Prayer for Relief §§ a-d, ECF No. 7 ("First Am. Compl.").   SAF does not define "similarly situated," but SAF appears to envision that such similarly situated members, at a minimum, are "responsible," "law-abiding" (apart from unlawful use of medical marijuana), and "peaceable," wish to "possess firearms and ammunition" and "utilize medical marijuana," Gottlieb Decl. ¶ 5, and satisfy twelve separate conditions that indicate that they are not subject to other federal prohibitions on firearms possession or receipt, First. Am. Compl. ¶ 94.   SAF does not identify its members generally (other than Mr. Greene and Mr. Irey), nor does it explicate which specific members are "similarly situated" to Mr. Greene and Mr. Irey.   Clearly, determining which of SAF's hundreds of thousands of members is "similarly situated" to Mr. Greene and Mr. Irey would require fact-intensive individualized inquiries as to their eligibility to possess firearms

---

[5] Defendants do not dispute that SAF meets the second requirement.   As to the first requirement, Defendants are not contesting the standing of SAF members Mr. Greene and Mr. Irey at this time, but Defendants reserve the right to contest their standing later in this litigation.

(apart from the challenged provisions), their eligibility to use medical marijuana under state law, their "law-abiding" and "peaceable" status, and their desire to both use medical marijuana and possess firearms.  SAF's request for such relief is improper and unmanageable for similar reasons that courts reject unascertainable putative class actions.  In a class action, "the class must be currently and readily ascertainable based on objective criteria," because otherwise, it would be "impossible to identify" class members "without extensive and individualized fact-finding or 'mini-trials.'"  *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 592-93 (3d Cir. 2012).  The same is true of identifying SAF members protected by the proposed injunction.

SAF also fails to establish direct organizational standing.  "An entity has direct organizational standing when the organization itself suffers injuries as a result of the defendant's allegedly unlawful conduct.  This may occur, for example, when an organization must divert its resources to counteract the allegedly unlawful conduct."  *ERISA Indus. Comm. v. Asaro-Angelo*, No. CV2010094-ZNQ-TJB, 2023 WL 2808105, at *3 (D.N.J. Apr. 6, 2023) (citation omitted).  However, "[t]he Third Circuit has emphasized the importance of adequate evidence to support organizational injury."  *Id.*  Here, the only evidence offered of organizational injury is a bare assertion in a declaration of SAF's Executive Vice President that "SAF has expended and diverted resources because of the Defendants' enforcement and resultant policies, practices, and customs challenged," Gottlieb Decl. ¶ 12, with no further elaboration or substantiation.  Such a "bare allegation[] of injury" "fails for lack of proof."  *Fair Hous. Council of Suburban Philadelphia v. Montgomery Newspapers*, 141 F.3d 71, 78 (3d Cir. 1998).

## II.    Plaintiffs Are Unlikely To Succeed On The Merits

The challenged provisions, which restrict possession and receipt of firearms by unlawful drug users and those addicted to controlled substances, are constitutional, both facially and applied to medical marijuana users.  In the nearly two years since *Bruen*, dozens of federal courts have

rejected Second Amendment challenges to § 922(g)(3) or § 922(d)(3),[6] while the Fifth Circuit[7]

and a few district court decisions[8] have taken a minority view that § 922(g)(3) or § 922(d)(3) are

---

[6] *See*, *e.g.*, *United States v. Davis*, No. 23-cr-3088, 2024 WL 519970 (D. Neb. Feb. 9, 2024); *United States v. Davey*, No. 23-cr-20006, 2024 WL 340763 (D. Kan. Jan. 30, 2024); *United States v. Clements*, No. 23-cr-1389, 2024 WL 129071 (D.N.M. Jan. 11, 2024); *United States v. Blue Bird*, No. 22-cr-30112, 2024 WL 35247 (D.S.D. Jan. 3, 2024); *United States v. Cobbs*, No. 22-cr-4069, 2023 WL 8599708, (N.D. Iowa Dec. 12, 2023); *United States v. Strange*, No. 23-cr-97, 2023 WL 8458225 (E.D. Ky. Dec. 6, 2023); *United States v. Gardner*, No. 22-cr-48, 2023 WL 8099106 (W.D. Mo. Nov. 21, 2023); *United States v. Slone*, No. 22-cr-144, 2023 WL 8037044 (E.D. Ky, Nov. 20, 2023); *United States v. Robinson*, No. 23-cr-40013, 2023 WL 7413088 (D.S.D. Nov. 9, 2023); *United States v. Perry*, No. 22-cr-1300, 2023 WL 7185622 (S.D. Tex. Nov. 1, 2023); *United States v. Crutchfield*, No. 22-cr-269, 2023 WL 6976706 (D. Minn. Oct. 23, 2023); *United States v. Grubb*, No. 23-cr-1014, 2023 WL 6960371 (N.D. Iowa Oct. 20, 2023); *United States v. Pruden*, No. 23-cr-42, 2023 WL 6628606 (N.D. Iowa Oct. 11, 2023); *United States v. Hamlin*, No. 23-cr-08, 2023 WL 6481146 (D. Mont. Oct. 5, 2023); *United States v. Endsley*, No. 21-cr-58, 2023 WL 6476389 (D. Alaska Oct. 5, 2023); *United States v. Cooper*, No. 23-cr-2040, 2023 WL 6441943 (N.D. Iowa Sept. 29, 2023); *United States v. Okello*, No. 22-cr-40096, 2023 WL 5515828 (D.S.D. Aug. 25, 2023); *United States v. Bulltail*, No. 22-cr-86, 2023 WL 5458780 (D. Mont. Aug. 24, 2023); *United States v. Danielson*, No. 22-cr-299, 2023 WL 5288049 (D. Minn. Aug. 17, 2023); *United States v. Ledvina*, No. 23-cr-36, 2023 WL 5279470 (N.D. Iowa Aug. 16, 2023); *United States v. Espinoza-Melgar*, No. 21-cr-204, 2023 WL 5279654 (D. Utah Aug. 16, 2023); *McCloskey v. United States*, No. 4:22-cv-246, 2023 WL 5095701 (S.D. Ga. Aug. 9, 2023); *United States v. Campbell*, No. 1:22-cr-159, 2023 WL 5009202 (S.D. Miss. Aug. 4, 2023); *United States v. Wuchter*, No. 23-cr-2024, 2023 WL 4999862 (N.D. Iowa Aug. 4, 2023); *United States v. Springer*, No. 23-cr-1013, 2023 WL 4981583 (N.D. Iowa Aug. 3, 2023); *United States v. Giglio*, No. 1:23-cr-39, 2023 WL 4918332 (S.D. Miss. Aug. 1, 2023); *United States v. Striplin*, No. 4:21-cr-289, 2023 WL 4850753 (W.D. Mo. July 28, 2023); *United States v. Lewis*, No. 22-cr-222, 2023 WL 4604563 (S.D. Ala. July 18, 2023); *United States v. Gil*, No. 22-cr-773, 2023 WL 4356067 (W.D. Tex. July 5, 2023); *United States v. Overholser*, No. 3:22-cr-35, 2023 WL 4145343 (N.D. Ind. June 23, 2023); *United States v. Evenson*, No. 23-cr-24, 2023 WL 3947828 (D. Mont. June 12, 2023); *United States v. Walker*, No. 8:22-cr-291, 2023 WL 3932224 (D. Neb. June 9, 2023); *United States v. Stennerson*, No. 1:22-cr-139, 2023 WL 2214351 (D. Mont. Feb. 24, 2023); *United States v. Posey*, 655 F. Supp. 3d 762 (N.D. Ind. 2023); *United States v. Lewis*, 650 F. Supp. 3d 1235 (W.D. Okla. 2023); *United States v. Black*, 649 F. Supp. 3d 246 (W.D. La. 2023); *United States v. Sanchez*, 646 F. Supp. 3d 825 (W.D. Tex. 2022); *Fried v. Garland*, 640 F. Supp. 3d 1252 (N.D. Fla. 2022); *United States v. Seiwert*, No. 1:22-cr-443, 2022 WL 4534605 (N.D. Ill. Sept. 28, 2022).
[7] *See United States v. Daniels*, 77 F.4th 337 (5th Cir. 2023).  The United States petitioned for certiorari in *Daniels* and asked the Supreme Court to hold the petition pending the Supreme Court's resolution of *United States v. Rahimi*, No. 22-915, 143 S. Ct. 2688 (2023).  *See* Petition for Writ of Certiorari 5, *United States v. Daniels*, No. 23-376 (U.S. Oct. 5, 2023).  That petition remains pending.
[8] *See United States* v. *Alston*, No. 23-cr-21, 2023 WL 7003235 (E.D.N.C. Oct. 24, 2023); *United States v. Sam*, No. 22-cr-87, Order, ECF No. 38 (S.D. Miss. Oct. 3, 2023); *United States v.*

unconstitutional.   For the reasons described below, the overwhelming weight of authority is correct.   Disarming unlawful drug users is consistent with the historical tradition of restricting firearms possession and use on the basis of intoxication and the historical tradition of disarming groups of people who would present a danger with firearms.

### A.       The Challenged Provisions Are Facially Constitutional

Although much of plaintiffs' legal argument focuses on marijuana and medical marijuana, they make clear that they also raise a facial challenge to the challenged provisions.   The Amended Complaint's sole count is titled, "18 U.S.C. §§ 922(g)(3), (d)(3) are unconstitutional facially and as-applied pursuant to the Second Amendment."   Am. Compl., Count I (emphasis and capitalization omitted).   Their preliminary injunction brief argues that "18 U.S.C. § 922(g)(3) lacks any historical analogue, particularly as it relates to medicinal marijuana," Mem. 11 (emphasis and capitalization omitted), showing that they contend that the statute is unconstitutional as applied to any controlled substance, not just medical marijuana.   "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."   *United States v. Salerno*, 481 U.S. 739, 745 (1987).   A contention that a statute "might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since [the Supreme Court] ha[s] not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment."   *Id.*   Plaintiffs are unlikely to succeed in showing that the challenged provisions, which prohibit unlawful drug users and those addicted to controlled substances from possessing or receiving firearms, are facially unconstitutional.

---

*Connelly*, 668 F. Supp. 3d 662 (W.D. Tex. 2023); *United States v. Harrison*, 654 F. Supp. 3d 1191 (W.D. Okla. 2023).

### 1.    Courts Interpret the Second Amendment Based on Text and Historical Tradition

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that the Second Amendment protects the "right of law-abiding, responsible citizens" to possess handguns in the home for self-defense.  *Id.* at 635.  Consistent with that interpretation, the Court cautioned that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill," and it described those restrictions as "examples" of "presumptively lawful regulatory measures" that were not "exhaustive."  *Id.* at 626, 627 n.26.  The Court incorporated that understanding into its holding, ruling that the plaintiff was entitled to possess a handgun only if he was "not disqualified from the exercise of Second Amendment rights."  *Id.* at 635.

In *Bruen*, the Court repeatedly used the term "law-abiding citizen" to describe the class of persons protected by the Second Amendment.  *See* 597 U.S. at 9 ("ordinary, law-abiding citizens"); *id.* at 15 ("law-abiding, adult citizens"); *id.* at 26 ("law-abiding, responsible citizens" (quotation marks omitted)); *id.* at 29 ("a law-abiding citizen's right to armed self-defense"); *id.* at 30 ("law-abiding citizens"); *id.* at 31 ("ordinary, law-abiding, adult citizens"); *id.* at 33 n.8 ("law-abiding citizens"); *id.* at 38 ("law-abiding citizens"); *id.* at 38 n.9 ("law-abiding, responsible citizens" (quotation marks omitted)); *id.* at 60 ("law-abiding citizens"); *id.* at 70 ("law-abiding, responsible citizens"); *id.* at 71 ("law-abiding citizens").

Many aspects of Second Amendment doctrine rest on the premise that the Amendment protects only law-abiding citizens.  In judging whether modern firearms regulations are consistent with their historical precursors, courts must ask "how and why the regulations burden a law-abiding citizen's right to armed self-defense."  *Id.* at 29.  In determining whether the Second Amendment protects particular types of weapons, courts must consider whether those weapons are

"typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625. And the government may require gun owners to pass background checks because such checks ensure that those who carry guns "are, in fact, 'law-abiding, responsible citizens.'" *Bruen*, 597 U.S. at 38 n.9.

*Bruen* further held that the constitutional analysis of firearm regulations must be "rooted in the Second Amendment's text, as informed by history." *Id.* at 19. The Court held that "when the Second Amendment's plain text covers an individual's conduct, . . . the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation" to show that it comports with the Second Amendment. *Id.* at 17. The Court noted that analysis of the nation's historical tradition "will often involve reasoning by analogy," under which a court evaluates whether a modern firearms regulation is "relevantly similar" to historical practice. *Id.* at 28-29. The Court pointed to "two metrics" relevant to analogical reasoning: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 29. The Court stressed that it was not imposing a "regulatory straightjacket" or requiring identification of a "historical *twin*" or "a dead ringer for historical precursors." *Id.* at 30.

Plaintiffs suggest that only historical materials from 1791, or perhaps the years immediately surrounding 1791, are relevant, arguing that "1791" is "the proper historical period to ascertain." Mem. 11-13. That is inconsistent with the Supreme Court's reasoning in *Heller* and *Bruen*. In both *Heller* and *Bruen*, the Court considered as relevant a broad set of historical materials, including English history from the medieval era through the American founding, *Heller*, 554 U.S. at 592-94; *Bruen*, 597 U.S. at 40-45, American colonial history, *Heller*, 554 U.S. at 594, 601, 624-26; *Bruen*, 597 U.S. at 46-49; American founding era history, *Heller*, 554 U.S. at 581-86, 602-05; *Bruen*, 597 U.S. at 49-50, and American history through the end of the 19th century,

*Heller*, 554 U.S. at 606-19; *Bruen*, 597 U.S. at 51-70.  All of those materials are part of "this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17.

It is true that the Third Circuit concluded in *Lara v. Commissioner Pennsylvania State Police* that "the Second Amendment should be understood according to its public meaning in 1791," 91 F.4th 122, 134 (3d Cir. 2024), but nothing in *Lara* requires this Court to ignore all historical materials other than those immediately surrounding 1791.  In *Lara*, the Third Circuit dealt with a unique situation where the Pennsylvania government "ha[d] not pointed to an eighteenth century regulation" that the Third Circuit viewed as relevant to a statute's constitutionality but had cited "dozens of 19th century laws" allegedly similar to the statute at issue.  *Id.* at 133.  Based on its view that there was no historical evidence from the founding era or earlier supporting the constitutionality of the statute at issue, the Third Circuit concluded that it could not sustain the statute based solely on historical evidence from the mid-to-late-19th century.  Here, however, as shown below, the relevant historical traditions extend from pre-colonial English history, through American colonial history, through the founding era, and through the 19th century to the present day.  This Court should not overread *Lara* as holding that only founding-era history is relevant to Second Amendment analysis.  It would be surprising if the Third Circuit held as such, as that would necessarily imply that dozens of pages of the Supreme Court's historical analysis in *Heller* and *Bruen* was irrelevant surplusage.  This Court should follow the practice of courts in this circuit since *Lara*, which have continued to consider a wide range of historical materials from beyond the founding era when engaging in Second Amendment analysis.[9]

---

[9] *See*, *e.g.*, *United States v. Smith*, No. 2:23-cr-129-22, 2024 WL 896772, at *4-6 (W.D. Pa. Mar. 1, 2024) (relying on English history from the seventh century to the seventeenth century, colonial history, and founding era history); *United States v. Laureano*, No. 23-cr-12 (EP), 2024 WL 838887, at *7 (D.N.J. Feb. 28, 2024) (citing both "Founding era disarmament laws" and "regulations contemporaneous with the Fourteenth Amendment's ratification"); *United States v.*

## 2.    *The Challenged Provisions Address An Unprecedented Societal Concern*

*Bruen* instructs that "cases implicating unprecedented societal concerns or dramatic technological changes" require an especially "nuanced approach," and the government need only "identify a well-established and representative historical *analogue*, not a historical *twin.*" 597 U.S. at 27, 30. The challenged provisions address such an unprecedented societal concern: the unlawful use of controlled substances. Through much of the 19th century there was no need for firearm prohibitions addressing drugs other than alcohol because such substances were not widely used as intoxicants in the United States until the late 19th and early 20th centuries. *See* David F. Musto, *Drugs in America: A Documentary History* 188-192 (2002); Erik Grant Luna, *Our Vietnam: The Prohibition Apocalypse*, 46 DePaul L. Rev. 483, 487 (1997) ("[N]arcotics addiction was a negligible phenomenon in the eighteenth and nineteenth centuries."). Only in 1877 did Nevada became the first state to require a prescription for the purchase of any drug (in that case, opium). Elizabeth Kelly Gray, *Habit Forming: Drug Addiction in America, 1776-1914* 25 (2023). Because of this history, "[i]llegal drug trafficking," in particular, "is a largely modern crime." *United States v. Alaniz*, 69 F.4th 1124, 1129 (9th Cir. 2023) (upholding under *Bruen* sentencing enhancement for possessing dangerous weapon during drug offense).

Marijuana is no exception. It is true, as plaintiffs point out, that hemp was grown for agricultural purposes in the founding era. Mem. 13. Although plaintiffs suggest otherwise, *id.* 13-14, there are essentially "no accounts or reports" of "cannabis being used as an intoxicant during the period when the plant was widely cultivated as an agricultural commodity." John Rublowsky, *The Stoned Age: A History of Drugs in America* 98 (1974). Even by the 1930s, Americans lacked

---

*Williams*, No. 3:21-cr-34, 2024 WL 665851, at *12-13 (M.D. Pa. Feb. 16, 2024) (relying on "17th, 18th, and 19th century law"); *United States v. Ortiz*, No. 23-cr-506-KSM, 2024 WL 493423, at *7 & n.3 (E.D. Pa. Feb. 8, 2024) (concluding that "Reconstruction era" history is relevant to confirming the Second Amendment's meaning).

"any lengthy or broad experience" with marijuana, Musto, *supra*, at 192, and prohibitions did not emerge until the early 20th century.[10]

Founding-era laws addressing firearm use by those intoxicated by alcohol do not demonstrate that concerns about users of *unlawful drugs* have persisted since the founding. Alcohol, with certain exceptions (such as the prohibition era in the 20th century), has been legal throughout American history; indeed, the Controlled Substances Act excludes from the definition of controlled substances "distilled spirts, wine, [and] malt beverages."  21 U.S.C.  § 802(6). Although alcohol-related statutes are relevant historical analogues supporting the constitutionality of the challenged provisions, differences in the laws' scope are readily explained by distinct concerns posed by the use of *unlawful* substances.

> ### 3.      The Challenged Provisions Are Analogous To Laws Disarming The Intoxicated

Historical laws regulating firearm possession and use by those under the influence of alcohol provide a sufficiently close analogy to justify the challenged provisions.  The founding generation recognized that those who regularly became intoxicated threatened the social and political order.  *See*, *e.g.*, Benjamin Rush, *An Inquiry into the Effects of Ardent Spirits Upon the Human Body and Mind* 6 (1812) (describing drunkenness as a "temporary fit of madness").  A 1658 Massachusetts law, for example, allowed constables to apprehend those "overtaken with drink" and keep them "in close custody" until brought before a magistrate.  *The Charters & General Laws of the Colony and Province of Massachusetts Bay* 82 (1814).  Colonial and founding-era legislatures also adopted specific measures to separate firearms and alcohol,

---

[10] *See* U.S. Treasury Dep't, *State Laws Relating to the Control of Narcotic Drugs and the Treatment of Drug Addiction* 1-9 (1931) (describing development of state-level laws); Richard J. Bonnie & Charles H. Whitebread, II, *The Forbidden Fruit and the Tree of Knowledge: An Inquiry into the Legal History of American Marijuana Prohibition*, 56 Va. L. Rev. 971, 985 (1970); *id.* at 1010 (noting Utah passed first state prohibition on cannabis sale or possession in 1915).

including laws regulating firearm use by individuals deemed likely to become intoxicated.  A 1655 Virginia law prohibited "shoot[ing] any gunns at drinkeing [events]," regardless of whether attendees actually became intoxicated.  1 William Waller Hening, *Statutes at Large; Being a Collection of All the Laws of Virginia* 401-02 (1823).  A 1771 New York law similarly barred firing guns during the New Year's holiday, a restriction that "was aimed at preventing the 'great Damages . . . frequently done on [those days] by persons . . . being often intoxicated with Liquor.'" *Heller*, 554 U.S. 570, 632 (2008) (quoting 5 *Colonial Laws of New York* 244-46 (1894)).  And a 1731 Rhode Island law forbade firing guns or pistols in any tavern at night. *See Acts & Laws of the English Colony of Rhode-Island & Providence-Plantations* 120 (Hall, 1767).

Perhaps more instructive are 18th-century militia laws, which reflect legislatures' significant authority to separate firearms and alcohol.  New Jersey, Pennsylvania, and South Carolina disarmed or authorized the confinement of intoxicated militia members.  *See* 2 Arthur Vollmer, U.S. Selective Serv. Sys., *Military Obligation: The American Tradition*, pt. 8, New Jersey, at 25-26 (1947) (1746 law disarming those who appeared "in [a]rms di[s]gui[s]ed in [l]iquor"); *id.* pt. 11, Pennsylvania, at 97 (1780 law disarming those "found drunk"); *id.* pt. 13, South Carolina, at 96 (1782 law allowing officers to be cashiered or "confined till sober").[11] Similar laws persisted into the 19th century, *see, e.g.*, James Dunlop, *The General Laws of Pennsylvania* 405-06 (2d ed. 1849) (1822 law) — by which time at least three states outright excluded "common drunkards" from the militia, *see* 1844 R.I. Pub. Laws 503; 1837 Me. Laws 424; 1837 Mass. Acts 273.

---

[11] Many other laws forbade selling "any Strong Liquor" near the locations where militias mustered and trained. *See, e.g.*, 2 Vollmer, *supra*, pt. 5, Maryland, at 93 (1756 law); *id.* pt. 3, Delaware, at 13 (1756 law); *id.* pt. 8, New Jersey, at 31 (1746 law) *id.* pt. 11, Pennsylvania, at 100 (1780 law); *id.* pt. 13, South Carolina, at 30 (1721 law).

Despite the pervasiveness of alcohol at the founding, early laws understandably focused on the militia because social norms "had an important restraining effect on intemperance" and there thus was "little public outcry against alcoholism."  Mark Edward Lender & James Kirby Martin, *Drinking in America: A History* 14-16 (1987).  The community "held drinking excesses largely in bounds."  *Id.* at 15.  And the cumbersome nature of 18th-century firearms also mitigated the general risk created by intoxicated individuals.  *See* Randolph Roth, "Why Guns Are and Are Not the Problem," *in* Jennifer Tucker, et al., *A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment* 116-17 (2019).  As those circumstances changed during the 19th century, *see*, *e.g.*, Lender, *supra*, at 45-46, however, states and territories began imposing criminal penalties on intoxicated members of the public who carried, used, or received firearms or pistols.  *See* 1867 Kan. Sess. Laws 25 (prohibiting those "under the influence of intoxicating drink" from carrying a pistol or other deadly weapon); 1878 Miss. Laws 175-76 (prohibiting selling weapons to a "person intoxicated"); Mo. Rev. Stat. § 1274 (1879) (prohibiting carrying "any kind of firearms" "when intoxicated or under the influence of intoxicating drinks"); 1883 Wis. Sess. Laws 290, § 3 (prohibiting person in "state of intoxication" from going "armed with any pistol or revolver"); 1890 Okla. Sess. Laws 495, art. 47, § 4 (officers may not "carry[] . . . arms while under the influence of intoxicating drinks"); 1899 S.C. Acts 97, No. 67, § 1 (forbidding "boisterous conduct" while "under the influence of intoxicating liquors," including "discharg[ing] any gun" near a public road); 1909 Idaho Sess. Laws 6, § 1 (prohibiting "hav[ing] or carry[ing]" any "deadly or dangerous weapon" when "intoxicated, or under the influence of intoxicating drinks").  Such statutes were considered "in perfect harmony with the constitution" and "a reasonable regulation of the use of such arms," even where state constitutions were

understood to secure an individual's right to bear arms. *State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886).

The challenged provisions' temporary prohibition on firearms possession or receipt impose "a comparable burden" that is "comparably justified" to historical intoxication statutes. *Bruen*, 597 U.S. at 29. In terms of *why* the challenged provisions restrict the Second Amendment right, like the intoxication statutes, these provisions limit firearm use at times an individual is deemed unlikely to use them responsibly. Intoxication-related statutes were enacted to prevent the "mischief" threatened by intoxicated persons "going abroad with fire-arms," *Shelby*, 2 S.W. at 469, and Congress likewise enacted Sections 922(g)(3) and 922(d)(3) to "keep firearms away from the persons [it] classified as potentially irresponsible and dangerous," *Barrett v. United States*, 423 U.S. 212, 218 (1976); *see also infra*, p. 27 (discussing legislative history). For confirmation, this Court need only consider the parity with which legislatures historically treated alcohol and drugs once illegal drugs proliferated in the 20th century. At least one jurisdiction, Michigan, simply extended its by-then common restriction on carrying firearms while intoxicated to cover those under the influence of "any exhilarating or stupefying drug." 1929 Mich. Pub. Acts 55. Other jurisdictions elected to regulate more indirectly by prohibiting the *delivery* or *sale* of firearms to certain persons, but extended such laws to drug addicts and habitual drunkards alike. *See* 1927 N.J. Laws 745; 1931 Pa. Laws 499; 1935 Ind. Acts 161; 1935 S.D. Sess. Laws 356; 1935 Wash. Sess. Laws 601; 1936 Ala. Acts 52; H.R. 8754, 72 Cong., 47 Stat. 650, 652 (1st Sess. 1932).

Critically, although plaintiffs focus much of their argument on marijuana, and particularly state-regulated medical marijuana, they raise a facial challenge to the challenged provisions, and they seek an injunction that would prevent the government from enforcing the challenged provisions based on unlawful use of any controlled substance, including cocaine, heroin, fentanyl,

or methamphetamines.  *See* Proposed Order.  As explained below, given marijuana's impairing effects, even users of state-regulated medical marijuana present a danger with firearms that Congress was entitled to regulate.  *See infra*, pp. 31-33.  But plaintiffs can hardly dispute that unlawful users of cocaine, heroin, fentanyl, and methamphetamines (and people addicted to those drugs) with firearms present at least as much danger to the public as did the drunkards of the founding era and Reconstruction era.

In terms of *how* the challenged provisions burden the right to self-defense, like historical intoxication laws, they impose a *temporary* restriction on possession or receipt that lasts only during the period an individual is deemed unlikely to use firearms responsibly.  This "relatively lenient" burden "only endures for as long as the individual is an unlawful user or addict, leaving them free to regain their full Second Amendment rights at any time."  *Posey*, 655 F. Supp. 3d at 775-76.[12]

Many courts have correctly upheld § 922(g)(3) based on the historical analogy to intoxication statutes.  As one court explained:

> the prohibition in § 922(g)(3) can be analogized to the historical intoxication statutes. Under those historical regulations the intoxicated could not carry or use firearms, while under the modern regulation an active drug user cannot possess firearms.  So, for the duration of the period individuals are using intoxicating substances, their Second Amendment rights are impaired.  Both groups are then able to regain their Second Amendment rights by simply ending their substance use.  These historical regulations may not be "dead ringer[s]" for § 922(g)(3), but they are not required to be and are nonetheless sufficiently analogous.  As such, the scope of § 922(g)(3) is in line with these historical examples.

*Posey*, 655 F. Supp. 3d, at 773-74 (citations omitted).[13]

---

[12] *See also United States v. Yancey*, 621 F.3d 681, 686 (7th Cir. 2010) (§ 922(g)(3) is "far less onerous" than provisions imposing lifetime firearms bans because "an unlawful drug user like Yancey could regain his right to possess a firearm simply by ending his drug abuse"); *accord Endsley*, 2023 WL 6476389, at *4; *Fried*, 640 F. Supp. 3d at 1262.

[13] *See also, e.g., Slone*, 2023 WL 8037044, at *4 ("The Government has shown that § 922(g)(3) is 'relevantly similar' to historical regulations aimed at preventing potentially dangerous persons

Plaintiffs acknowledge much of this history, but they argue that the historical examples are not quite similar enough to the challenged provisions to justify their constitutionality. Plaintiffs argue that some of these historical laws may have served other purposes, such as "preserving gunpowder" and "ensur[ing] a competent military." Mem. 18-19. But they cite no evidence that these laws were intended *only* to serve such purposes. By restricting access to or use of firearms on the basis of intoxication, these laws also self-evidently protected the public from crime or violence committed by an intoxicated person using firearms.

Plaintiffs also make much of the fact that many of the historical statutes restricted firearms rights while a person was intoxicated, but the challenged provisions extend beyond the period of intoxication. Mem. 19-21. Still, as explained above, the challenged provisions also impose only a *temporary* restriction, and like a person subject to one of the historical intoxication statutes, people subject to Sections 922(g)(3) and 922(d)(3) are "able to regain their Second Amendment rights by simply ending their substance use." *Posey*, 655 F. Supp. 3d at 774. The difference between the duration of the restrictions is readily explained by the fact that controlled substances, unlike alcohol, are *unlawful*. Many individuals who regularly commit federal crimes by unlawfully obtaining and possessing controlled substances have connection with criminality for which gun possession presents public safety risks. Because alcohol, by contrast, has generally

---

from possessing and using firearms, including the mentally ill and the intoxicated."); *Robinson*, 2023 WL 7413088, at *4 ("[P]rovisions from the colonial era and early statehood are consistent with modern society's concern with the possession of weapons by those who might be impaired by alcohol or controlled substances. Statutes in effect during the 17-19th Centuries analogous to § 922(g)(3) were enacted to control the possession and use of firearms by intoxicated individuals."); *Okello*, 2023 WL 5515828, at *3 ("the court finds that historic laws prohibiting possession of firearms by the intoxicated are sufficient to justify § 922(g)(3)"); *Fried*, 640 F. Supp. 3d at 1262 ("The manner in which the modern restriction burdens Second Amendment rights is comparable to how the intoxication statutes burdened those rights. . . . The burdens that the challenged regulation and the historical restrictions placed on individuals' Second Amendment rights are also comparably justified.").

been lawful, laws understandably allowed alcohol drinkers to *possess* firearms, limiting their use only during periods of intoxication.  *Bruen* instructs that a relevant metric for assessing historical analogues is "how . . . the regulations burden *a law-abiding citizen's right* to armed self-defense," 597 U.S. at 29 (emphasis added).  Unlike the historical intoxication statutes, which burdened citizens' rights to armed self-defense when they engaged in *lawful* behavior of possessing and using alcohol, the challenged provisions burden the right to armed self-defense only for so long as a person is "actively engaged" in committing a federal crime.  *See* 27 C.F.R. § 478.11 (definition of "Unlawful user of or addicted to any controlled substance").

Plaintiffs misapply *Bruen* by arguing that the absence of a historical "dead ringer," 597 U.S. at 30, is fatal to the constitutionality of the challenged provisions.  Plaintiffs echo some of the arguments in the few decisions that have, against the overwhelming weight of authority, rejected the constitutionality of § 922(g)(3).  *See Daniels*, 77 F.4th at 345-48; *Harrison*, 654 F. Supp. 3d at 1200-03; *Connelly*, 668 F. Supp. 3d at 672-75.  Yet these cases have been widely criticized for "demand[ing] excessive precision of an historical analogue," *Lewis*, 2023 WL 4604563, at *15, and seeking "not a 'well-established and representative historical *analogue*' to § 922(g)(3), but rather a 'historical *twin*'—thereby imposing a 'regulatory straightjacket [sic]' on Congress that vastly exceeds what the Supreme Court requires," *Espinoza-Melgar*, 2023 WL 5279654, at *10 (quoting *Bruen*, 597 U.S. at 30).[14]  Plaintiffs' arguments fail for the same reason.

---

[14] *See also Blue Bird*, 2024 WL 35247, at *2 (criticizing *Harrison* and *Connelly* for taking a "constrained view of historical evidence"); *Cobbs*, 2023 WL 8599708, at *4 ("I respectfully disagree with the narrow view that the *Harrison* court, and certain other district courts, have taken of the historic precedent of firearm regulation for unlawful citizenry."); *Grubb*, 2023 WL 6960371, at *5; *Danielson*, 2023 WL 5288049, at *5.

4. ***Laws Disarming Those Deemed Dangerous Justify Any Reach Beyond The Historical Scope Of Intoxication Statutes***

The full scope of the challenged provisions is further justified by other historical analogues, including those disarming persons who would pose a threat to the safety of others if armed.  English law established the government's authority to disarm individuals posing a threat to the safety of others.  English common law and statutory law prohibited individuals from "go[ing] armed to terrify the King's subjects." *Sir John Knight's Case*, 3 Mod. 117, 87 Eng. Rep. 75, 76 (K.B. 1686); Statute of Northampton, 2 Edw. 3, c.3 (1328).  The Militia Act of 1662 later authorized crown officers to seize the arms of those "judge[d] dangerous to the Peace of the Kingdom.'"  13 & 14 Car. 2, c.3, § 13 (1662).  The 1689 English Bill of Rights declared subjects' right to possess arms, but limited the right to *Protestant* subjects, 1 W. & M. c.2, § 6, and did not purport to repeal the Militia Act, which was employed into the 18th century, *see*, *e.g.*, *Calendar of State Papers, Domestic: William III, 1700-1702*, at 233-34 (Edward Bateson ed., 1937).  Before, contemporaneous with, and after the Bill of Rights' enactment, Parliament also enacted statutes disarming Catholics in England and Ireland. 3 Jac. I, c.5, §§ 16-18 (1605-06); 1 W. & M. c.15, §§ 3-4 (1688); 7 Will. III, c.5 (1695) (Ireland).  And in the first half of the 18th century, statutes disarmed Scottish persons believed to be loyal to James II. *See*, *e.g.*, 1 George I, c.54 (1715); 11 George I, c.26 (1724); 19 George II, c.39 (1746).

The tradition continued in early American legislatures.  Some laws disarmed those who carried arms in a manner that spread fear or terror.  *See* 1692-1694 Mass. Acts 11-12; 1696-1701 N.H. Laws 15.  Others disarmed entire groups deemed dangerous or untrustworthy, including those

who refused to swear allegiance to the colony[15] or the Revolution's cause[16]; enslaved persons[17]; and Native Americans.[18]  And although historical laws disarming people based on religion or race are repugnant and would be unconstitutional today, some courts have relied on the past existence of such laws to "demonstrate that at the time of the founding, the American colonists were accustomed to laws depriving people posing a threat to society (as they viewed it) from possessing arms."  *Smith*, 2024 WL 896772, at *5; *see also United States v. Jackson*, 69 F.4th 495, 503 (8th Cir. 2023) ("While some of these categorical prohibitions of course would be impermissible today under other constitutional provisions, they are relevant here in determining the historical understanding of the right to keep and bear arms."), *reh'g and reh'g en banc denied*, 85 F. 4th 468 (8th Cir 2023), *docketing pet. for cert.*, No. 23-6170 (S. Ct. Dec. 6, 2023).[19]

Second Amendment precursors proposed in state ratifying conventions likewise confirmed that legislatures may disarm certain categories of individuals, including for "crimes committed, or real danger of public injury." 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 665 (1971) (discussing Pennsylvania proposal).  Accordingly, as one early scholar wrote, the

---

[15] 1 *Records of Governor & Company of the Massachusetts Bay in New England* 211-12 (Nathaniel B. Shurtleff ed., 1853) (1637 order disarming Anne Hutchinson's followers).

[16] *See, e.g.*, 4 *Journals of the Continental Congress* 201-06 (1906) (1776 resolution); 1775-1776 Mass. Acts 479; 1777 Pa. Laws 63; 1777 N.C. Sess. Laws 231; 1776-1777 N.J. Laws 90; 9 William Waller Hening, *Statutes at Large; Being a Collection of All the Laws of Virginia* 281-83 (1821) (1777 law); 15 *The Public Records of the Colony of Connecticut from May, 1775, to June, 1776, Inclusive* 193 (Charles J. Hoadly ed., 1890) (1775 law).

[17] *See, e.g.*, 1700-1797 Del. Laws 104; 1692-1720 Md. Laws 117-18; 1715-1760 N.Y. Laws 162; 1715-1755 N.C. Sess. Laws 64; 1731-1743 S.C. Acts 168.

[18] *See, e.g.*, 1723-1730 Conn. Acts. 292; *Charter & General Laws of Massachusetts Bay* 133 (1814) (1633 law); 6 *Statutes at Large of Pennsylvania from 1682 to 1801* 319-20 (WM Stanley Ray ed., 1898) (1763 law); 1 Hening, *supra*, at 219 (1633 Virginia law).

[19] Other courts have concluded that laws that discriminated on the basis of religion or race cannot be considered as historical analogues.  *See, e.g.*, *United States v. Eason*, No. 1:22-cr-65, 2024 WL 639350, at *3-4 (N.D. Ind. Feb. 15, 2024).  Given the breadth of historical materials cited in this brief that demonstrate the constitutionality of Sections 922(g)(3) and 922(d)(3), the Court should reject plaintiffs' claims whether or not this Court considers these historical laws.

government may restrict a person's right to carry firearms when there is "just reason to fear that he purposes to make an unlawful use of them."  William Rawle, *A View of the Constitution of the United States of America* 126 (2d ed. 1829).  And that understanding persisted after the Civil War. In 1866, for example, a federal Reconstruction order applicable to South Carolina provided that, although the "rights of all loyal and well-disposed inhabitants to bear arms will not be infringed," "no disorderly person, vagrant, or disturber of the peace, shall be allowed to bear arms."  Cong. Globe, 39th Cong., 1st Sess. 908-09 (1866).

Moreover, a historical tradition exists of restricting possession of firearms by "the mentally ill."  *Heller*, 554 U.S. at 626; *see also* Robert Dowlut, *The Right to Arms: Does the Constitution or Predilection of Judges Reign?*, 36 Okla. L. Rev. 65, 96 (1983) (concluding that "[c]olonial and English societies of the eighteenth century" excluded the mentally ill from the right to possess firearms).  Historical laws allowed the state to seize the property of someone who is mentally ill until "he comes of his right mind" or his death.  1788 N.Y. Laws Ch. 12.[20]  Although plaintiffs may "recoil at being compared to the mentally ill," given the impairing effects of controlled substances, both the mentally ill and unlawful drug users "can be dangerous when armed."  *Fried*, 640 F. Supp. 3d at 1263; *see also Yancey*, 621 F.3d at 685 ("habitual drug abusers, like the mentally ill, are more likely to have difficulty exercising self-control, making it dangerous for them to possess deadly firearms").

---

[20] *See also, e.g.*, *Smith v. Turner*, 48 U.S. 283, 463 (1849) (noting states have an "acknowledged right" to "exclude" the mentally ill); Carlton F.W. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L. J. 1371, 1377 (2009) ("in eighteenth-century America, justices of the peace were authorized to lock up" the mentally ill); Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 28-29 (1868) (in addressing who is part of "the people" in whom "sovereignty is vested," explaining that "[c]ertain classes have been almost universally excluded," excluding the mentally ill and felons).

Plaintiffs entirely disregard this history.  But *Bruen* instructed courts to discern and apply "constitutional principles" from historical materials.  *Bruen*, 597 U.S. at 31 (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1275 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)).  This history supports the constitutional principle "that the state can take the right to bear arms away from a category of people that it deems dangerous," *Kanter v. Barr*, 919 F.3d 437, 464 (7th Cir. 2019) (Barrett, J., dissenting) — although the government's authority to disarm certain groups is not *limited* to such persons, *see*, *e.g.*, *Range v. Attorney General*, 69 F.4th 96, 105 (3d Cir. 2023), (describing disarming "distrusted" groups); *id.* at 110 (Ambro, J., concurring) (describing disarming those who "pose a threat to the orderly functioning of society").

The challenged provisions are consistent with the constitutional principle that the legislature may disarm categories of people that it deems dangerous with firearms.  "[T]he legislative history of § 922(g)(3) shows" that "Congress believed that unlawful drug users could be dangerous."  *Espinoza-Melgar*, 2023 WL 5279654, at *7.  As the Third Circuit explained regarding § 922(g)(3)'s legislative history, the statute's purpose of reducing violent crime by curtailing access to firearms by those

> whose access to, and possession of, firearms Congress deemed contrary to public interest . . . is illustrated by Congressman Celler's floor statement, entered into the Congressional Record during the Act's debate, wherein he noted that:
>
> > [W]e are convinced that a strengthened [firearms control system] can significantly contribute to reduc[ing] the danger of crime in the United States.  No one can dispute the need to prevent drug addicts, mental incompetents, persons with a history of mental disturbances, and persons convicted of certain offenses from buying, owning, or possessing firearms.  This bill seeks to maximize the possibility of keeping firearms out of the hands of such persons.
>
> *Huddleston* [*v. United States*, 415 U.S. 814, 828 (1974)] (internal quotation marks & citation omitted).

*United States v. Cheeseman*, 600 F.3d 270, 279 (3d Cir. 2010); *see also Endsley*, 2023 WL 6476389, at *5 ("[T]he very real risk to public safety posed by the combination of unlawful drug

use and firearms was evidently a primary motivation behind Congress's enactment of § 922(g)(3). This motivation aligns with this Nation's historical tradition of banning dangerous people from possessing guns.").

Congress had ample reason to conclude that gun possession by unlawful drug users, as a class, poses a serious risk of danger to others. Unlawful drug users "may reasonably be viewed as . . . less likely than the general population (due at least to altered mental states both while under the influence and while in withdrawal) to handle a firearm responsibly." *Lewis*, 2023 WL 4604563, at *13; *see also Wilson v. Lynch*, 835 F.3d 1083, 1094 (9th Cir. 2016) ("It is beyond dispute that illegal drug users, including marijuana users, are likely as a consequence of that use to experience altered or impaired mental states that affect their judgment and that can lead to irrational or unpredictable behavior."); *United States v. Carter*, 750 F.3d 462, 469-70 (4th Cir. 2014) (finding "convincing" the government's argument "that drugs 'impair [users'] mental function . . . and thus subject others (and themselves) to irrational and unpredictable behavior'"). Plaintiffs do not appear to dispute that it is dangerous to use firearms while under the influence of unlawfully obtained controlled substances, including marijuana, stating that they "do not seek to be able to utilize firearms and ammunition while under the effects of medicinal marijuana." Mem. 4. But the injunction they are seeking would have exactly that effect, preventing the government from enforcing § 922(g)(3) against them at all, regardless of whether they use firearms while under the influence of marijuana (or heroin, cocaine, or any other drug). *See* Proposed Order. In addition, drugs such as marijuana impair a person's judgment, including the ability to make decisions about whether it is safe to use firearms. *See infra*, pp. 31-32. Plaintiffs' argument that unlawful drug users who possess firearms do not pose danger to the public thus rests on the dubious

notion that such unlawful drug users will exercise sound judgment while under the influence of judgment-impairing controlled substances.

Moreover, common sense and numerous studies establish a clear link between drug use (including marijuana use) and criminal behavior.[21]  Unlawful drug users often "commit crime in order to obtain money to buy drugs" and "violent crime may occur as part of the drug business or culture." *Harmelin* v. *Michigan*, 501 U.S. 957, 1002 (1991) (Kennedy, J., concurring in part and concurring in the judgment).  Because of the *unlawful* nature of their activities, drug users are more likely than law-abiding citizens to have dangerous confrontations (particularly if guns are involved) with drug dealers, law enforcement officers, and others—raising a concern of danger even beyond periods of actual intoxication.  It thus is no surprise that individual judges have suggested that "drug dealing" is "dangerous because [it] often lead[s] to violence," *Folajtar v. Attorney General*, 980 F.3d 897, 922 (3d Cir. 2020) (Bibas, J., dissenting), and that § 922(g)(3)

---

[21] A comprehensive U.S. government analysis of drug abuse among arrestees, published in 2005, found that more than 60% of adults arrested for serious violent or property offenses (including murder, rape, robbery, aggravated assault, and burglary) had used illicit drugs in the year prior to their arrest, compared to just 13.6% of those not arrested.  Substance Abuse and Mental Health Services Administration, *National Survey on Drug Use and Health Report: Illicit Drug Use among Persons Arrested for Serious Crimes* 1 (2005).  Similarly, in 2004, more than half of state and federal inmates reported using drugs in the month before their offense, and 32% of state and 26% of federal inmates committed their offenses while under the influence of drugs.  Office of Justice Programs, *Bureau of Justice Statistics Special Report: Drug Use and Dependence, State and Federal Prisoners, 2004* 1 (2006).  A leading study from 1992 found, after controlling for other variables (like age, race, or education), that the use of substances, including marijuana, was "significantly related to criminal behavior" and that rates of criminal behavior are higher among those who use both alcohol and marijuana (without other illicit drugs) than those who use alcohol alone.  Lana Harrison & Joseph Gfroerer, *The Intersection of Drug Use and Criminal Behavior: Results From the National Household Survey on Drug Abuse*, 38 Crime & Delinquency 422, 431-35 (1992).  And one study found that "at age 18, frequent marijuana users were 11 times more likely" to engage in violence. Evelyn H. Wei *et al.*, *Teasing Apart the Developmental Associations Between Alcohol and Marijuana Use and Violence*, 20 Journal of Contemporary Criminal Justice 166, 176 (2004).

aligns with a historically justified interest in "keeping guns out of the hands of those who are likely to misuse them," *Kanter*, 919 F.3d at 465-66 (Barrett, J., dissenting).

Finally, in terms of *how* the challenged provisions restrict exercise of Second Amendment rights, they serve only as a *temporary* prohibition, prohibiting firearm possession or receipt only during the period users of unlawful controlled substances are considered to present a risk of dangerousness. *See supra*, p. 21.

It is therefore unsurprising that many courts have upheld § 922(g)(3) because it is analogous to the historical tradition of disarming groups of people who would present a danger with firearms. As one court explained:

> [T]he Government has shown that Section 922(g)(3) is "relevantly similar" to historical regulations aimed at preventing potentially dangerous persons from possessing and using firearms. The Government has shown that the "two metrics" identified by the Court in *Bruen* as relevant to determining whether historical analogs are similar to modern-day regulations are satisfied: the historical restrictions and Section 922(g)(3) comparably burden the Second Amendment right by categorically prohibiting certain persons from possessing firearms, and comparably justify the regulation as promoting public safety by keeping guns out of the hands of presumptively dangerous persons, namely, felons, intoxicated persons, and the mentally ill.

*Clements*, 2024 WL 129071, at *5 (citation omitted).[22]

## B. The Challenged Provisions Are Constitutional As Applied

The challenged provisions are constitutional, not just facially, but also as applied to individuals who (as Mr. Greene and Mr. Irey assert) do not unlawfully use controlled substances

---

[22] *See also, e.g.*, *Davey*, 2024 WL 340763, at *5 ("Given this historical traditional of disarming dangerous people, the court concludes that § 922(g)(3) is consistent with this tradition."); *Fried*, 640 F. Supp. 3d at 1263 ("At bottom, the historical tradition of keeping guns from those the government fairly views as dangerous—like alcoholics and the mentally ill—is sufficiently analogous to modern laws keeping guns from habitual users of controlled substances."); *Grubb*, 2023 WL 6960371, at *4; *Endsley*, 2023 WL 6476389, at *5; *Bulltail*, 2023 WL 5458780, at *2; *Espinoza-Melgar*, 2023 WL 5279654, at *6; *Striplin*, 2023 WL 4850753, at *1; *Lewis*, 2023 WL 4604563, at *11-13; *Posey*, 655 F. Supp. 3d at 774.

other than medical marijuana and are otherwise non-violent and law-abiding. *See* Greene Decl. ¶¶ 1, 12; Irey Decl. ¶¶ 1, 18.[23]

As one court has already held, the same historical traditions that generally justify Sections 922(g)(3) and 922(d)(3) — the tradition of restricting firearms rights on the basis of intoxication and the tradition of disarming groups who would be dangerous with firearms — justify applying the statutes to medical marijuana users. *See Fried*, 640 F. Supp. 3d at 1258-63.

Plaintiffs do not dispute that much like alcohol, the substance that triggered the historical intoxication statutes, marijuana causes significant mental and physical impairments that make it dangerous for a person to handle firearms. As one state medical board concluded in promulgating an informed consent form that physicians must use when authorizing individuals for medical marijuana use, "[t]he use of marijuana can affect coordination, motor skills and cognition, i.e., the ability to think, judge and reason," can cause numerous "[p]otential side effects," including "dizziness, anxiety, confusion, . . . impairment of short term memory, . . . difficulty in completing complex tasks, . . . inability to concentrate, impaired motor skills, paranoia, psychotic symptoms, . . . [and] depression," and may also "impair . . . judgment." Florida Board of Medicine, Medical Marijuana Consent Form 1-2, https://flboardofmedicine.gov/forms/medical-marijuana-consent-form.pdf. Some medical offices in Pennsylvania that certify patients for medical marijuana use the same language in their informed consent forms.[24]

---

[23] In the abbreviated posture of this Motion for Preliminary Injunction, Defendants have not had the opportunity to test the veracity of Mr. Greene's and Mr. Irey's declarations. Defendants reserve the right to do so at a later stage in this litigation. However, for the reasons stated here, plaintiffs are not likely to succeed in showing that the challenged provisions are unconstitutional as applied to Mr. Greene and Mr. Irey (or other purportedly similarly situated individuals) even if the factual averments in their declarations are accurate.

[24] *See* PHA Adult Medicine, Medical Cannabis Use Consent Form, https://www.phaadultmedicine.com/_files/ugd/2e54b7_9a91354a3ec543e98af7f381ee5eee1b.pdf ; Center for Holistic Medicine, Medical Marijuana Consent,

Ample scholarship confirms marijuana's significant impairing effects.  For example, one study found that marijuana use "was associated with elevated risky decision-making" and caused "significant deficits" to "executive planning," while adversely affecting "general motor performance, sustained attention, spatial working memory, and response inhibition." Jon Grant, Short Communication; Neuropsychological Deficits Associated with Cannabis Use in Young Adults, 121(1-2) J. Drug & Alcohol Depend. 159-162, at 5 (2012).  Another study shows that marijuana users "exhibit impairments on . . . behavioral control," which "may contribute to poor decision-making."  Daniel J. Fridberg, Cognitive Mechanisms Underlying Risky Decision-Making in Chronic Cannabis Users, 54 (1) J. Math Psychol. 28-38, at 13-14 (2010).  Marijuana can cause aggressive behavior when used in high dosages.  *See* Sharon M. Boles & Karen Miotto, *Substance abuse and violence: A review of the literature*, 8 Aggression & Violent Behavior 155, 161-62, 165-66 (2003); Norman S. Miller, *et al.*, *A Review of Cases of Marijuana and Violence*, 17 Int'l J. of Envtl. Res. & Pub. Health, no. 5, at 1-2, 8-9 (2020).  Marijuana use also can cause disinhibition; impaired motor skills and reaction time; impaired judgment; panic attacks, paranoia, anxiety, and other psychiatric effects; and hallucinations.  Miller, *supra*, at 8-9; Denial of Petition To Initiate Proceedings To Reschedule Marijuana, 81 Fed. Reg. 53,688, 53,693-94, 53,749 (Aug. 12, 2016).[25]

---

https://www.bewisebewell.com/storage/app/media/medical-marijuana-consent-form-2020.pdf.

[25] *See also* Jorie Casey, Effects of Frequent Marijuana Use on Risky Decision-Making in Young Adult College Students, Addictive Behav. Rpts., at 1, 6 (2020) (marijuana use "may contribute to cognitive impairments in executive functioning," making marijuana users "more likely to make risky judgments" and "exhibit increased impulsive decision-making"); Christopher Whitlow, Short Communication; Long-Term Heavy Marijuana Users Make Costly Decisions on a Gambling Task, 76 (1-2) J. Drug Alcohol Depend. 107-11 (2004) at 5 (2004) (results "suggest[] that heavy marijuana users may be particularly prone to poor decision-making"); Brian F. O'Donnell, Decision Making and Impulsivity in Young Adult Cannabis Users, Frontiers in Psych., 12:679904, at 1 (2021) (marijuana users showed "greater impulsivity" than non-users); Mary P. Becker, Neurocognition in College-Aged Daily Marijuana Users, J. Clin. Exp. Neuropsych., 36(4):379-98, at 18 (2014) (marijuana users "demonstrated numerous cognitive deficits" that affected "decision-making").

As the *Fried* court agreed, "unlawful drug use (including marijuana use) causes significant mental and physical impairments that make it dangerous for a person to possess firearms."  640 F. Supp. 3d at 1262-63.

Given marijuana's impairing effects, it is lawful to apply Sections 922(g)(3) and 922(d)(3) to impose a temporary prohibition on medical marijuana users from possessing and receiving firearms.  The contention that a person has not previously engaged in violent or criminal behavior (other than marijuana possession in violation of federal law) does not change the fact that marijuana use causes significant impairments that both render it unsafe to use a firearm and impair a person's judgment.  People who regularly use a substance that impairs the ability to think, judge, and reason "are analogous to other groups the government has historically found too dangerous to have guns."  *Id.* at 1263.

The fact that marijuana possession remains a federal crime further supports the conclusion that Congress may constitutionally determine that it would be dangerous to allow marijuana users (even medical marijuana users) to have access to firearms.  Although "[m]any people refer to" state medical marijuana programs as "'legalizing' medical marijuana," Pennsylvania and other jurisdictions "did no such thing," because "federal law still prohibits possession of marijuana— for medical purposes or otherwise."  *Id.* at 1255.  Plaintiffs are not "like [Bryan] Range," *Range*, 69 F.4th at 106, the individual that the Third Circuit held could not be disarmed for life based on a conviction for food stamp fraud in the 1990s, when he had not engaged in criminal activity for many years. [26]  Mr. Greene regularly commits the federal crime of unlawful possession of a

---

[26] The United States petitioned for certiorari in *Range* and asked the Supreme Court to hold the petition pending the Supreme Court's resolution of *United States v. Rahimi*, No. 22-915 (U.S.). *See* Petition for Writ of Certiorari 7, *Garland v. Range*, No. 23-374 (U.S. Oct. 5, 2023).  That petition remains pending.

controlled substance and wishes to possess firearms while continuing to commit that crime, Greene Decl. ¶¶ 6-7, and Mr. Irey has declared his intention to commit that same crime while continuing to possess firearms, Irey Decl. ¶¶ 9, 13.   Therefore, the application of Sections 922(g)(3) and 922(d)(3) to plaintiffs is consistent with the "tradition of disarming those engaged in criminal conduct." *Fried*, 640 F. Supp. 3d at 1260.

## III.   Plaintiffs Fail To Demonstrate A Likelihood Of Irreparable Harm

The Court should deny plaintiffs' motion for the independently sufficient reason that plaintiffs fail to meet their burden to show that they are "likely to suffer irreparable harm in the absence of preliminary relief." *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)); *see also Reilly*, 858 F.3d at 179 (plaintiff "must demonstrate" irreparable harm to obtain preliminary injunctive relief).

Plaintiffs' sole argument for irreparable harm is that they are being deprived of Second Amendment rights, which they argue is *per se* irreparable harm.   As an initial matter, this argument depends on their incorrect merits argument that the challenged provisions violate the Second Amendment.   *See supra*, Part II.   In addition, their argument that violation of constitutional rights is *per se* irreparable harm contradicts Third Circuit precedent, which holds that "[c]onstitutional harm is not necessarily synonymous with the irreparable harm necessary for issuance of a preliminary injunction." *Lanin v. Borough of Tenafly*, 515 F. App'x 114, 118 (3d Cir. 2013) (per curiam) (quoting *Hohe v. Casey*, 868 F.2d 69, 73 (3d Cir. 1989)).   To be sure, the Supreme Court and the Third Circuit have held that the deprivation of *First Amendment* rights constitutes irreparable injury.   *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *B.H. ex rel. Hawk v. Easton Area Sch. Dist.*, 725 F.3d 293, 323 (3d Cir. 2013) ("The ban prevents B.H.

and K.M. from exercising their right to freedom of speech, which unquestionably constitutes irreparable injury.") (citation omitted).  And plaintiffs cite cases from other circuits that overread *Elrod* as creating a rule that applies to all constitutional rights.[27]  Yet outside the First Amendment context, the Third Circuit has held that even where plaintiffs show likelihood of success on the merits of a constitutional claim, they "must also show that they will be irreparably injured by a denial of the preliminary injunction."  *N.J. Retail Merchs. Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 388 (3d Cir. 2012).[28]

Notably, a district court within this circuit recently concluded that "an alleged deprivation of a Second Amendment right does not automatically constitute irreparable harm."  *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, 664 F. Supp. 3d 584, 604 (D. Del. 2023).  That court instead concluded that plaintiffs were required to show "that their ability to self-defend has been meaningfully diminished," and denied a preliminary injunction because the plaintiffs had not made such a showing.  *Id.*

Here, plaintiffs have not shown any basis for irreparable harm beyond their incorrect legal argument that a claimed Second Amendment violation is *per se* irreparable harm.  Mr. Irey does not show any diminishment in his "ability to self-defend."  *Id.*  Rather, he currently possesses firearms and uses them for self-defense and other lawful purposes.  Irey Decl. ¶ 9.  Mr. Greene

---

[27] *See, e.g.*, *Washington v. Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017) (finding that "the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'") (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod*, 427 U.S. at 373))).

[28] *See also Acierno*, 40 F.3d at 647 (rejecting preliminary injunction because plaintiff "failed to show he will be irreparably harmed unless a preliminary injunction issues," even though district court found plaintiff was likely to succeed on Fourteenth Amendment claim); *Lanin*, 515 F. App'x at 118 (rejecting preliminary injunction because plaintiffs had not shown irreparable harm, despite claim of violation of constitutional right to travel); *Sidamon-Eristoff*, 669 F.3d at 388 (independently examining whether plaintiffs had shown irreparable harm after holding that they were likely to succeed on Contract Clause claim).

avers that he cannot obtain or possess firearms under the challenged provisions because he currently uses medical marijuana, Greene Decl. ¶¶ 6, 8-10, but the temporary prohibition of the challenged provisions "only endures for as long as [Mr. Greene] is an unlawful user or addict, leaving [him] free to regain [his] full Second Amendment rights at any time." *Posey*, 655 F. Supp. 3d at 775-76. To the extent the Court believes that a legal inability to possess firearms could qualify as irreparable harm, Mr. Greene has the power to end that legal inability by ending his unlawful drug use. And although he asserts he uses medical marijuana "intermittently" to treat unspecified "symptoms," Greene Decl. ¶ 6, he does not provide evidence of any immediate medical need to use marijuana, and neither does Mr. Irey.[29] Therefore, neither Mr. Greene nor Mr. Irey have shown irreparable harm.

Even if the Court were to conclude that Mr. Greene and Mr. Irey had shown irreparable harm, SAF has offered no evidence that any of its unnamed members are suffering irreparable harm that can only be prevented by a preliminary injunction, beyond conclusory assertions that certain unidentified members are "similarly situated" to Mr. Greene and Mr. Irey. *See* Gottlieb Decl. ¶¶ 5-6. Accordingly, SAF has not met its burden to show entitlement to injunctive relief.

## IV.    The Balance Of Equities And Public Interest Weigh Against Injunctive Relief

Although the balance of the equities and the public interest typically are considered as separate factors in the preliminary injunction analysis, "[t]hese factors merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. Here, these combined factors strongly counsel against issuing the requested preliminary injunction.

---

[29] By contrast, in *Gonzales v. Raich*, the respondents provided evidence that their doctors "concluded, after prescribing a host of conventional medicines to treat respondents' conditions and to alleviate their associated symptoms, that marijuana is the only drug available that provides effective treatment[,]" and respondents "rely heavily on cannabis to function on a daily basis." 545 U.S. at 7. Mr. Irey and Mr. Greene provide no remotely similar evidence.

The government and the public have a vital public safety interest in the continued enforcement of Sections 922(g)(3) and 922(d)(3).  Section 922(g) "is no minor provision."  *Rehaif* v. *United States*, 139 S. Ct. 2191, 2201 (2019) (Alito, J., dissenting).  It "probably does more to combat gun violence than any other federal law."  *Id.*  Indeed, "Congress' intent in enacting §[] 922(g) . . . was to keep firearms out of the hands of presumptively risky people."  *Dickerson*, 460 U.S. at 112 n.6.  Section 922(d) serves a similar purpose by prohibiting the transfer of firearms to individuals prohibited from possessing them by Section 922(g).  And Sections 922(g)(3) and Section (d)(3) are among the most frequently applied of the Gun Control Act's disqualifications.  Since the creation of the federal background-check system in 1998, Sections 922(g)(3) and (d)(3) have resulted in more than 222,000 denials of firearms transactions.  *See* Crim. Justice Info Servs. Div., Fed. Bureau of Investigation, U.S. Dep't of Justice, *Federal Denials—Reasons Why the NICS Section Denies, November 30, 1998 – February 29, 2024*.  In 2022, the most recent year for which statistics are available, these provisions resulted in more than 8,000 denials.  *See* Crim. Justice Info. Servs. Div., Fed. Bureau of Investigation, U.S. Dep't of Justice, *National Instant Criminal Background Check System 2022 Operational Report*, at 32 (2023).

The preliminary injunction sought by plaintiffs would interfere with enforcement of these vital public safety measures, particularly if the Court extends relief to members of SAF that are "similarly situated" to Mr. Greene and Mr. Irey, as plaintiffs request.  *See* Proposed Order.  SAF is a massive membership organization with hundreds of thousands of members.  *See* Gottlieb Decl. ¶ 5.  SAF has neither identified its members (other than Mr. Greene and Mr. Irey), nor specified which members it believes satisfy the nebulous test of being "similarly situated" to Mr. Greene and Mr. Irey.  Therefore, as a practical matter, plaintiffs' requested preliminary injunction would greatly interfere with the federal government's ability to enforce Sections 922(g)(3) and 922(d)(3)

and use those provisions as a basis to deny firearms transfers through the national background check system.

On the other side of the balancing of the equities, plaintiffs have not shown any irreparable harm. *See supra*, Part III. Mr. Greene and Mr. Irey have not been deprived of the ability to possess firearms, but merely forced to choose between firearms possession and unlawful drug use, a choice that was within Congress's power to impose. *See supra*, Part II. And plaintiffs have presented no evidence whatsoever of harm suffered by other SAF members. The balance of the equities weighs strongly against injunctive relief, particularly injunctive relief against SAF's unnamed members.

## V.   Any Injunctive Relief Should Be Appropriately Limited

For the reasons stated above, the Court should not award any injunctive relief. In the event the Court disagrees, any relief ordered should be limited in two respects.

*First*, any injunctive relief should extend only to Mr. Greene and Mr. Irey, not to SAF's unnamed members. As explained above, SAF lacks standing, *see supra*, Part I, SAF has not shown irreparable harm, *see supra*, Part III, and the equities weigh against extending relief to SAF's members, *see supra*, Part IV. Extending relief to SAF members "similarly situated" to Mr. Greene and Mr. Irey, as plaintiffs request, Proposed Order, would also violate the requirement of Federal Rule of Civil Procedure 65(d) that an injunction clearly set forth its terms, because it is unclear who those "similarly situated" members are.

Rule 65(d) requires that "[e]very order granting an injunction" must "state its terms specifically" and "describe in reasonable detail — and not by referring to the complaint or other document — the act or acts restrained or required." Fed. R. Civ. P. 65(d). Rule 65(d) "is designed to prevent uncertainty and confusion on the part of those to whom the injunction is directed, to avoid the possible founding of contempt citations on an order that is too vague to be understood,

and to ascertain that the appellate court knows precisely what it is reviewing." *Calvin Klein Cosms. Corp. v. Parfums de Coeur, Ltd.*, 824 F.2d 665, 669 (8th Cir. 1987).

"The judicial contempt power is a potent weapon. When it is founded upon a decree too vague to be understood, it can be a deadly one. Congress responded to that danger by requiring that a federal court frame its orders so that those who must obey them will know what the court intends to require and what it means to forbid." *Schmidt v. Lessard*, 414 U.S. 473, 476 n.2 (1974) (citation omitted). Thus, courts have found injunctions too vague when they failed to provide sufficient notice of the individuals or entities against whom conduct was enjoined. *See, e.g.*, *Am. Red Cross v. Palm Beach Blood Bank, Inc.*, 143 F.3d 1407, 1411 (11th Cir. 1998) (injunction prohibiting entity from contacting "any donor whose name is contained on Plaintiff's [trade secret donor] lists" impermissibly vague because enjoined party had "no way to determine whether a given member of the public might happen to appear on" a list not in its possession); *NLRB v. Teamsters*, 419 F.2d 1282, 1283 (6th Cir. 1970) (injunction directing employers to cease from restraining or coercing the employees of a specified company "or the employees of any other employer within its jurisdictional territory" was too vague where, inter alia, the injunction failed to define the specified jurisdiction "and thus it provides no means of defining the people for whom protection is sought").

Here, SAF has not revealed the identities of its members, so Defendants have no way to tell who would even potentially be protected by the requested injunction. Even if SAF identified its members, neither Defendants nor a court could determine whether an SAF member was "similarly situated" to Mr. Greene and Mr. Irey without engaging in a detailed, fact-intensive inquiry of that member's circumstances. *See supra*, pp. 9-10. Therefore, the requested injunction

would not "describe in reasonable detail . . . the act or acts restrained or required."  Fed. R. Civ. P. 65(d)(1)(C).

*Second*, any injunctive relief should not prohibit enforcement of the challenged provisions against Mr. Greene or Mr. Irey (or anyone else) based on unlawful drug use other than use of marijuana that complies with a state medical marijuana program.  Plaintiffs request an order enjoining defendants from enforcing the challenged provisions against them writ large, not just as relates to use of medical marijuana.  *See* Proposed Order at 2.  "A plaintiff's remedy must be tailored to redress the plaintiff's particular injury," *Gill v. Whitford,* 138 S. Ct. 1916, 1934 (2018), and "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Madsen v. Women's Health Ctr.*, *Inc.*, 512 U.S. 753, 765 (1994) (citation omitted).  Here, Mr. Greene and Mr. Irey assert that they do not, and do not desire to, unlawfully use any controlled substance other than medical marijuana.  *See* Greene Decl. ¶¶ 1(g), 5-6; Irey Decl. ¶¶ 1(g), 13.  They have not shown that it is necessary to redress their claimed injuries to obtain an overbroad injunction that would protect them from enforcement even in the event they unlawfully use heroin, cocaine, or any other controlled substance.

## VI.   The Court Should Not Consolidate Plaintiffs' Motion With A Trial On The Merits Or Grant Summary Judgment

The Court should reject plaintiffs' suggestion that the Court consolidate plaintiffs' preliminary injunction motion with a trial on the merits or grant summary judgment.  Mem. 27-28.  Although the Federal Rules of Civil Procedure authorize consolidating a preliminary injunction hearing with a trial on the merits, "it is generally inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits."  *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).  That is because a preliminary injunction motion has a "limited purpose" of "preserv[ing] the relative positions of the parties until a trial on the merits can be held," and is

often resolved with "haste" and "on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Id.*

The reasons why such consolidation is generally appropriate apply fully here, where this case is at the earliest possible stage. Defendants have not even responded to the Amended Complaint by answering or moving to dismiss, *see generally*, Fed. R. Civ. P. 12, and are not due to do so until May 10, 2024.[30] Plaintiffs assert that "the issues in this case are purely legal," Mem. 28, but many of plaintiffs' legal arguments turn on their alleged factual circumstances, *see*, *e.g.*, *id.* at 2 (arguing that plaintiffs have a Second Amendment right to possess firearms because they "are 'law-abiding, responsible' citizens") (quoting *Heller*, 554 U.S. at 635). Plaintiffs articulate no reason why the Court should progress with such extraordinary haste to a trial on the merits, skipping past all other phases of litigation. Plaintiffs' suggestion that the Court should grant summary judgment is likewise improper, as plaintiffs have not moved for summary judgment or attempted to comply with the requirements of the federal rules or local rules concerning motions for summary judgment, such as the requirement to set forth undisputed facts in enumerated paragraphs supported by record citations. *See* Fed. R. Civ. P. 56(a), (c); LCvR 56.

## CONCLUSION

The Court should deny Plaintiffs' Motion for Preliminary Injunction.

---

[30] *See* Fed. R. Civ. P. 12(a)(2) (federal government defendants must respond to complaint "within 60 days after service on the United States attorney"); ECF No. 12 at 2 (proof of service stating that U.S. Attorney's office received service on March 11, 2024).

Dated:  April 1, 2024

Respectfully Submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

BRIGHAM J. BOWEN
Assistant Director, Federal Programs Branch

*/s/ Jeremy S.B. Newman*
JEREMY S.B. NEWMAN (D.C. Bar
#1024112)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel: (202) 532-3114
Fax: (202) 616-8470
Email: jeremy.s.newman@usdoj.gov

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

On April 1, 2024, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Western District of Pennsylvania, using the electronic case filing system of the court.  I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

<u>/s/ *Jeremy S.B. Newman*</u>
JEREMY S.B. NEWMAN
Trial Attorney