**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ROBERT GREENE,** *et al.* | : | |
| | : | |
| Plaintiffs | : | |
| | : | |
| **v.** | : | Civil Action No. 1:24-cv-00021-CB |
| | : | |
| **MERRICK B. GARLAND,** *et al.* | : | |
| | : | |
| Defendants | : | |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

**Table of Contents**

I.     ARGUMENT ................................................................................................. 1

     a.    Standing ........................................................................................... 1

     b.    The Defendants' list of post-Bruen District Courts Opinions should be given little weight ................................................................................. 2

     c.    The Proper Historical Period to Interpret Second Amendment Rights as held by the Supreme Court and Third Circuit Precedent .................. 4

     d.    "Law Abiding" ................................................................................. 5

     e.    "Unprecedented Societal Concerns" ............................................... 7

     f.    The Government's Analogies ............................................................ 9

     g.    "Laws Disarming those Deemed Dangerous" ................................ 11

     h.    Facial and As-Applied Challenges ............................................... 14

II.    CONCLUSION ........................................................................................... 15

# Table of Authorities

**Cases**

*District of Columbia v. Heller,* 554 U.S. 570 (2008) .............................................. 2, 12

*Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246 (2020) ....................................... 5

*Folajtar v. Att'y Gen.*, 980 F.23 897 (3d Cir. 2020) ...................................................... 6

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) ................................... 5

*Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333 (1977).............................. 1

*Lara v. Comm'r Pennsylvania State Police*, 91 F.4th 122 (3d Cir. 2024).................... 5

*New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022).. 2, 4, 5, 9
    10

*Range v. Att'y General,* 69 F.4th 96 (3d Cir. 2023) (*en banc*) ...................................... 6

*Sprint Communications Co.*, 554 U. S. 269 (2008) ....................................................... 4

*United Food and Com. Workers Union Loc. 751 v. Brown Grp., Inc.,* 517 U.S. 544
    (1996) ....................................................................................................................... 2

*United States v. Blue Bird*, No. 22-cr-30112, 2024 WL 35247 (D.S.D. Jan. 3, 2024) . 3

*United States v. Clements*, No. 23-cr-1389, 2024 WL 129071 (D.N.M. Jan. 11, 2024) 3

*United States v. Daniels*, 610 F. Supp. 3d 892 (S.D. Miss. 2022) ............................... 3

*United States v. Daniels*, 77 F.4th 377 (5th Cir. 2023)......................................... 3, 12

*United States v. Davis* No. 23-cr-3088, 2024 WL 519970 (D. Neb. Feb. 9, 2024) ....... 3

*United States v. Espinoza-Melgar*, 2023 U.S. Dist. LEXIS 144847 (D. Utah Aug. 16,
    2023) ........................................................................................................................ 6

*United States v. Perry*, No. 22-cr-1300, 2023 WL 7185622 (S.D. Tex. Nov. 1, 2023).. 4

*United States v. Strange*, No. 23-cr-97, 2023 WL 8458225 (E.D. Ky. Dec. 6, 2023) ... 3

*United States v. Yancey*, 621 F.3d 681 (7th Cir. 2010)............................................... 3

*Warth v. Seldin*, 422 U.S. 490 (1975) ......................................................................... 2

**Statutes**

Pub. L. No. 117–328, 136 Stat. 4561 (2022)................................................................ 7

**Other Authorities**

David F. Musto, *The American Experience with Stimulants and Opiates*, 2 Persps.
    On Crime & Just. (1998).......................................................................................... 7

Joseph G.S. Greenlee, *Disarming the Dangerous: The American Tradition of Firearm Prohibitions*, 16 DREXEL L. REV. 1 (2024)............................................. 11, 12

NICHOLAS J. JOHNSON, ET AL, FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS AND POLICY (3d ed. 2022) ........................................................ 11

PA. GAZETTE, No. 399, July 22, 1736 ............................................................. 7

W.J. RORABAUGH, THE ALCOHOLIC REPUBLIC AN AMERICAN TRADITION 30 (Oxford University Press, Inc. 1979) ................................................................. 7

Plaintiffs Robert Greene ("Greene"), James Irey ("Irey"), and Second Amendment Foundation ("SAF"), by and through their attorneys, hereby file this reply brief in support of their motion for preliminary injunction.

## I.   ARGUMENT

### a.   Standing

Defendants argue that Plaintiff SAF lacks standing to sue. Def. Br. at 8–10. Defendants do not dispute that the first two prongs of associational standing stemming from *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977) are met, but rather that the third prong "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit," somehow bars SAF's participation. In support of this, Defendants claim that the injunctive relief requested "would require…a fact-intensive individualized injury."

However, this could not be further from the truth. For the Court's clarity, SAF's "similarly situated" members that it brings suit on behalf are (1) those individuals who possess a MMID pursuant to Pennsylvania law, use medical marijuana in compliance with Pennsylvania law, are not otherwise prohibited by 18 U.S.C. § 922(g), and would like to purchase, possess, and utilize firearms and ammunition, and (2) those individuals who currently purchase, possess, and utilize firearms and ammunition, are not otherwise prohibited by 18 U.S.C. § 922(g), would obtain a MMID pursuant to Pennsylvania law, and would use medical marijuana pursuant to Pennsylvania law. *See* First Amended Complaint ("FAC") at ¶ 16, 94–

102.

Regardless, Supreme Court precedent dispenses with any further analysis

required on this point. An organization only needs *one* injured member to have

standing. *Warth v. Seldin,* 422 U.S. 490, 511 (1975); *United Food and Com. Workers*

*Union Loc. 751 v. Brown Grp., Inc.,* 517 U.S. 544, 555 (1996). Greene and Irey are

both SAF members. As a result, if either Greene or Irey have standing, which

Defendants do not currently dispute, so does SAF.

      b.  The Defendants' list of post-*Bruen* District Courts Opinions
          should be given little weight

The Government lists a series of district court decisions in a footnote for

support that this Court should reject Plaintiffs' challenge. While it may appear to be

impressive, there is certainly no wisdom in crowds when it comes to Second

Amendment challenges. One only need to look at the 14 years between the Supreme

Court's decision in *District of Columbia v. Heller,* 554 U.S. 570 (2008) and *New York*

*State Rifle & Pistol Association, Inc. v. Bruen,* 597 U.S. 1 (2022) to see that lower

courts through this country consistently applied the wrong test to Second

Amendment challenges, despite clear instructions from the Supreme Court in *Heller*

regarding the application of a test of text as informed by this nation's history and

tradition. "Not only did *Heller* decline to engage in means-end scrutiny generally,

but it also specifically ruled out the intermediate-scrutiny test" that courts

nationwide applied to Second Amendment challenges. *Bruen,* 579 U.S. at 23.

2

To Plaintiffs' knowledge, the only circuit court to address this issue post-*Bruen* reversed a district court's decision which relied on the logic presented in *United States v. Yancey*, 621 F.3d 681 (7th Cir. 2010), to conclude that Section 922(g)(3) was constitutional. *See United States v. Daniels*, 610 F. Supp. 3d 892, 897 (S.D. Miss. 2022) (reversed by *United States v. Daniels*, 77 F.4th 377 (5th Cir. 2023).

And the district courts that the government cites arrived at their conclusions for differing reasons. Several indicated that challenges may be successful, but they were bound to circuit precedent.[1] Others determined that *as-applied* challenges may be brought but there were not sufficient facts in the record to make such a determination. And while Plaintiffs admit that some of the decisions seemingly upheld the constitutionality of Section 922(g)(3), there is no reason for this Court to follow the pack, as explained *infra*.[2,3,4]

---

[1] Courts that found they were bound by circuit precedent. *See, e.g. United States v. Gardner*, No. 22-cr-48, 2023 WL 8099106 (W.D. Mo. Nov. 21, 2023) and *United States v. Robinson*, No. 23-cr-40013, 2023 WL 7413088 (D.S.D. Nov. 9, 2023).

[2] Courts that found an *as-applied* challenge may be brought but lacked a sufficient factual record to make a determination. *See, e.g. United States v. Clements*, No. 23-cr-1389, 2024 WL 129071 (D.N.M. Jan. 11, 2024).

[3] Courts that found they were bound by circuit precedent and an *as-applied* challenge may be brought but lacked a sufficient factual record to make a determination. *See, e.g. United States v. Davis* No. 23-cr-3088, 2024 WL 519970 (D. Neb. Feb. 9, 2024) and *United States v. Blue Bird*, No. 22-cr-30112, 2024 WL 35247 (D.S.D. Jan. 3, 2024).

[4] Courts finding on other grounds. *See, e.g. United States v. Strange*, No. 23-cr-97, 2023 WL 8458225 at *13 (E.D. Ky. Dec. 6, 2023) (distinguishing a facial challenge involving possession of fentanyl, ephedrine, and tramadol with firearms from the *Daniels, Connelly*, and *Harrison* Courts determinations that "stripping the defendant of his or her right to possess a firearm, *based solely on the defendant's*

c. The Proper Historical Period to Interpret Second Amendment
Rights as held by the Supreme Court and Third Circuit Precedent

As Plaintiffs articulated in their opening brief, 1791 is the proper period to

determine the original meaning of various provisions in the Bill of Rights. Doc. 11-1

at 1–13. The Government takes issue with this approach, claiming that the

Supreme Court considered a broad set of historical materials beginning in the

English medieval era through the end of the 19th Century in America. Doc. 19 at

14–15. While it is true that the Supreme Court did look at history from those

historical time periods, the Court has repeatedly stated that it is the Founding Era

that informs the discussion. "As we recognized in *Heller* itself, because post-Civil

War discussions of the right to keep and bear arms 'took place 75 years after the

ratification of the Second Amendment, they do not provide as much insight into its

original meaning as earlier sources.' 554 U. S., at 614; cf. *Sprint Communications

Co.*, 554 U. S. 269, 312 (2008) (Roberts, C. J., dissenting) ("The belated innovations

of the mid- to late-19th-century courts come too late to provide insight into the

meaning of [the Constitution in 1787]"). *Bruen*, 597 U.S. at 36–37 (citations cleaned

up).

Moreover, the Supreme Court explained that Reconstruction Era evidence is

only relevant to the extent that it confirms what had been established before.

---

*non-contemporaneous use* of marijuana, did not comport with historical regulation of
firearm possession.") and *United States v. Perry*, No. 22-cr-1300, 2023 WL 7185622
at *7 (S.D. Tex. Nov. 1, 2023) (finding 922(g)(3) not facially unconstitutional and
indictment allegations must be taken as true, leaving questions of fact for the jury).

"[P]ostratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Bruen*, 597 U.S. at 36 (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1274 n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)); *see also Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2258-59 (2020) (observing that "more than 30 States" adopting laws "in the second half of the 19th century…cannot by itself establish an early American tradition" and only serves to "reinforce an early practice but cannot create one.").

In *Lara v. Comm'r Pennsylvania State Police*, 91 F.4th 122, 134 (3d Cir. 2024), the Third Circuit set aside the Pennsylvania State Police Commisioner's catalouge of statutes from the mid to late nineteenth century as being too far from the adoption of the Second Amendment. Plaintiffs' will discuss Defendants "analogous" laws from the proper period *infra*.

> d.  "Law Abiding"

Defendants place great weight on the phrase "law-abiding" and state that "[m]any aspects of Second Amendment doctrine rest on the premise that the Amendment protects only law-abiding citizens." Doc. 19 at 13. This view is not only untenable but would make every Second Amendment challenge a factually intensive inquiry and reintroduce interest balancing as courts would then need to determine what the threshold for laws broken would qualify as removing a person from the protections of being "law-abiding." As Judge Kimball explained "[i]f 'the

5

people' includes only law-abiding citizens, then those who violate the law could plausibly lose the right not only to possess firearms, but also to peaceable assemble and to be free from unreasonable searches and seizures." *United States v. Espinoza-Melgar*, 2023 U.S. Dist. LEXIS 144847, at \*3 (D. Utah Aug. 16, 2023).

Regardless, the Third Circuit has already rejected this confined understanding of who the Second Amendment protects. In *Range v. Att'y General,* 69 F.4th 96, 101 (3d Cir. 2023) (*en banc*), the Third Circuit noted that "the criminal histories of the plaintiffs in *Heller, McDonald*, and *Bruen* were not at issue in those cases. So, their references to 'law-abiding, responsible citizens' **were dicta**." (bolded emphasis added). The Court further explained that "[a]t root, the Government's claim that only 'law-abiding, responsible citizens,' are protected by the Second Amendment devolves authority to legislators to decide whom to exclude from 'the people.' We reject that approach because such 'extreme deference gives legislatures unreviewable power to manipulate the Second Amendment by choosing a label." *Id.* at 102–03 (citing *Folajtar v. Att'y Gen.*, 980 F.23 897, 912 (3d Cir. 2020) (Bibas, J. dissenting)).

And as a last point of evidence, while marijuana is still unlawful at the federal level, since 2015 Congress has annually renewed a provision in the appropriations acts that prohibit the Department of Justice from using appropriated funds to prevent certain states and territories, along with the District of Columbia, from "implementing their own laws that authorize the use,

6

distribution, possession, or cultivation of medical marijuana." *See, e.g.* Pub. L. No.

117–328, 136 Stat. 4561 (2022).

        e.  "Unprecedented Societal Concerns"

Defendants' argument that medical marijuana poses an unprecedented

societal concern misses the mark. Even if, *arguendo*, the premise that the Founding

Era was unfamiliar with marijuana as an intoxicant were accepted, as the

Government alleges (Doc. 19 at 16), the Founders were intimately familiar with

alcohol as one, along with the problems it created. "It also became evident to some

people that drunkenness led to thievery, lechery, and brutality. The association of

rum with crime and disorder caused these Americans to perceive inebriation itself

as a major social problem." W.J. RORABAUGH, THE ALCOHOLIC REPUBLIC AN

AMERICAN TRADITION 30 (Oxford University Press, Inc. 1979). Benjamin Franklin

himself reprinted an English article against liquor in 1736, to which he added a

preface stating "Perhaps it may have as good an Effect in these Countries as it had

in England. And there is much Necessity for such a Publication here as there; for

our RUM does the same Mischief in proportion; as their GENEVA." PA. GAZETTE,

No. 399, July 22, 1736.[5] *See also*, David F. Musto, *The American Experience with*

*Stimulants and Opiates*, 2 Persps. On Crime & Just. 51, 52 (1998)(finding that "[i]n

the early Republic," there was "an extremely high level of alcohol consumption

(chiefly, distilled spirits)") and Rorabaugh, *supra*, at 21 ("[t]hey drank from crack of

---

[5] Available at: https://www.newspapers.com/image/39391139/

dawn to crack of dawn…[t]hey drank while working and *while travelling across half a continent*.").

While Defendants go to great lengths to emphasize "unlawful drugs" (*id.* at 17), the ultimate result from the use of these substances is an individual who is intoxicated for a period of time, no different than the temporary intoxication of an individual under the influence of alcohol of which the Founders were readily aware. The *only* difference, for the purposes of this analysis, is the lawfulness of the substance as defined by the federal government.[6] As explained in Plaintiffs' opening brief (Doc. 11-1 at 16–19) and *infra*, this Nation was aware of the effects of individuals who imbibed alcohol and passed narrowly tailored laws that only applied to individuals who were under the influence, not a flat ban on anyone who drank alcohol.

Additionally, the Government's argument as to the lawfulness of a substance misses the mark. If an individual is prescribed and uses a Schedule II narcotic, such as oxycodone,[7,8] nothing prevents them from exercising their Second Amendment rights. But if an individual acquires and uses oxycodone without a prescription, they are subject to prosecution under Section 922(g)(3). Regardless of whether the

---

[6] Although, it is arguable that since Congress has suspended the Department of Justice's ability to use appropriated funds to prevent states from implementing laws pertaining to medical marijuana, that Congress has implicitly endorsed the legality of such. Regardless, MMID holders are complying with Pennsylvania law – thus "law-abiding".

[7] https://www.dea.gov/drug-information/drug-scheduling

[8] One of many examples that could be utilized.

individual was prescribed the oxycodone, the ingestion of it results in intoxication, yet in one situation an individual may retain their Second Amendment rights and in the other, they lose them.

Thus, individuals who use an intoxicant is not the "unprecedented societal concern" that Defendants make it out to be. Even if, *arguendo,* it were, that does not allow for the analogies the Government needs to proffer to lack context under the binding precedent – they still need to be relevantly similar in the "how" and the "why," if the issue they sought to resolve was not a general societal issue that existed around the time of Founding. Where it is a general societal problem that has persisted since the 18th century, as Plaintiffs contend, then "the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen,* 597 U.S. at 26,[9]

> f.   The Government's Analogies

---

[9] As to what constitutes an analogue, the *Bruen* court explained that there are two conceptual pathways. If the modern regulation addresses "a general societal problem that has persisted since the 18th century," then "the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id*. at 26. But if a modern law addresses "unprecedented societal concerns or dramatic technological changes," it calls for a "more nuanced approach." *Id*. at 27. We must reason by analogy to determine whether older regulations are "relevantly similar" to the modern law. *Id* at 29. In relation to whether two laws are "relevantly similar," the *Bruen* court explained that two laws are "relevantly similar" if they share a common "why" and "how"; they must both address a comparable problem (the "why") and place a comparable burden on the rightsholder (the "how"). *Id*.

The Government claims that the challenged provisions are analogous to laws disarming the intoxicated. Doc. 19 at 17. This might be true if the challenged laws disarmed individuals only while they were intoxicated – as the laws they cite to did.[10] Unfortunately for the Defendants, their law acts as a *flat ban* against an individual who possesses a MMID and uses medical marijuana, regardless of whether they are actively engaging in the use of their medicine. Moreover, Defendants' argument hinges on the lawfulness of the substance at issue, rather than the constitutionality of barring an individual from exercising their Second Amendment rights consistent with this Nation's history and tradition as required by *Bruen*.

Indeed, *Bruen* explained that in reviewing historical analogues, courts must assess both "how and why" the law burdens an individual's right to armed self-defense. 597 U.S. at 29. While Plaintiffs acknowledge the "why," ensuring militia members called to muster were of clear mind and able to adequately use a firearm in service of this Nation or possibly preventing intoxicated individuals from recklessly discharging firearms and causing damage, *might be the same* as when the Government's purported analogues were enacted, the "how" is certainly different.

The bulk of the laws cited by Defendants as analogous merely disarmed an

---

[10] Plaintiffs acknowledge that at least one law cited barred the sale of a firearm to an individual *while intoxicated*. Doc. 19 at 19. Additionally, the 1658 Massachusetts law proffered by Defendants is in no way analogous as it allowed for the arrest and detention of individuals who were drunk until they could see a magistrate. *Id.* at 17.

10

individual while under the influence. Doc. 19 at 18–19. Several of the later enacted

statutes prohibited the carrying of firearms and the sale of a firearm to an

intoxicated individual and are not comparable to the prohibition at issue in this

matter. *Id*. at 19.

The historical restrictions imposed on the populace did not prevent

individuals who drank alcohol to the point of intoxication from possessing firearms

while not under the influence. Of course, the Founders were aware of the effects of

alcohol, including the crime associated with it, as noted *supra*. Defendants'

argument justifying the ban by linking marijuana and the alleged association of

crime is less than compelling. The Government then attempts to justify the "how"

by claiming this is only a *temporary* restriction on possession or receipt of firearms,

eluding the reality that any individual convicted for violating Section 922(g)(3) is

forever stripped of their right to keep and bear arms.

Thus, Section 922(g)(3) sweeps too broadly in its restriction against MMID

holders, as it prevents them from possessing firearms and ammunition – full stop.

> g.  "Laws Disarming those Deemed Dangerous"

Finally, grasping at straws, the Government seeks to hang its hat on laws

disarming those deemed dangerous to save the challenge prohibition. Defendants

begin by offering a recitation of statutes from England and early colonial

legislatures that disarmed individuals who carried arms in a manner that spread

fear or terror. Doc. 19 at 24. To be sure, none of these laws are from the relevant

11

period and the "how" and "why" are drastically different from the case at bar.

The Government then switches to groups who were deemed "dangerous or untrustworthy," which mainly categorized individuals based on their religion or race – a proposition that Defendants acknowledge is "repugnant and would be unconstitutional today." *Id.* at 25. Even if we were to look to these categorical prohibitions as potentially informative, they were enacted to prevent insurrections. *See* NICHOLAS J. JOHNSON, ET AL, FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS AND POLICY 440–41 (3d ed. 2022) (laws disarming Blacks "rested upon White fears that armed Blacks, especially freemen, might conspire to carry out a slave revolt."); Joseph G.S. Greenlee, *Disarming the Dangerous: The American Tradition of Firearm Prohibitions*, 16 DREXEL L. REV. 1, 35–36 (2024) (explaining that Catholics were disarmed during the French and Indian War because "American Protestants worried that their Catholic neighbors were plotting with Catholic France to impose Catholic rule throughout America").

The state ratifying conventions fail to shed any clarifying light on the issue. "It is dubious to rely on such history to interpret a text that was widely understood to codify a pre-existing right, rather than to fashion a new one." *Heller*, 554 U.S. at 603. In any event, even if this Court were to consider these proposals, "[t]here is no evidence…suggesting 'crimes committed' included nonviolent crimes; the only discussion of what conduct [was covered] noted that it would apply to insurrectionists. Greenlee, *supra*, at 75. Moreover, the "dangerousness" the

12

Founders were concerned with slaves or freeman conspiring to carry out a slave revolt, preventing Indians from attacking colonies, and preventing an all out insurrection by British loyalists while combatting an invasion by the "best-trained, best-equipped, most formidable military force on earth." Greenlee, *supra*, at 27, 29–30, 49–50.

The Government also compares medical marijuana users to the mentally ill. Doc. 19 at 26. But this comparison fails to prove convincing. As the *Daniels* court noted, the Founding Era believed drunkenness to be a "temporary fit of madness" or "temporary insanity". 77 F.4th at 349. Even if the same were accepted for marijuana, "that comparison could justify disarming a citizen only while he is in a state comparable to lunacy. Just as there was no historical justification for disarming a citizen of sound mind, there is no tradition that supports disarming a sober citizen who is not currently under an impairing influence." *Id.*

While the Government puts great stock in Congress's determination that "unlawful drug users could be dangerous," the line of legality is rather blurry. As Plaintiffs stated in their complaint, 38 states have legalized medical marijuana.[11] FAC at ¶ 57. Thus, a vast majority of the states have examined the benefits and potential dangers of medical marijuana, *chosen* to legalize its use, and implement highly regulated systems for individuals to be approved for its use.

---

[11] And Congress has also prevented the Department of Justice from using appropriated funds to prevent states from doing so. *Supra* Section I.d.

To the extent Defendants continue down the path of "unlawfulness", their remaining examples are uncompelling. "Unlawful drug users often 'commit crime in order to obtain money to buy drugs' and 'violent crime may occur as part of the drug business or culture'." Doc. 19 at 29. (internal citations omitted). While this *may* be true, MMID cardholders are lawful users of medical marijuana pursuant to Pennsylvania law and purchase their medicine from any number of state regulated locations. References to unlawful drug dealing are far afield from the state of affairs with Plaintiff Greene and others who lawfully hold MMID cards.

> h.  Facial and *As-Applied* Challenges

Plaintiffs' challenge to the Section 922(g)(3) should, at a minimum, survive *as-applied*. While Section 922(g)(3) may not be unconstitutional in all its applications (ie. against users of other narcotics), Plaintiffs are not individuals who are users of such substances.

However, *as-applied*, Section 922(g)(3) *is* unconstitutional, as demonstrated *supra*. For clarity, Plaintiffs are not arguing that laws preventing intoxicated individuals from possessing or using firearms *while intoxicated* may not survive constitutional scrutiny. That is not at issue in the instant matter. Plaintiffs are arguing that a *flat ban* on their possession and use of firearms because they either use or want to use medical marijuana pursuant to Pennsylvania law to treat their symptoms *is* unconstitutional. To say that an individual loses their right to keep and bear arms for self-defense and other lawful purposes merely because they may

be "intoxicated" at some point in time, by virtue of using a lawful medicine pursuant

to state, eludes logic.

## II.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court issue

a preliminary injunction.

Dated: April 11, 2024                           Respectfully Submitted,

                                                /s/ Adam Kraut

                                                Adam Kraut, Esq.
                                                PA Bar No. 318482
                                                SECOND AMENDMENT FOUNDATION
                                                12500 N.E. Tenth Place
                                                Bellevue, WA  98005
                                                Akraut@SAF.org
                                                (425) 454-7012

                                                Joshua Prince, Esq.
                                                PA Bar No. 306521
                                                CIVIL RIGHTS DEFENSE FIRM, P.C.
                                                646 Lenape Road
                                                Bechtelsville, PA 19505
                                                Joshua@Civilrightsdefensefirm.com
                                                (888) 202-9297 ext 81114
                                                (610) 400-8439 (f)