IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROBERT GREENE, JAMES IREY, and | ) | |
| SECOND AMENDMENT FOUNDATION, | ) | CIVIL ACTION NO. 1:24-cv-00021 |
| Plaintiffs, | ) | |
| | ) | JUDGE BISSOON |
| v. | ) | |
| | ) | *(Electronically Filed)* |
| MERRICK B. GARLAND, Attorney General | ) | |
| of the United States, STEVEN M. DETTELBACH, | ) | |
| Director, Bureau of Alcohol, Tobacco, Firearms, | ) | |
| and Explosives, CHRISTOPHER WRAY, Director | ) | |
| of the Federal Bureau of Investigation, and | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS FIRST AMENDED COMPLAINT FOR
<u>FAILURE TO STATE A CLAIM AND LACK OF SUBJECT MATTER JURISDICTION</u>**

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................1

BACKGROUND ....................................................................................................................2

I.     Statutory and Regulatory Background............................................................................2

     A.     The Gun Control Act of 1968...........................................................................2

     B.     The Controlled Substances Act ........................................................................3

II.     Plaintiffs' First Amended Complaint ............................................................................4

III.     Procedural History........................................................................................................7

LEGAL STANDARD ............................................................................................................8

ARGUMENT ........................................................................................................................9

I.     Pursuant to Rule 12(b)(1), Plaintiff SAF's Claim Should Be Dismissed for Lack of Standing ...................................................................................................................9

II.     Pursuant to Rule 12(b)(6), Plaintiffs' Claims Should Be Dismissed Because the Challenged Provisions Are Constitutional....................................................................11

     A.     The Challenged Provisions Are Facially Constitutional ......................................13

         1.     *Courts Interpret the Second Amendment Based on Text and Historical Tradition* ...................................................................................14

         2.     *The Challenged Provisions Are Analogous To Laws Disarming The Intoxicated* .....................................................................................19

         3.     *Laws Disarming Those Deemed Dangerous Also Justify the Challenged Provisions* ..........................................................................25

     B.     The Challenged Provisions Are Constitutional As Applied................................31

CONCLUSION.....................................................................................................................35

# TABLE OF AUTHORITIES

## CASES

*Am. Chiropractic Ass'n v. Am. Specialty Health Inc.*,
625 F. App'x 169 (3d Cir. 2015) ................................................................ 9-10

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .................................................................................. 8

*Barrett v. United States*,
423 U.S. 212 (1976) .............................................................................. 2, 22

*Catania v. Zurich Am. Ins. Co.*,
No. 2:13-cv-1278, 2014 WL 12599599 (W.D. Pa. June 16, 2014) ................... 4, 8

*Constitution Party of Pa. v. Aichele*,
757 F.3d 347 (3d Cir. 2014) ...................................................................... 8

*Dickerson v. New Banner Inst., Inc.*,
460 U.S. 103 (1983) .................................................................................. 2

*District of Columbia v. Heller*,
554 U.S. 570 (2008) .......................................................................... *passim*

*ERISA Indus. Comm. v. Asaro-Angelo*,
No. CV2010094-ZNQ-TJB, 2023 WL 2808105 (D.N.J. Apr. 6, 2023) ............... 11

*Folajtar v. Attorney General*,
980 F.3d 897 (3d Cir. 2020) ...................................................................... 30

*Fowler v. UPMC Shadyside*,
578 F.3d 203 (3d Cir. 2009) .................................................................... 4, 8

*Fried v. Garland*,
640 F. Supp. 3d 1252 (N.D. Fla. 2022) ................................................. *passim*

*Gonzales v. Raich*,
545 U.S. 1 (2005) ................................................................................. 3-4

*Harmelin* v. *Michigan*,
501 U.S. 957 (1991) ................................................................................ 30

*Hasson v. United States*,
No. 19-CR-00096-LKG, 2024 WL 3729103 (D. Md. Aug. 8, 2024) ................... 12

*Huddleston v. United States*,
    415 U.S. 814 (1974) ..........................................................................29

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977) ............................................................................9

*Hvizdak v. United States*,
    No. 2:14-cv-1296, 2015 WL 5098745 (W.D. Pa. Aug. 31, 2015)..........8

*Kanter v. Barr*,
    919 F.3d 437 (7th Cir. 2019) ............................................................30

*Lara v. Commissioner Pennsylvania State Police*,
    91 F.4th 122 (3d Cir. 2024), *pet. for cert. filed*, No. 24-93 (U.S. July 30, 2024) ..............17, 18

*Marcus v. BMW of N. Am., LLC*,
    687 F.3d 583 (3d Cir. 2012) ..............................................................11

*McCloskey v. United States*,
    No. 4:22-cv-246, 2023 WL 5095701 (S.D. Ga. Aug. 9, 2023) .............12

*New York State Rifle & Pistol Ass'n v. Bruen*,
    597 U.S. 1 (2022) ........................................................................*passim*

*Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc.*,
    280 F.3d 278 (3d Cir. 2002) ..............................................................10

*Range v. Attorney General*,
    69 F.4th 96, 106 (3d Cir. 2023) (en banc), vacated by 144 S. Ct. 2706 (2024) ......................33

*Smith v. Turner*,
    48 U.S. 283 (1849) ............................................................................27

*State v. Shelby*,
    2 S.W. 468 (Mo. 1886) .................................................................21, 22

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ............................................................................9

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016) ............................................................................9

*United States v. Alston*,
    No. 23-cr-21, 2023 WL 7003235 (E.D.N.C. Oct. 24, 2023) .................13

*United States v. Biden*,
 --- F. Supp. 3d ---, 2024 WL 2112377 (D. Del. May 9, 2024),
 *appeal filed*, No. 24-1938 (3d Cir. May 20, 2024) ...............................................................12

*United States v. Black*,
 649 F. Supp. 3d 246 (W.D. La. 2023) ..........................................................................13

*United States v. Blue Bird*,
 No. 22-cr-30112, 2024 WL 35247 (D.S.D. Jan. 3, 2024) ........................................12

*United States v. Bulltail*,
 No. 22-cr-86, 2023 WL 5458780 (D. Mont. Aug. 24, 2023) ...........................12, 31

*United States v. Campbell*,
 No. 1:22-cr-159, 2023 WL 5009202 (S.D. Miss. Aug. 4, 2023) ............................12

*United States v. Carter*,
 750 F.3d 462 (4th Cir. 2014) .........................................................................................29

*United States v. Cheeseman*,
 600 F.3d 270 (3d Cir. 2010) ...........................................................................................29

*United States v. Clements*,
 No. 23-cr-1389, 2024 WL 129071 (D.N.M. Jan. 11, 2024) ............................12, 31

*United States v. Cobbs*,
 No. 22-cr-4069, 2023 WL 8599708, (N.D. Iowa Dec. 12, 2023) ...........................12

*United States v. Connelly*,
 --- F.4th ---, 2024 WL 3963874 (5th Cir. Aug. 28, 2024).......................... 13, 34, 35

*United States v. Connelly*,
 668 F. Supp. 3d 662 (W.D. Tex. 2023), *aff'd in part, rev'd in part*,
 --- F. 4th ---, 2024 WL 3963874 (5th Cir. Aug. 28, 2024) ......................................13

*United States v. Cooper*,
 No. 23-cr-2040, 2023 WL 6441943 (N.D. Iowa Sept. 29, 2023) ...........................12

*United States v. Cousar*,
 No. 23-10004-01-EFM, 2024 WL 1406898 (D. Kan. Apr. 2, 2024) .....................12

*United States v. Crutchfield*,
 No. 22-cr-269, 2023 WL 6976706 (D. Minn. Oct. 23, 2023) .................................12

*United States v. Daniels*,
 77 F.4th 337 (5th Cir. 2023), *vacated by* 144 S. Ct. 2707 (2024) ...........................13

*United States v. Danielson*,
   No. 22-cr-299, 2023 WL 5288049 (D. Minn. Aug. 17, 2023) ................................12

*United States v. Davey*,
   No. 23-cr-20006, 2024 WL 340763 (D. Kan. Jan. 30, 2024)............................ 12, 31

*United States v. Davis*,
   No. 23-cr-3088, 2024 WL 519970 (D. Neb. Feb. 9, 2024) ....................................12

*United States v. Deng*,
   104 F.4th 1052 (8th Cir. 2024), *pet. for cert. filed*, No. 24-5404 (U.S. Aug. 27, 2024)...........12

*United States v. Eason*,
   No. 1:22-cr-65, 2024 WL 639350 (N.D. Ind. Feb. 15, 2024)....................................27

*United States v. Endsley*,
   No. 21-cr-58, 2023 WL 6476389 (D. Alaska Oct. 5, 2023)................................. 12, 23, 29, 31

*United States v. Espinoza-Melgar*,
   No. 21-cr-204, 2023 WL 5279654 (D. Utah Aug. 16, 2023) ...................................... 12, 28, 31

*United States v. Evenson*,
   No. 23-cr-24, 2023 WL 3947828 (D. Mont. June 12, 2023)....................................12

*United States v. Gardner*,
   No. 22-cr-48, 2023 WL 8099106 (W.D. Mo. Nov. 21, 2023)..................................12

*United States v. Giglio*,
   No. 1:23-cr-39, 2023 WL 4918332 (S.D. Miss. Aug. 1, 2023)................................12

*United States v. Gil*,
   No. 22-cr-773, 2023 WL 4356067 (W.D. Tex. July 5, 2023) .................................12

*United States v. Grubb*,
   No. 23-cr-1014, 2023 WL 6960371 (N.D. Iowa Oct. 20, 2023) .......................12, 31

*United States v. Hamlin*,
   No. 23-cr-08, 2023 WL 6481146 (D. Mont. Oct. 5, 2023) ....................................12

*United States v. Harrison*,
   654 F. Supp. 3d 1191 (W.D. Okla. 2023)............................................................13

*United States v. Jackson*,
   110 F.4th 1120 (8th Cir. 2024) ............................................................................26

*United States v. Laureano,*
    No. 23-cr-12 (EP), 2024 WL 838887 (D.N.J. Feb. 28, 2024) ................................19

*United States v. Ledvina,*
    No. 23-cr-36, 2023 WL 5279470 (N.D. Iowa Aug. 16, 2023) ...............................12

*United States v. Lewis,*
    650 F. Supp. 3d 1235 (W.D. Okla. 2023) .............................................................13

*United States v. Lewis,*
    No. 22-cr-222, 2023 WL 4604563 (S.D. Ala. July 18, 2023) ................. 12, 29, 31

*United States v. McDaniel,*
    No. 22-CR-0176-BHL-1, 2024 WL 2513641 (E.D. Wis. May 24, 2024) ..............12

*United States v. Montoya,*
    No. 1:21-CR-0997-KWR, 2024 WL 1991494 (D.N.M. May 6, 2024)...................12

*United States v. Okello,*
    No. 22-cr-40096, 2023 WL 5515828 (D.S.D. Aug. 25, 2023) ..........................12, 23

*United States v. Ortiz,*
    No. 23-cr-506-KSM, 2024 WL 493423 & n.3 (E.D. Pa. Feb. 8, 2024)..................19

*United States v. Overholser,*
    No. 3:22-cr-35, 2023 WL 4145343 (N.D. Ind. June 23, 2023) ..............................12

*United States v. Perry,*
    No. 22-cr-1300, 2023 WL 7185622 (S.D. Tex. Nov. 1, 2023)...............................12

*United States v. Posey,*
    655 F. Supp. 3d 762 (N.D. Ind. 2023)...................................................... 13, 23, 31

*United States v. Pruden,*
    No. 23-cr-42, 2023 WL 6628606 (N.D. Iowa Oct. 11, 2023) ...............................12

*United States v. Rahimi,*
    144 S. Ct. 1889 (2024) .................................................................................*passim*

*United States v. Robinson,*
    No. 23-cr-40013, 2023 WL 7413088 (D.S.D. Nov. 9, 2023)...........................12, 23

*United States v. Salerno,*
    481 U.S. 739 (1987) ............................................................................................13

*United States v. Sanchez*,
646 F. Supp. 3d 825 (W.D. Tex. 2022) .................................................................13

*United States v. Seiwert*,
No. 1:20-cr-443, 2022 WL 4534605 (N.D. Ill. Sept. 28, 2022) .............................13

*United States v. Slone*,
No. 22-cr-144, 2023 WL 8037044 (E.D. Ky, Nov. 20, 2023).........................12, 23

*United States v. Smith*,
No. 2:23-cr-129-22, 2024 WL 896772 (W.D. Pa. Mar. 1, 2024) ....................19, 26

*United States v. Springer*,
No. 23-cr-1013, 2023 WL 4981583 (N.D. Iowa Aug. 3, 2023) .............................12

*United States v. Stennerson*,
No. 1:22-cr-139, 2023 WL 2214351 (D. Mont. Feb. 24, 2023) .............................13

*United States v. Strange*,
No. 23-cr-97, 2023 WL 8458225 (E.D. Ky. Dec. 6, 2023)....................................12

*United States v. Striplin*,
No. 4:21-cr-289, 2023 WL 4850753 (W.D. Mo. July 28, 2023).......................12, 31

*United States v. Uchytil*,
No. 23-CR-2056-LTS-MAR, 2024 WL 1386223 (N.D. Iowa Apr. 1, 2024),
*report and recommendation adopted*,
No. CR23-2056-LTS-MAR, 2024 WL 1745050 (N.D. Iowa Apr. 23, 2024).........12

*United States v. Veasley*,
98 F.4th 906 (8th Cir. 2024), *pet. for cert. filed*, No. 24-5089 (U.S. July 27, 2024)...............12

*United States v. Walker*,
No. 8:22-cr-291, 2023 WL 3932224 (D. Neb. June 9, 2023)........................... 12-13

*United States v. Williams*,
No. 3:21-cr-34, 2024 WL 665851 (M.D. Pa. Feb. 16, 2024) .................................19

*United States v. Wuchter*,
No. 23-cr-2024, 2023 WL 4999862 (N.D. Iowa Aug. 4, 2023) .............................12

*United States v. Yancey*,
621 F.3d 681 (7th Cir. 2010) .................................................... 1, 23, 24, 28

*United States v. Youngblood*,
--- F. Supp. 3d ---, 2024 WL 3449554 (D. Mont. July 17, 2024)...........................12

*Wilson v. Lynch*,
    835 F.3d 1083 (9th Cir. 2016) ...........................................................29

**STATUTES**

18 U.S.C. § 922(d)(3).............................................................................*passim*

18 U.S.C. § 922(g) ........................................................................................2

18 U.S.C. § 922(g)(1)...................................................................................33

18 U.S.C. § 922(g)(3)...........................................................................*passim*

18 U.S.C. § 922(g)(8) .............................................................. 15, 16, 23, 31

21 U.S.C. § 811(a)(1)....................................................................................4

21 U.S.C. § 811(a)(2)....................................................................................4

21 U.S.C. § 812, sched. I(c)(10) ...................................................................3

21 U.S.C. § 812(b)(1)....................................................................................3

21 U.S.C. § 844(a) ........................................................................................4

H.R. 8754, 72 Cong., 47 Stat. 650 (1st Sess. 1932)...................................22

**LEGISLATIVE HISTORIES**

Cong. Globe, 39th Cong., 1st Sess. 908 (1866).........................................27

**REGULATIONS**

27 C.F.R. § 478.11 ....................................................................................3, 25

27 C.F.R. § 478.32(a)(3) .............................................................................3, 6

27 C.F.R. § 478.32(d)(3) .............................................................................3, 6

Notice of Proposed Rulemaking,
    *Schedules of Controlled Substances: Rescheduling of Marijuana*,
    89 Fed. Reg. 44,597 (May 21, 2024) .......................................................4

Notice of Hearing on Proposed Rulemaking,
    *Schedules of Controlled Substances: Rescheduling of Marijuana*,
    89 Fed. Reg. 70,148 (Aug. 29, 2024).......................................................4

# STATE STATUTES

5 *Colonial Laws of New York* (1894)..................................................................................20

6 *Statutes at Large of Pennsylvania from 1682 to 1801* (WM Stanley Ray ed., 1898)...............26

35 Pa. Stat. Ann. § 10231.403(a) ......................................................................................3

1692-1694 Mass. Acts 11-12 ...........................................................................................26

1692-1720 Md. Laws 117-118 .........................................................................................26

1696-1701 N.H. Laws 15 ................................................................................................26

1700-1797 Del. Laws 104 ...............................................................................................26

1715-1755 N.C. Sess. Laws 64.........................................................................................26

1715-1760 N.Y. Laws 162 ...............................................................................................26

1723-1730 Conn. Acts. 292 .............................................................................................26

1731-1743 S.C. Acts 168 ................................................................................................26

1775-1776 Mass. Acts 479 ..............................................................................................26

1776-1777 N.J. Laws 90..................................................................................................26

1777 N.C. Sess. Laws 231 ..............................................................................................26

1777 Pa. Laws 63 .........................................................................................................26

1788 N.Y. Laws Ch. 12...................................................................................................27

1837 Mass. Acts 273 .....................................................................................................20

1837 Me. Laws 424 .......................................................................................................20

1844 R.I. Pub. Laws 503 ................................................................................................20

1867 Kan. Sess. Laws 25.................................................................................................21

1878 Miss. Laws 175 .....................................................................................................21

Mo. Rev. Stat. § 1274 (1879) ..........................................................................................21

1883 Wis. Sess. Laws 290, § 3 ...........................................................................21

1890 Okla. Sess. Laws 495, art. § 4 ...................................................................21

1899 S.C. Acts 97, No. 67, § 1 ...........................................................................21

1909 Idaho Sess. Laws 6, § 1 .............................................................................21

1927 N.J. Laws 745 ............................................................................................22

1929 Mich. Pub. Acts 55 ....................................................................................22

1931 Pa. Laws 499 .............................................................................................22

1935 Ind. Acts 161 .............................................................................................22

1935 S.D. Sess. Laws 356 ..................................................................................22

1935 Wash. Sess. Laws 601 ...............................................................................22

1936 Ala. Acts 52 ...............................................................................................22

## OTHER AUTHORITIES

1 George I, c.54 (1715) .......................................................................................26

1 *Records of Governor & Company of the Massachusetts Bay in New England*
(Nathaniel B. Shurtleff ed., 1853) .................................................................26

1 W. & M. c.2, § 6 .............................................................................................25

1 W. & M. c.15, §§ 3-4 (1688) ..........................................................................26

1 William Waller Hening, *Statutes at Large; Being a Collection of All the Laws of Virginia*
(1823) ..................................................................................................... 19, 26

2 Arthur Vollmer, U.S. Selective Serv. Sys., *Military Obligation: The American Tradition*, pt. 8,
New Jersey, (1947) .......................................................................................20

2 Bernard Schwartz, *The Bill of Rights: A Documentary History* (1971) .....................27

3 Jac. I, c.5, §§ 16-18 (1605-06) ........................................................................26

4 *Journals of the Continental Congress* (1906) .................................................26

7 Will. III, c.5 (1695) .........................................................................................26

9 William Waller Hening, *Statutes at Large; Being a Collection of All the Laws of Virginia* (1821) ...........................................................................................................26

11 George I, c.26 (1724) .......................................................................................26

13 & 14 Car. 2, c.3, § 13 (1662) ...........................................................................25

15 *The Public Records of the Colony of Connecticut from May, 1775, to June,1776, Inclusive* (Charles J. Hoadly ed., 1890) .......................................................26

19 George II, c.39 (1746) .....................................................................................26

*Acts & Laws of the English Colony of Rhode-Island & Providence-Plantations* (Hall, 1767)............................................................................................................20

Benjamin Rush, *An Inquiry into the Effects of Ardent Spirits Upon the Human Body and Mind* (1812)..........................................................................................19

*Calendar of State Papers, Domestic: William III, 1700-1702* (Edward Bateson ed., 1937) ........25

Carlton F.W. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit,* 60 Hastings L. J. 1371 (2009)..................................................................................28

Center for Holistic Medicine, Medical Marijuana Consent, https://www.bewisebewell.com/storage/app/media/medical-marijuana-consent-form-2020.pdf. ........32

*The Charters & General Laws of the Colony and Province of Massachusetts Bay* (1814) .........................................................................................................19, 26

Florida Board of Medicine, Medical Marijuana Consent Form, https://flboardofmedicine.gov/forms/medical-marijuana-consent-form.pdf. ...........................32

James Dunlop, *The General Laws of Pennsylvania* (2d ed. 1849) .............................................20

Mark Edward Lender & James Kirby Martin, *Drinking in America: A History* (1987).........20, 21

PHA Adult Medicine, Medical Cannabis Use Consent Form, https://www.phaadultmedicine.com/_files/ugd/2e54b7_9a91354a3ec543e98af7f381ee5eee1b.pdf ....32

Randolph Roth, "Why Guns Are and Are Not the Problem," *in* Jennifer Tucker, et al., *A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment* (2019) ...........................................................................................20

Robert Dowlut, *The Right to Arms: Does the Constitution or Predilection of Judges Reign?* 36 Okla. L. Rev. 65 (1983)...................................................................................27

*Sir John Knight's Case*, 3 Mod. 117, 87 Eng. Rep. 75 (K.B. 1686)............................................25

Statute of Northampton, 2 Edw. 3, c.3 (1328)............................................................................25

Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* (1868)...............................................28

William Rawle, *A View of the Constitution of the United States of America* (2d ed. 1829)..........................................................................................................................27

**INTRODUCTION**

"[T]here is no constitutional problem with separating guns and drugs." *United States v. Yancey*, 621 F.3d 681, 687 (7th Cir. 2010) (per curiam). Congress separated guns and drugs in the Gun Control Act of 1968 by prohibiting "unlawful user[s]" of controlled substances from possessing firearms and prohibiting others from transferring firearms to unlawful drug users. 18 U.S.C. § 922(d)(3), (g)(3). Plaintiffs' claim that these laws violate the Second Amendment is meritless. These laws, which impose a temporary prohibition on firearms possession and receipt during the time period that a person is actively engaged in unlawful drug use, comport with the Second Amendment because they are "consistent with the principles that underpin our regulatory tradition." *United States v. Rahimi*, 144 S. Ct. 1889, 1898 (2024). In particular, these laws "fit[] comfortably within th[e] tradition[s]" of restricting access to firearms on the basis of intoxication and disarming groups that the legislature determines would pose a danger with firearms. *Id.* at 1897.

Sections 922(g)(3) and 922(d)(3) are constitutional not only facially but also as applied to those who use marijuana pursuant to a state medical marijuana program. Marijuana's physical and mental effects make it dangerous for a person to handle firearms and also impair a person's judgment, including judgment about whether to use firearms. In addition, possession of marijuana (even under a state medical marijuana program) is a federal crime. It was within Congress's authority to determine that people who are actively engaged in committing a crime that renders them unable to safely handle firearms are too dangerous to possess or receive firearms.

Moreover, this Court lacks subject matter jurisdiction over the claim of Plaintiff Second Amendment Foundation ("SAF") because SAF lacks standing to represent its members. SAF requests relief, including permanent injunctive relief, for members that are "similarly situated" to Plaintiffs Robert Greene and James Irey. First Am. Compl., Prayer for Relief, § b, ECF No. 7

("FAC"). That request necessitates the participation of individual members because the Court cannot determine which members are "similarly situated" without their participation.

## BACKGROUND

### I. Statutory and Regulatory Background

#### A. The Gun Control Act of 1968

The Gun Control Act of 1968 updated earlier federal firearms laws by, among other things, "expand[ing] the categories of persons prohibited from receiving firearms." *Barrett v. United States*, 423 U.S. 212, 220 (1976). Section 922(g) prohibits certain groups from possessing or transporting any firearm with a nexus to interstate commerce, including felons, those adjudicated mentally ill or involuntarily committed, and those subject to a domestic violence restraining order. 18 U.S.C. § 922(g). "Congress' intent in enacting §[] 922(g) . . . was to keep firearms out of the hands of presumptively risky people." *Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 112 n.6 (1983).

As relevant here, "unlawful user[s] of . . . any controlled substance" as defined in the Controlled Substances Act (CSA), cannot possess firearms. 18 U.S.C. § 922(g)(3). Marijuana is a controlled substance, and all marijuana possession (except for approved research purposes) violates federal law. *See infra*, p. 3. Section 922(d) prohibits transferring firearms to someone that the transferor knows or has reasonable cause to believe falls within one of the categories of § 922(g), including unlawful drug users. *See* 18 U.S.C. § 922(d)(3). Therefore, Section 922(g)(3) prohibits unlawful drug users from possessing firearms, and § 922(d)(3) prohibits any person from transferring firearms to persons known or reasonably believed to be marijuana users.

The Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), a bureau within the Department of Justice, enforces federal firearms laws and issues regulations concerning those laws. ATF has promulgated a regulation defining an "[u]nlawful user" of a controlled substance

as someone who "is a current user" of a controlled substance in a manner other than as prescribed by a physician,[1] meaning that "the unlawful use has occurred recently enough to indicate that the individual is actively engaged in such conduct." 27 C.F.R. § 478.11. ATF has also promulgated a regulation stating that no person who is an unlawful user of or addicted to any controlled substance as defined in the CSA may ship, receive, or possess a firearm in interstate commerce, *id.* § 478.32(a)(3), and no person may transfer a firearm to a person knowing or having reasonable cause to believe that such a person is such an unlawful drug user or addict, *id.* § 478.32(d)(3). This brief refers to 18 U.S.C. §§ 922(g)(3), (d)(3), and 27 C.F.R. §§ 478.32(a)(3), (d)(3) together as the "challenged provisions."

### B.     The Controlled Substances Act

The CSA regulates many drugs, called controlled substances, by categorizing them on schedules in accordance with their potential for abuse, safety, and accepted medical uses, and imposing restrictions based on schedule. Congress placed marijuana (spelled "marihuana" in the CSA) on Schedule I, the most restrictive schedule. 21 U.S.C. § 812, sched. I(c)(10). Accordingly, when Congress enacted the CSA in 1970, it found that marijuana "has a high potential for abuse," "has no currently accepted medical use in treatment in the United States," and has "a lack of accepted safety for use of the drug or other substance under medical supervision." *Id.* § 812(b)(1). Some states, including Pennsylvania, have enacted state laws providing that medicinal use of marijuana does not violate state law, under certain circumstances. However, marijuana possession remains unlawful under federal law. Because marijuana is a Schedule I drug, possession of marijuana is illegal for all purposes except government-approved research. *See Gonzales v. Raich*,

---

[1] Because marijuana is a Schedule I drug, it may not lawfully be prescribed by a physician. *See infra*, pp. 3-4. Under Pennsylvania's medical marijuana law, a medical practitioner does not prescribe marijuana, but rather issues the patient "[a] certification to use medical marijuana." 35 Pa. Stat. Ann. § 10231.403(a).

545 U.S. 1, 14 (2005).  Unlawful possession of a controlled substance is a crime punishable by up to a year in prison.  21 U.S.C. § 844(a).  A conviction after a previous drug conviction is a felony punishable by up to two years in prison, with increasing penalties for further convictions.  *Id.*

The Attorney General has authority to "transfer between schedules" any drug or "remove any drug or other substance from the schedules" if, after considering scientific and medical evaluations and recommendations from the Secretary of Health and Human Services, he finds that the drug meets criteria for a different schedule or does not meet the requirements for any schedule.  *Id.* § 811(a)(1), (a)(2).  Marijuana is still currently a Schedule I drug.[2]

## II.     Plaintiffs' First Amended Complaint

Plaintiff Robert Greene alleges[3] that he is a Pennsylvania resident, and the District Attorney of Warren County, who applied for and obtained a Pennsylvania Medical Marijuana ID card ("MMID") pursuant to Pennsylvania's Medical Marijuana Act in May of 2023.  FAC ¶¶ 14, 68-69.  He "use[s] medical marijuana" for unspecified "treatment," *id.* ¶ 16; *see also id.* ¶ 73 (Greene "desire[s] to seek and receive medical treatment using medical marijuana").  He "desires and intends to lawfully purchase, possess, and utilize firearms and ammunition . . . for self-defense and all other lawful purposes," but he has refrained from attempting to obtain firearms and ammunition because of the challenged provisions.  *Id.* ¶¶ 71, 75.  He purportedly is not subject to

---

[2] On May 21, 2024, the Attorney General published a notice of proposed rulemaking proposing to reschedule marijuana to Schedule III.  Notice of Proposed Rulemaking, *Schedules of Controlled Substances: Rescheduling of Marijuana*, 89 Fed. Reg. 44,597 (May 21, 2024).  On August 29, 2024, the Drug Enforcement Administration published a notice of hearing announcing that it would hold a hearing on the proposed rescheduling beginning on December 2, 2024.  Notice of Hearing on Proposed Rulemaking, *Schedules of Controlled Substances: Rescheduling of Marijuana*, 89 Fed. Reg. 70,148 (Aug. 29, 2024).

[3] This section describes Plaintiffs' allegations.  At this stage, the "court 'must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions.'"  *Catania v. Zurich Am. Ins. Co.*, No. 2:13-cv-1278, 2014 WL 12599599, at *2 (W.D. Pa. June 16, 2014) (quoting *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009)).

various other federal prohibitions on firearms possession or receipt.[4]  He is "not, pursuant to state law, an unlawful user of any controlled substance," *id.* ¶ 66(g), suggesting that his only unlawful use of controlled substances is use of medical marijuana.  He further alleges that apart from his unlawful use of marijuana, he is "a responsible, law-abiding, peaceable citizen with no history of violent behavior or other conduct that would suggest he poses any threat or danger."  *Id.* ¶ 74.

Plaintiff James Irey alleges that he is a Pennsylvania resident who currently possesses firearms and ammunition.  *Id.* ¶ 15.  He is not subject to various federal prohibitions on firearms possession or receipt.[5]  An approved physician under Pennsylvania's Medical Marijuana Program has confirmed that he would approve Irey for an MMID to obtain marijuana to treat his chronic pain and neuropathy.  *Id.* ¶ 85.  However, he does not allege that he has any pressing medical need to obtain marijuana or that he cannot treat his conditions with other medications.  He "desires and intends to apply for, and receive, a MMID to utilize medical marijuana . . . pursuant to Pennsylvania law," *id.* ¶ 86, but he has abstained from applying for an MMID and obtaining and using medical marijuana because he does not want to violate the challenged provisions if he continues to possess firearms and ammunition, *id.* ¶ 92.  He alleges that he is "a responsible, law-

---

[4] Greene alleges that he is a United States citizen over the age of 21 who is not under indictment, has never been convicted of a crime of domestic violence or punishable by more than one year in prison, is not a fugitive, is not addicted to any controlled substance, has not been adjudicated a mental defective or committed to a mental institution, has not been dishonorably discharged from the military, has not renounced his citizenship, and is not subject to a domestic violence restraining order.  *See id.* ¶ 66(a)-(f), (h)-(l).

[5] Irey alleges that he is a United States citizen over the age of 21 who is not under indictment, has never been convicted of a crime of domestic violence or punishable by more than one year in prison, is not a fugitive, is not an unlawful user of or addicted to any controlled substance, has not been adjudicated a mental defective or committed to a mental institution, has not been dishonorably discharged from the military, has not renounced his citizenship, and is not subject to a domestic violence restraining order.  *See id.* ¶ 78.

abiding, peaceable citizen . . . with no history of violent behavior or other conduct that would suggest he poses any threat or danger." *Id.* ¶ 90.

Plaintiff Second Amendment Foundation (SAF) is a nonprofit corporation that "seeks to preserve the effectiveness of the Second Amendment." *Id.* ¶ 16. "SAF has over 720,000 members and supporters nationwide, including in the Commonwealth of Pennsylvania, including Plaintiffs Greene and Irey," *id.*, but SAF does not identify any other members or make any allegations of the specific circumstances of any other members. It appears that any person — including felons, domestic abusers, people who wish to use firearms to commit crimes and violent acts, and other potentially dangerous people — may join SAF on its website simply by submitting a $15 annual membership fee or a $150 lifetime membership fee. *See* Second Amendment Foundation, Join Now, saf.org/join-saf/. SAF seeks relief for its members that are "similarly situated" to Greene and Irey. *Id.* ¶ 1; *see also id.*, Prayer for Relief, §§ a-c.

Plaintiffs assert in the single count in the First Amended Complaint that "18 U.S.C. §§ 922(g)(3), (d)(3) are unconstitutional facially and as-applied pursuant to the Second Amendment." *Id.*, Count I (emphasis and capitalization omitted). They claim that "Defendants' enforcement of §§ 922(g)(3), (d)(3), and the regulations, customs, practices, and policies related thereto, including, but not limited to, 27 C.F.R. §§ 478.32(a)(3), (d)(3), are an infringement and an impermissible burden on Plaintiffs' and SAF's similarly situated members' right to keep and bear arms pursuant to the Second Amendments [sic] of the U.S. Constitution." *Id.* ¶ 113. Plaintiffs seek a declaration that the challenged provisions "violate Plaintiffs Greene and Irey's and SAF's similarly situated members'" Second Amendment rights, and a permanent injunction against "enforcing" the challenged provisions "against Plaintiffs Greene and Irey and SAF's similarly situated members." *Id.*, Prayer for Relief, §§ a-b.

## III.    Procedural History

Greene and SAF filed the original Complaint on January 23, 2024.  Complaint, ECF No. 1.  On March 6, 2024, Plaintiffs filed the First Amended Complaint, which added Irey as a Plaintiff. *See generally* FAC.  On March 19, 2024, Plaintiffs filed a Motion for Preliminary Injunction.  ECF No. 11.  In support of their motion, Plaintiffs submitted declarations that generally matched the allegations about Greene, Irey, and SAF set forth in the First Amended Complaint.  *See* Declaration of Alan Gottlieb, ECF No. 16-1 (Executive Vice President of SAF); Declaration of Robert Greene, ECF No. 16-2; Declaration of James Irey, ECF No. 16-3.  Defendants opposed the Motion for Preliminary Injunction.  ECF No. 19.  The Court initially set a hearing on the Motion for Preliminary Injunction.  ECF No. 23.  The parties then entered a stipulation providing that, for purposes of the Motion for Preliminary Injunction, the Court could consider Plaintiffs' declarations and certain other exhibits.  Stipulation of the Parties ¶¶ 1-7, ECF No. 24.  In relation to the Motion for Preliminary Injunction, the parties also stipulated to certain other facts, including the existence of the relevant statutes and regulations.  *Id.* ¶¶ 9-22.  The Court adopted the stipulation and canceled the hearing.  Order, ECF No. 25.

On September 10, 2024, the Court denied the Motion for Preliminary Injunction.  *See* Memorandum Opinion and Order, ECF No. 29.  The Court held that Plaintiffs had failed to demonstrate irreparable harm, noting that the Third Circuit has rejected the argument that alleged harm to Second Amendment rights "itself presumes irreparable harm," and "Plaintiffs have failed to identify any specific circumstances that would establish irreparable harm under the stipulated facts of this case." *Id.* at 6-7.  The Court also found that "[a]lthough it is unnecessary to examine the two remaining factors – the public interest and a balancing of the equities[,] . . . those elements lean in Defendants' favor as well." *Id.* at 8 n.2.  The Court explained that "[b]ecause Plaintiffs cannot demonstrate irreparable harm, the Court need not, and will not, examine Plaintiffs'

likelihood of success on the merits." *Id.* at 7. The Court deemed it "unnecessary at this juncture to address Defendants' alternative contention that Plaintiff SAF lacks standing, and the Court expresse[d] no opinion on the merits of that argument." *Id.* at 8 n.2.

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face." *Catania*, 2014 WL 12599599, at *2 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). In reviewing such a motion, the "court 'must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions.'" *Id.* (quoting *Fowler*, 578 F.3d at 210-11). "Then, a court must 'determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a plausible claim for relief.'" *Id.* (quoting *Fowler*, 578 F.3d at 211).

A Rule 12(b)(1) motion to dismiss challenges the Court's subject-matter jurisdiction. "A motion to dismiss for want of standing is . . . properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter." *Hvizdak v. United States*, No. 2:14-cv-1296, 2015 WL 5098745, at *2 (W.D. Pa. Aug. 31, 2015) (quoting *Constitution Party of Pa. v. Aichele,* 757 F.3d 347, 357 (3d Cir. 2014)). Defendants here bring a facial attack to Plaintiff SAF's standing. "A facial attack considers only 'a claim on its face and asserts that it is insufficient to invoke the subject matter jurisdiction of the courts' due to some jurisdictional defect." *Id.* (quoting *Aichele*, 757 F.3d at 358). "It is judged under the same standard as a motion to dismiss pursuant to Rule 12(b)(6)." *Id.*

**ARGUMENT**

## I. Pursuant to Rule 12(b)(1), Plaintiff SAF's Claim Should Be Dismissed for Lack of Standing

The Court should dismiss SAF's claim because SAF lacks standing to sue. "[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). "Article III does not give federal courts the power to order relief to any uninjured plaintiff." *Id.* at 431 (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 466 (2016) (Roberts, C. J., concurring)).

SAF appears to rely primarily on a theory of associational standing, asserting that it "brings this action on behalf of" its members who are "similarly situated" to Greene and Irey. FAC ¶¶ 16, 94. "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

SAF's claim to associational standing founders on the third requirement.[6] Although courts sometimes conclude the participation of individual members "may be unnecessary" when an association seeks injunctive relief, associational standing "is permitted only where the claims do not require 'a fact-intensive-individual inquiry.'" *Am. Chiropractic Ass'n v. Am. Specialty Health*

---

[6] Defendants do not dispute that SAF meets the second requirement. As to the first requirement, Defendants are not contesting the standing of SAF members Greene and Irey at this time, but Defendants reserve the right to contest their standing later in this litigation.

*Inc.*, 625 F. App'x 169, 176 (3d Cir. 2015) (quoting *Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 283, 284 n.3 (3d Cir. 2002)).

Here, the nature of the relief requested would require such a fact-intensive individualized inquiry. SAF seeks declaratory relief and permanent injunctive relief on behalf of its members who are "similarly situated" to Greene and Irey. *See* FAC, Prayer for Relief. The First Amended Complaint sets forth a series of qualifications for such "similarly situated" members, stating that such members:

- satisfy twelve distinct criteria relating to their legal eligibility to possess or receive firearms, *id.* ¶ 94,[7]

- "either (1) possess MMIDs and would purchase, possess, and utilize firearms and ammunition, or (2) own and possess firearms and ammunition and would apply for a MMID and use medical marijuana for treatment pursuant to Pennsylvania law, but for" the challenged provisions, *id.* ¶ 95,

- "desire and intend to . . . utilize firearms and ammunitions for self-defense and all other lawful purposes," *id.* ¶ 96,

- "are responsible, law-abiding, peaceable citizens with no history of violent behavior or other conduct that would suggest they pose any threat or danger," *id.* ¶ 99, and

- "fear . . . arrest, prosecution, incarceration and/or fine" if they attempt to receive an MMID and use medical marijuana while possessing firearms, *id.* ¶ 101.

Clearly, determining which of SAF's hundreds of thousands of members are "similarly situated" to Greene and Irey, under the criteria set forth in the First Amended Complaint, would require fact-intensive individualized inquiries. These inquiries would hinge on members' legal

---

[7] Specifically, "similarly situated" members are U.S. citizens over the age of 21, not under indictment, have not been convicted of a felony or a domestic violence misdemeanor, are not fugitives, "[a]re not, pursuant to state law, unlawful users of any controlled substance" (suggesting that the only unlawful drug use is medical marijuana use), have not been adjudicated mentally defective or committed to a mental institution, have not been dishonorably discharged from the Armed Forces, have not renounced their citizenship, and are not under a domestic violence restraining order. *Id.*

eligibility to possess firearms apart from the challenged provisions (which depends on their citizenship, criminal, substance abuse, mental health, and military history), their eligibility to use medical marijuana under state law, their intended use of firearms (and whether such use is for self-defense or other lawful purposes), their "law-abiding" and "peaceable" status, and their desire to use medical marijuana while possessing firearms.  SAF's request for such relief is improper and unmanageable for similar reasons that courts reject unascertainable putative class actions.  In a class action, "the class must be currently and readily ascertainable based on objective criteria," because otherwise, it would be "impossible to identify" class members "without extensive and individualized fact-finding or 'mini-trials.'"  *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 592-93 (3d Cir. 2012).  The same is true of identifying SAF's "similarly situated" members on whose behalf SAF seeks relief.

SAF also fails to plead a basis for direct organizational standing.  "An entity has direct organizational standing when the organization itself suffers injuries as a result of the defendant's allegedly unlawful conduct.  This may occur, for example, when an organization must divert its resources to counteract the allegedly unlawful conduct."  *ERISA Indus. Comm. v. Asaro-Angelo*, No. CV2010094-ZNQ-TJB, 2023 WL 2808105, at *3 (D.N.J. Apr. 6, 2023) (citation omitted).  However, "[t]he Third Circuit has emphasized the importance of adequate evidence to support organizational injury."  *Id.*  SAF pleads no facts that would support direct organizational standing.

## II.    Pursuant to Rule 12(b)(6), Plaintiffs' Claims Should Be Dismissed Because the Challenged Provisions Are Constitutional

The challenged provisions, which restrict possession and receipt of firearms by unlawful drug users and those addicted to controlled substances, are constitutional, both facially and applied to medical marijuana users.  In the nearly two years since *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), dozens of federal courts have rejected Second Amendment challenges

to § 922(g)(3) or § 922(d)(3),[8] while the Fifth Circuit[9] and a few district court decisions[10] have

taken a minority view that § 922(g)(3) or § 922(d)(3) is unconstitutional, at least under some

[8] *See, e.g.*, *United States v. Deng*, 104 F.4th 1052, 1054 (8th Cir. 2024), *pet. for cert. filed*, No. 24-5404 (U.S. Aug. 27, 2024); *United States v. Veasley*, 98 F.4th 906, 915-18 (8th Cir. 2024), *pet. for cert. filed*, No. 24-5089 (U.S. July 27, 2024); *Hasson v. United States*, No. 19-CR-00096-LKG, 2024 WL 3729103, at *6-7 (D. Md. Aug. 8, 2024); *United States v. Youngblood*, --- F. Supp. 3d ----, 2024 WL 3449554, at *5-6 (D. Mont. July 17, 2024); *United States v. McDaniel*, No. 22-CR-0176-BHL-1, 2024 WL 2513641, at *5-7 (E.D. Wis. May 24, 2024); *United States v. Biden*, --- F. Supp. 3d ---, 2024 WL 2112377, at *3 (D. Del. May 9, 2024), *appeal filed*, No. 24-1938 (3d Cir. May 20, 2024); *United States v. Montoya*, No. 1:21-CR-0997-KWR, 2024 WL 1991494, at *11 (D.N.M. May 6, 2024); *United States v. Cousar*, No. 23-10004-01-EFM, 2024 WL 1406898, at *11 (D. Kan. Apr. 2, 2024); *United States v. Uchytil*, No. 23-CR-2056-LTS-MAR, 2024 WL 1386223, at *3-4 (N.D. Iowa Apr. 1, 2024), *report and recommendation adopted*, No. CR23-2056-LTS-MAR, 2024 WL 1745050 (N.D. Iowa Apr. 23, 2024); *United States v. Davis*, No. 23-cr-3088, 2024 WL 519970 (D. Neb. Feb. 9, 2024); *United States v. Davey*, No. 23-cr-20006, 2024 WL 340763 (D. Kan. Jan. 30, 2024); *United States v. Clements*, No. 23-cr-1389, 2024 WL 129071 (D.N.M. Jan. 11, 2024); *United States v. Blue Bird*, No. 22-cr-30112, 2024 WL 35247 (D.S.D. Jan. 3, 2024); *United States v. Cobbs*, No. 22-cr-4069, 2023 WL 8599708, (N.D. Iowa Dec. 12, 2023); *United States v. Strange*, No. 23-cr-97, 2023 WL 8458225 (E.D. Ky. Dec. 6, 2023); *United States v. Gardner*, No. 22-cr-48, 2023 WL 8099106 (W.D. Mo. Nov. 21, 2023); *United States v. Slone*, No. 22-cr-144, 2023 WL 8037044 (E.D. Ky, Nov. 20, 2023); *United States v. Robinson*, No. 23-cr-40013, 2023 WL 7413088 (D.S.D. Nov. 9, 2023); *United States v. Perry*, No. 22-cr-1300, 2023 WL 7185622 (S.D. Tex. Nov. 1, 2023); *United States v. Crutchfield*, No. 22-cr-269, 2023 WL 6976706 (D. Minn. Oct. 23, 2023); *United States v. Grubb*, No. 23-cr-1014, 2023 WL 6960371 (N.D. Iowa Oct. 20, 2023); *United States v. Pruden*, No. 23-cr-42, 2023 WL 6628606 (N.D. Iowa Oct. 11, 2023); *United States v. Hamlin*, No. 23-cr-08, 2023 WL 6481146 (D. Mont. Oct. 5, 2023); *United States v. Endsley*, No. 21-cr-58, 2023 WL 6476389 (D. Alaska Oct. 5, 2023); *United States v. Cooper*, No. 23-cr-2040, 2023 WL 6441943 (N.D. Iowa Sept. 29, 2023); *United States v. Okello*, No. 22-cr-40096, 2023 WL 5515828 (D.S.D. Aug. 25, 2023); *United States v. Bulltail*, No. 22-cr-86, 2023 WL 5458780 (D. Mont. Aug. 24, 2023); *United States v. Danielson*, No. 22-cr-299, 2023 WL 5288049 (D. Minn. Aug. 17, 2023); *United States v. Ledvina*, No. 23-cr-36, 2023 WL 5279470 (N.D. Iowa Aug. 16, 2023); *United States v. Espinoza-Melgar*, No. 21-cr-204, 2023 WL 5279654 (D. Utah Aug. 16, 2023); *McCloskey v. United States*, No. 4:22-cv-246, 2023 WL 5095701 (S.D. Ga. Aug. 9, 2023); *United States v. Campbell*, No. 1:22-cr-159, 2023 WL 5009202 (S.D. Miss. Aug. 4, 2023); *United States v. Wuchter*, No. 23-cr-2024, 2023 WL 4999862 (N.D. Iowa Aug. 4, 2023); *United States v. Springer*, No. 23-cr-1013, 2023 WL 4981583 (N.D. Iowa Aug. 3, 2023); *United States v. Giglio*, No. 1:23-cr-39, 2023 WL 4918332 (S.D. Miss. Aug. 1, 2023); *United States v. Striplin*, No. 4:21-cr-289, 2023 WL 4850753 (W.D. Mo. July 28, 2023); *United States v. Lewis*, No. 22-cr-222, 2023 WL 4604563 (S.D. Ala. July 18, 2023); *United States v. Gil*, No. 22-cr-773, 2023 WL 4356067 (W.D. Tex. July 5, 2023); *United States v. Overholser*, No. 3:22-cr-35, 2023 WL 4145343 (N.D. Ind. June 23, 2023); *United States v. Evenson*, No. 23-cr-24, 2023 WL 3947828 (D. Mont. June 12, 2023); *United States v. Walker*, No. 8:22-cr-291,

circumstances. For the reasons described below, the overwhelming weight of authority is correct. Disarming unlawful drug users is consistent with the historical tradition of restricting firearms possession and use on the basis of intoxication and the historical tradition of disarming groups of people who would present a danger with firearms.

## A. The Challenged Provisions Are Facially Constitutional

Although the First Amended Complaint focuses largely on marijuana and medical marijuana, Plaintiffs raise a facial challenge to the challenged provisions, claiming that "18 U.S.C. §§ 922(g)(3), (d)(3) are unconstitutional facially and as-applied pursuant to the Second Amendment." FAC, Count I (emphasis and capitalization omitted). "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). A contention that a statute "might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since [the Supreme Court] ha[s] not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment." *Id.* As the Supreme Court explained recently in the Second Amendment context, "to prevail" on a facial challenge, "the Government need only

---

2023 WL 3932224 (D. Neb. June 9, 2023); *United States v. Stennerson*, No. 1:22-cr-139, 2023 WL 2214351 (D. Mont. Feb. 24, 2023); *United States v. Posey*, 655 F. Supp. 3d 762 (N.D. Ind. 2023); *United States v. Lewis*, 650 F. Supp. 3d 1235 (W.D. Okla. 2023); *United States v. Black*, 649 F. Supp. 3d 246 (W.D. La. 2023); *United States v. Sanchez*, 646 F. Supp. 3d 825 (W.D. Tex. 2022); *Fried v. Garland*, 640 F. Supp. 3d 1252 (N.D. Fla. 2022); *United States v. Seiwert*, No. 1:20-cr-443, 2022 WL 4534605 (N.D. Ill. Sept. 28, 2022).

[9] *See United States v. Connelly*, --- F.4th ---, 2024 WL 3963874, at *9-10 (5th Cir. Aug. 28, 2024); *see also United States v. Daniels*, 77 F.4th 337 (5th Cir. 2023), *vacated by* 144 S. Ct. 2707 (2024) (granting certiorari, vacating, and remanding for reconsideration in light of *Rahimi*).

[10] *See United States v. Alston*, No. 23-cr-21, 2023 WL 7003235 (E.D.N.C. Oct. 24, 2023); *United States v. Sam*, No. 22-cr-87, Order, ECF No. 38 (S.D. Miss. Oct. 3, 2023); *United States v. Connelly*, 668 F. Supp. 3d 662 (W.D. Tex. 2023), *aff'd in part, rev'd in part*, --- F. 4th ---, 2024 WL 3963874 (5th Cir. Aug. 28, 2024); *United States v. Harrison*, 654 F. Supp. 3d 1191 (W.D. Okla. 2023).

demonstrate that [the challenged provisions are] constitutional in some of [their] applications." *Rahimi*, 144 S. Ct. at 1898. Plaintiffs' facial challenge to the challenged provisions, which prohibit unlawful drug users and those addicted to controlled substances from possessing or receiving firearms, is meritless.

### 1. Courts Interpret the Second Amendment Based on Text and Historical Tradition

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that the Second Amendment protects the "right of law-abiding, responsible citizens" to possess handguns in the home for self-defense. *Id.* at 635. Consistent with that interpretation, the Court cautioned that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill," and it described those restrictions as "examples" of "presumptively lawful regulatory measures" that were not "exhaustive." *Id.* at 626, 627 n.26. The Court incorporated that understanding into its holding, ruling that the plaintiff was entitled to possess a handgun only if he was "not disqualified from the exercise of Second Amendment rights." *Id.* at 635.

In *Bruen*, the Court repeatedly used the term "law-abiding citizen" to describe the class of persons protected by the Second Amendment. *See* 597 U.S. at 9 ("ordinary, law-abiding citizens"); *id.* at 15 ("law-abiding, adult citizens"); *id.* at 26 ("law-abiding, responsible citizens" (quotation marks omitted)); *id.* at 29 ("a law-abiding citizen's right to armed self-defense"); *id.* at 30 ("law-abiding citizens"); *id.* at 31 ("ordinary, law-abiding, adult citizens"); *id.* at 33 n.8 ("law-abiding citizens"); *id.* at 38 ("law-abiding citizens"); *id.* at 38 n.9 ("law-abiding, responsible citizens" (quotation marks omitted)); *id.* at 60 ("law-abiding citizens"); *id.* at 70 ("law-abiding, responsible citizens"); *id.* at 71 ("law-abiding citizens").

Many aspects of Second Amendment doctrine demonstrate that a person's compliance or non-compliance with the law plays a significant role in determining the Second Amendment's application to that person. In judging whether modern firearms regulations are consistent with their historical precursors, courts must ask "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 29. In determining whether the Second Amendment protects particular types of weapons, courts must consider whether those weapons are "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625. And the government may require gun owners to pass background checks because such checks ensure that those who carry guns "are, in fact, 'law-abiding, responsible citizens.'" *Bruen*, 597 U.S. at 38 n.9.

*Bruen* further held that the constitutional analysis of firearm regulations must be "rooted in the Second Amendment's text, as informed by history." *Id.* at 19. The Court held that "when the Second Amendment's plain text covers an individual's conduct, . . . the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation" to show that it comports with the Second Amendment. *Id.* at 17. The Court noted that analysis of the nation's historical tradition "will often involve reasoning by analogy," under which a court evaluates whether a modern firearms regulation is "relevantly similar" to historical practice. *Id.* at 28-29. The Court pointed to "two metrics" relevant to analogical reasoning: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 29. The Court stressed that it was not imposing a "regulatory straightjacket" or requiring identification of a "historical *twin*" or "a dead ringer for historical precursors." *Id.* at 30.

In *Rahimi*, the Supreme Court applied its test in *Bruen* for the first time and upheld against facial challenge 18 U.S.C. § 922(g)(8), which prohibits individuals under certain domestic violence restraining orders from possessing firearms. *Rahimi* rejected an unduly narrow approach

to the kinds of firearms regulations that could serve as historical support for modern restrictions. The Court explained that "some courts have misunderstood the methodology of our recent Second Amendment cases." *Rahimi*, 144 S. Ct. at 1897. Those cases, the Court observed, "were not meant to suggest a law trapped in amber." *Id*. Instead, "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Id*. at 1898.

In sustaining § 922(g)(8), the Supreme Court recognized that the government had "offer[ed] ample evidence that the Second Amendment permits the disarmament of individuals who pose a credible threat to the physical safety of others." *Id*. That historical evidence included surety bond laws, which authorized magistrates to "require individuals suspected of future misbehavior to post a bond," and "going armed" laws, which "provided a mechanism for punishing those who had menaced others with firearms." *Id*. at 1899-1901. The Court reached that conclusion even though it was well aware that there were several differences between those historical laws and the challenged modern prohibition. For example, "[a]fter providing sureties, a person kept possession of all of his firearms," and "[e]ven if he breached the peace," the penalty "was that he and his sureties had to pay a sum of money," rather than forfeit weapons or face imprisonment. *Id*. at 1939 (Thomas, J., dissenting). Likewise, going armed laws generally applied to "public" misconduct, not to the "conduct [the modern prohibition] seeks to prevent— interpersonal violence in the home." *Id*. at 1942 (Thomas, J., dissenting). The Court recognized that the challenged prohibition "is by no means identical to these founding era regimes," but held that "it does not need to be." *Id.* at 1901 (majority opinion). Instead, the Court found it sufficient that the prohibition "is 'relevantly similar'" to historical laws "in both why and how it burdens the Second Amendment right." *Id*. (quoting *Bruen*, 597 U.S. at 29).

Plaintiffs have argued in their prior briefing that only late 18th century historical evidence can be relevant to Second Amendment analysis. *See* Mot. for Prelim. Inj., at 11-13, ECF No. 16. That is inconsistent with the Supreme Court's evaluation of historical evidence in *Heller*, *Bruen*, and *Rahimi*. In those cases, the Court considered as relevant a broad set of historical materials, including English history from the medieval era through the American founding, *Heller*, 554 U.S. at 592-94; *Bruen*, 597 U.S. at 40-45; *Rahimi*, 144 U.S. at 1899-1900, American colonial history, *Heller*, 554 U.S. at 594, 601, 624-26; *Bruen*, 597 U.S. at 46-49; *Rahimi*, 144 S. Ct. at 1901, American founding era history, *Heller*, 554 U.S. at 581-86, 602-05; *Bruen*, 597 U.S. at 49-50; *Rahimi*, 144 S. Ct. at 1900, and 19th century American history, *Heller*, 554 U.S. at 606-19; *Bruen*, 597 U.S. at 51-70; *Rahimi*, 144 S. Ct. at 1901. All of those materials are part of "this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17; *see also Rahimi*, 144 S. Ct. at 1917-19 (Kavanaugh, J., concurring) (observing that the Supreme Court has identified "post-ratification history as a proper tool to discern constitutional meaning" and citing dozens of examples).

It is true that, when considering which ratification of the constitutional amendments mattered when interpreting the Second Amendment, the Third Circuit concluded in *Lara v. Commissioner Pennsylvania State Police* that "the Second Amendment should be understood according to its public meaning in 1791." 91 F.4th 122, 134 (3d Cir. 2024), *pet. for cert. filed*, No. 24-93 (U.S. July 30, 2024). And, in part for that reason, the court "set aside the Commissioner's catalogue of statutes from the mid-to-late nineteenth century." *Id.* But the Third Circuit appeared to do so on the premise that *Bruen* required regulators to identify "a single founding-era statute imposing restrictions . . . to carry guns" of the same type as the challenged modern-day firearm restriction. *Id.* at 137. That reasoning reflects a "misunderst[anding]" of "the methodology of

[the Supreme Court's] recent Second Amendment cases" of the Second Amendment as "a law trapped in amber" that the Supreme Court rejected in *Rahimi*. 144 S. Ct. at 1898. As Justice Barrett elaborated, such a view would wrongly "assume[] that founding-era legislatures maximally exercised their power to regulate, thereby adopting a 'use it or lose it' view of legislative authority." *Id.* at 1925 (Barrett, J., concurring). The relevant inquiry does not demand a one-to-one match between a founding-era law and a modern law, but rather asks whether "the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Id.* at 1898 (majority). And courts can consider post-ratification evidence in ascertaining that regulatory tradition so long as it does not "contradict[] earlier evidence." *Bruen*, 591 U.S. 66. As Justice Kavanaugh explained in his *Rahimi* concurrence, "[p]ost-ratification interpretations and applications by government actors—at least when reasonably consistent and longstanding—can be probative of the meaning of vague constitutional text." *Rahimi*, 144 S. Ct. at 1916 (Kavanaugh, J., concurring); *see also id.* at 1924 (Barrett, J., concurring) (recognizing that post-ratification history can be "an important tool").

In any event, this is not a case like *Lara* where the court found a paucity of relevant pre-19th century evidence supporting the constitutionality of the statute at issue. *See Lara*, 91 F.4th at 133 (concluding that the state defendants "ha[d] not pointed to an eighteenth century regulation" that the Third Circuit viewed as relevant to a statute's constitutionality but had cited "dozens of 19th century laws" allegedly similar to the statute at issue). Rather, as shown below, the relevant historical traditions extend from pre-colonial English history, through American colonial history, through the founding era, and through the 19th century to the present day. Even on its own terms, *Lara* does not call for disregarding post-ratification evidence that is consistent with earlier evidence. This Court should follow the correct practice of courts in this circuit since *Lara* and

consider the consistent and longstanding principles reflected in a wide range of historical materials from beyond the founding era when engaging in Second Amendment analysis.[11]

### 2. The Challenged Provisions Are Analogous To Laws Disarming The Intoxicated

Historical laws regulating firearm possession and use by those under the influence of alcohol provide a sufficiently close analogy to justify the challenged provisions. The founding generation recognized that those who regularly became intoxicated threatened the social and political order. *See, e.g.*, Benjamin Rush, *An Inquiry into the Effects of Ardent Spirits Upon the Human Body and Mind* 6 (1812) (describing drunkenness as a "temporary fit of madness"). A 1658 Massachusetts law, for example, allowed constables to apprehend those "overtaken with drink" and keep them "in close custody" until brought before a magistrate. *The Charters & General Laws of the Colony and Province of Massachusetts Bay* 82 (1814). Colonial and founding-era legislatures also adopted specific measures to separate firearms and alcohol, including laws regulating firearm use by individuals deemed likely to become intoxicated. A 1655 Virginia law prohibited "shoot[ing] any gunns at drinkeing [events]," regardless of whether attendees actually became intoxicated. 1 William Waller Hening, *Statutes at Large; Being a Collection of All the Laws of Virginia* 401-02 (1823). A 1771 New York law similarly barred firing guns during the New Year's holiday, a restriction that "was aimed at preventing the 'great Damages . . . frequently done on [those days] by persons . . . being often intoxicated with Liquor.'"

---

[11] *See, e.g., United States v. Smith*, No. 2:23-cr-129-22, 2024 WL 896772, at *4-6 (W.D. Pa. Mar. 1, 2024) (relying on English history from the seventh century to the seventeenth century, colonial history, and founding era history); *United States v. Laureano*, No. 23-cr-12 (EP), 2024 WL 838887, at *7 (D.N.J. Feb. 28, 2024) (citing both "Founding era disarmament laws" and "regulations contemporaneous with the Fourteenth Amendment's ratification"); *United States v. Williams*, No. 3:21-cr-34, 2024 WL 665851, at *12-13 (M.D. Pa. Feb. 16, 2024) (relying on "17th, 18th, and 19th century law"); *United States v. Ortiz*, No. 23-cr-506-KSM, 2024 WL 493423, at *7 & n.3 (E.D. Pa. Feb. 8, 2024) (concluding that "Reconstruction era" history is relevant to confirming the Second Amendment's meaning).

*Heller*, 554 U.S. 570, 632 (2008) (quoting 5 *Colonial Laws of New York* 244-46 (1894)). And a 1731 Rhode Island law forbade firing guns or pistols in any tavern at night. *See Acts & Laws of the English Colony of Rhode-Island & Providence-Plantations* 120 (Hall, 1767).

Similarly, 18th-century militia laws reflect legislatures' significant authority to restrict firearms access for intoxicated militia members. New Jersey, Pennsylvania, and South Carolina disarmed or authorized the confinement of intoxicated militia members. *See* 2 Arthur Vollmer, U.S. Selective Serv. Sys., *Military Obligation: The American Tradition*, pt. 8, New Jersey, at 25-26 (1947) (1746 law disarming those who appeared "in [a]rms di[s]gui[s]ed in [l]iquor"); *id.* pt. 11, Pennsylvania, at 97 (1780 law disarming those "found drunk"); *id.* pt. 13, South Carolina, at 96 (1782 law allowing officers to be cashiered or "confined till sober").[12] Similar laws persisted into the 19th century, *see, e.g.*, James Dunlop, *The General Laws of Pennsylvania* 405-06 (2d ed. 1849) (1822 law) — by which time at least three states outright excluded "common drunkards" from the militia, *see* 1844 R.I. Pub. Laws 503; 1837 Me. Laws 424; 1837 Mass. Acts 273.

Despite the pervasiveness of alcohol at the founding, early laws understandably focused on the militia because social norms "had an important restraining effect on intemperance" and there thus was "little public outcry against alcoholism." Mark Edward Lender & James Kirby Martin, *Drinking in America: A History* 14-16 (1987). The community "held drinking excesses largely in bounds." *Id.* at 15. And the cumbersome nature of 18th-century firearms also mitigated the general risk created by intoxicated individuals. *See* Randolph Roth, "Why Guns Are and Are Not the Problem," *in* Jennifer Tucker, et al., *A Right to Bear Arms?: The Contested Role of History*

---

[12] Many other laws forbade selling "any Strong Liquor" near the locations where militias mustered and trained. *See, e.g.*, 2 Vollmer, *supra*, pt. 5, Maryland, at 93 (1756 law); *id.* pt. 3, Delaware, at 13 (1756 law); *id.* pt. 8, New Jersey, at 31 (1746 law) *id.* pt. 11, Pennsylvania, at 100 (1780 law); *id.* pt. 13, South Carolina, at 30 (1721 law).

*in Contemporary Debates on the Second Amendment* 116-17 (2019). As those circumstances changed during the 19th century, *see*, *e.g.*, Lender, *supra*, at 45-46, however, states and territories began imposing criminal penalties on intoxicated members of the public who carried, used, or received firearms or pistols. *See* 1867 Kan. Sess. Laws 25 (prohibiting those "under the influence of intoxicating drink" from carrying a pistol or other deadly weapon upon pain of fine or imprisonment); 1878 Miss. Laws 175-76 (prohibiting selling weapons to a "person intoxicated"); Mo. Rev. Stat. § 1274 (1879) (prohibiting carrying "any kind of firearms" "when intoxicated or under the influence of intoxicating drinks" on pain of fine or imprisonment); 1883 Wis. Sess. Laws 290, § 3 (prohibiting person in "state of intoxication" from going "armed with any pistol or revolver" on pain of fine or imprisonment); 1890 Okla. Sess. Laws 495, art. 47, § 4 (officers may not "carry[] . . . arms while under the influence of intoxicating drinks"); 1899 S.C. Acts 97, No. 67, § 1 (forbidding "boisterous conduct" while "under the influence of intoxicating liquors," including "discharg[ing] any gun" near a public road, on pain of fine or imprisonment); 1909 Idaho Sess. Laws 6, § 1 (prohibiting "hav[ing] or carry[ing]" any "deadly or dangerous weapon" when "intoxicated, or under the influence of intoxicating drinks," on pain of fine or imprisonment). Such statutes were considered "in perfect harmony with the constitution" and "a reasonable regulation of the use of such arms," even where state constitutions were understood to secure an individual's right to bear arms. *State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886).

The challenged provisions' temporary prohibition on firearms possession or receipt impose "a comparable burden" that is "comparably justified" to historical intoxication statutes. *Bruen*, 597 U.S. at 29. In terms of *why* the challenged provisions restrict the Second Amendment right, like the intoxication statutes, these provisions limit firearm use at times an individual is deemed unlikely to use them responsibly. Intoxication-related statutes were enacted to prevent the

"mischief" threatened by intoxicated persons "going abroad with fire-arms," *Shelby*, 2 S.W. at 469, and Congress likewise enacted Sections 922(g)(3) and 922(d)(3) to "keep firearms away from the persons [it] classified as potentially irresponsible and dangerous," *Barrett*, 423 U.S. at 218; *see also infra*, pp. 28-29 (discussing legislative history). For confirmation, this Court need only consider the parity with which legislatures historically treated alcohol and drugs once illegal drugs proliferated in the 20th century. At least one jurisdiction, Michigan, simply extended its by-then common restriction on carrying firearms while intoxicated to cover those under the influence of "any exhilarating or stupefying drug." 1929 Mich. Pub. Acts 55. Other jurisdictions elected to regulate more indirectly by prohibiting the *delivery* or *sale* of firearms to certain persons, but extended such laws to drug addicts and habitual drunkards alike. *See* 1927 N.J. Laws 745; 1931 Pa. Laws 499; 1935 Ind. Acts 161; 1935 S.D. Sess. Laws 356; 1935 Wash. Sess. Laws 601; 1936 Ala. Acts 52; H.R. 8754, 72 Cong., 47 Stat. 650, 652 (1st Sess. 1932).

Critically, although plaintiffs have focused much of their argument on marijuana, and particularly state-regulated medical marijuana, they raise a facial challenge to the challenged provisions, and they seek an injunction that would prevent the government from enforcing the challenged provisions based on unlawful use of any controlled substance, including cocaine, heroin, fentanyl, or methamphetamines. *See* FAC, Count I; *id.*, Prayer for Relief, § b. As explained below, given marijuana's impairing effects, even users of state-regulated medical marijuana present a danger with firearms that Congress was entitled to regulate. *See infra*, pp. 31-35. But plaintiffs can hardly dispute that unlawful users of cocaine, heroin, fentanyl, and methamphetamines (and people addicted to those drugs) with firearms present at least as much danger to the public as did the drunkards of the founding era and Reconstruction era.

In terms of *how* the challenged provisions burden the right to self-defense, like historical intoxication laws, they impose a *temporary* restriction on possession or receipt that lasts only during the period an individual is deemed unlikely to use firearms responsibly. This "relatively lenient" burden "only endures for as long as the individual is an unlawful user or addict, leaving them free to regain their full Second Amendment rights at any time." *Posey*, 655 F. Supp. 3d at 775-76.[13] In *Rahimi*, the Supreme Court concluded that § 922(g)(8) was analogous to historic surety bond laws because both imposed "temporary" restrictions on firearms rights. 144 S. Ct. at 1902. The same is true here.

Many courts have correctly upheld § 922(g)(3) based on the historical analogy to intoxication statutes. As one court explained:

> the prohibition in § 922(g)(3) can be analogized to the historical intoxication statutes. Under those historical regulations the intoxicated could not carry or use firearms, while under the modern regulation an active drug user cannot possess firearms. So, for the duration of the period individuals are using intoxicating substances, their Second Amendment rights are impaired. Both groups are then able to regain their Second Amendment rights by simply ending their substance use. These historical regulations may not be "dead ringer[s]" for § 922(g)(3), but they are not required to be and are nonetheless sufficiently analogous. As such, the scope of § 922(g)(3) is in line with these historical examples.

*Posey*, 655 F. Supp. 3d, at 773-74 (citations omitted).[14]

---

[13] *See also Yancey*, 621 F.3d at 686 (§ 922(g)(3) is "far less onerous" than provisions imposing lifetime firearms bans because "an unlawful drug user like Yancey could regain his right to possess a firearm simply by ending his drug abuse"); *accord Endsley*, 2023 WL 6476389, at *4; *Fried*, 640 F. Supp. 3d at 1262.

[14] *See also*, *e.g.*, *Slone*, 2023 WL 8037044, at *4 ("The Government has shown that § 922(g)(3) is 'relevantly similar' to historical regulations aimed at preventing potentially dangerous persons from possessing and using firearms, including the mentally ill and the intoxicated."); *Robinson*, 2023 WL 7413088, at *4 ("[P]rovisions from the colonial era and early statehood are consistent with modern society's concern with the possession of weapons by those who might be impaired by alcohol or controlled substances. Statutes in effect during the 17-19th Centuries analogous to § 922(g)(3) were enacted to control the possession and use of firearms by intoxicated individuals."); *Okello*, 2023 WL 5515828, at *3 ("the court finds that historic laws prohibiting possession of firearms by the intoxicated are sufficient to justify § 922(g)(3)"); *Fried*, 640 F. Supp.

Plaintiffs may argue that despite this history, the challenged provisions are unconstitutional because they are not quite the same as historical regulations. For example, Plaintiffs have argued that the constitutionality of the challenged provisions is doomed by the fact that historical laws restricted firearms rights while a person was intoxicated, while the challenged provisions apply during the time period that a person is a current unlawful user of controlled substances. *See* ECF No. 16, at 19-21. *Rahimi* exposes the flaw in this type of reasoning. Our law is not "trapped in amber." 144 S. Ct. at 1897. To the contrary, "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791." *Id.* at 1897-98. As in *Rahimi*, the restriction at issue here is not "identical" to historical laws, "but it does not need to be." *Id.* at 1901. In concluding that the challenged prohibition was "sufficiently similar" to historical precursors, *Rahimi* emphasized, among other things, that the restrictions were of "limited duration," and that violators were subject to "imprisonment." *Id.* at 1902. The same similarities are present here. Historical laws disarmed individuals for the duration of their intoxication or drug addiction. Section 922(g)(3) likewise creates a "temporary" firearms disqualification. *Id.* It applies "only so long as [a person] abuses drugs," and permits a user to "regain his right to possess a firearm simply by ending his drug abuse." *Yancey*, 621 F.3d at 686-87. In addition, like Section 922(g)(3), many historical laws involved penalties including imprisonment. *See supra*, p. 21.

Furthermore, the difference between the duration of the restrictions is readily explained by the fact that controlled substances, unlike alcohol, are *unlawful*. Many individuals who regularly commit federal crimes by unlawfully obtaining and possessing controlled substances have

---

3d at 1262 ("The manner in which the modern restriction burdens Second Amendment rights is comparable to how the intoxication statutes burdened those rights. . . . The burdens that the challenged regulation and the historical restrictions placed on individuals' Second Amendment rights are also comparably justified.").

connection with criminality for which gun possession presents public safety risks. *See infra*, p. 30. Because alcohol, by contrast, has generally been lawful, historical laws understandably allowed alcohol drinkers to *possess* firearms, limiting their use only during periods of intoxication. *Bruen* instructs that a relevant metric for assessing historical analogues is "how . . . the regulations burden *a law-abiding citizen's right* to armed self-defense," 597 U.S. at 29 (emphasis added). Unlike the historical intoxication statutes, which burdened citizens' rights to armed self-defense when they engaged in *lawful* behavior of possessing and using alcohol, the challenged provisions burden the right to armed self-defense only for so long as a person is "actively engaged" in committing a federal crime. *See* 27 C.F.R. § 478.11 (definition of "Unlawful user of or addicted to any controlled substance").

### 3. *Laws Disarming Those Deemed Dangerous Also Justify the Challenged Provisions*

The full scope of the challenged provisions is further justified by other historical analogues, including those disarming persons who would pose a threat to the safety of others if armed. English law established the government's authority to disarm individuals posing a threat to the safety of others. English common law and statutory law prohibited individuals from "go[ing] armed to terrify the King's subjects." *Sir John Knight's Case*, 3 Mod. 117, 87 Eng. Rep. 75, 76 (K.B. 1686); Statute of Northampton, 2 Edw. 3, c.3 (1328). The Militia Act of 1662 later authorized crown officers to seize the arms of those "judge[d] dangerous to the Peace of the Kingdom.'" 13 & 14 Car. 2, c.3, § 13 (1662). The 1689 English Bill of Rights declared subjects' right to possess arms, but limited the right to *Protestant* subjects, 1 W. & M. c.2, § 6, and did not purport to repeal the Militia Act, which was employed into the 18th century, *see, e.g.*, *Calendar of State Papers, Domestic: William III, 1700-1702*, at 233-34 (Edward Bateson ed., 1937). Before, contemporaneous with, and after the Bill of Rights' enactment, Parliament also enacted statutes

disarming Catholics in England and Ireland. 3 Jac. I, c.5, §§ 16-18 (1605-06); 1 W. & M. c.15, §§ 3-4 (1688); 7 Will. III, c.5 (1695) (Ireland). And in the first half of the 18th century, statutes disarmed Scottish persons believed to be loyal to James II. *See*, *e.g.*, 1 George I, c.54 (1715); 11 George I, c.26 (1724); 19 George II, c.39 (1746).

The tradition continued in early American legislatures. Some laws disarmed those who carried arms in a manner that spread fear or terror. *See* 1692-1694 Mass. Acts 11-12; 1696-1701 N.H. Laws 15. Others disarmed entire groups deemed dangerous or untrustworthy, including those who refused to swear allegiance to the colony[15] or the Revolution's cause[16]; enslaved persons[17]; and Native Americans.[18] And although historical laws disarming people based on religion or race are repugnant and would be unconstitutional today, some courts have relied on the past existence of such laws to "demonstrate that at the time of the founding, the American colonists were accustomed to laws depriving people posing a threat to society (as they viewed it) from possessing arms." *Smith*, 2024 WL 896772, at *5; *see also United States v. Jackson*, 110 F.4th 1120, 1127 (8th Cir. 2024) ("While some of these categorical prohibitions of course would be impermissible

---

[15] 1 *Records of Governor & Company of the Massachusetts Bay in New England* 211-12 (Nathaniel B. Shurtleff ed., 1853) (1637 order disarming Anne Hutchinson's followers).

[16] *See, e.g.*, 4 *Journals of the Continental Congress* 201-06 (1906) (1776 resolution); 1775-1776 Mass. Acts 479; 1777 Pa. Laws 63; 1777 N.C. Sess. Laws 231; 1776-1777 N.J. Laws 90; 9 William Waller Hening, *Statutes at Large; Being a Collection of All the Laws of Virginia* 281-83 (1821) (1777 law); 15 *The Public Records of the Colony of Connecticut from May, 1775, to June, 1776, Inclusive* 193 (Charles J. Hoadly ed., 1890) (1775 law).

[17] *See, e.g.*, 1700-1797 Del. Laws 104; 1692-1720 Md. Laws 117-18; 1715-1760 N.Y. Laws 162; 1715-1755 N.C. Sess. Laws 64; 1731-1743 S.C. Acts 168.

[18] *See, e.g.*, 1723-1730 Conn. Acts. 292; *Charters & General Laws of Massachusetts Bay*, *supra*, at 133 (1633 law); 6 *Statutes at Large of Pennsylvania from 1682 to 1801* 319-20 (WM Stanley Ray ed., 1898) (1763 law); 1 Hening, *supra*, at 219 (1633 Virginia law).

today under other constitutional provisions, they are relevant here in determining the historical understanding of the right to keep and bear arms.").[19]

Second Amendment precursors proposed in state ratifying conventions likewise confirmed that legislatures may disarm certain categories of individuals, including for "crimes committed, or real danger of public injury." 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 665 (1971) (discussing Pennsylvania proposal). Accordingly, as one early scholar wrote, the government may restrict a person's right to carry firearms when there is "just reason to fear that he purposes to make an unlawful use of them." William Rawle, *A View of the Constitution of the United States of America* 126 (2d ed. 1829). And that understanding persisted after the Civil War. In 1866, for example, a federal Reconstruction order applicable to South Carolina provided that, although the "rights of all loyal and well-disposed inhabitants to bear arms will not be infringed," "no disorderly person, vagrant, or disturber of the peace, shall be allowed to bear arms." Cong. Globe, 39th Cong., 1st Sess. 908-09 (1866).

Moreover, a historical tradition exists of restricting possession of firearms by "the mentally ill." *Heller*, 554 U.S. at 626; *see also* Robert Dowlut, *The Right to Arms: Does the Constitution or Predilection of Judges Reign?*, 36 Okla. L. Rev. 65, 96 (1983) (concluding that "[c]olonial and English societies of the eighteenth century" excluded the mentally ill from the right to possess firearms). Historical laws allowed the state to seize the property of someone who is mentally ill until "he comes of his right mind" or his death. 1788 N.Y. Laws Ch. 12.[20] Although plaintiffs

---

[19] Other courts have concluded that laws that discriminated on the basis of religion or race cannot be considered as historical analogues. *See, e.g.*, *United States v. Eason*, No. 1:22-cr-65, 2024 WL 639350, at *3-4 (N.D. Ind. Feb. 15, 2024). Given the breadth of historical materials cited in this brief that demonstrate the constitutionality of Sections 922(g)(3) and 922(d)(3), the Court should reject plaintiffs' claims whether or not this Court considers these historical laws.

[20] *See also, e.g.*, *Smith v. Turner*, 48 U.S. 283, 463 (1849) (noting states have an "acknowledged

may "recoil at being compared to the mentally ill," given the impairing effects of controlled substances, both the mentally ill and unlawful drug users "can be dangerous when armed." *Fried*, 640 F. Supp. 3d at 1263; *see also Yancey*, 621 F.3d at 685 ("habitual drug abusers, like the mentally ill, are more likely to have difficulty exercising self-control, making it dangerous for them to possess deadly firearms").

The challenged provisions are "consistent with the principle[]" that the legislature may disarm categories of people that it deems dangerous with firearms. *Rahimi*, 144 S. Ct. at 1898; *see also id.* at 1901 ("we do not suggest that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse"). "[T]he legislative history of § 922(g)(3) shows" that "Congress believed that unlawful drug users could be dangerous." *Espinoza-Melgar*, 2023 WL 5279654, at *7. As the Third Circuit explained regarding § 922(g)(3)'s legislative history, the statute's purpose of reducing violent crime by curtailing access to firearms by those

> whose access to, and possession of, firearms Congress deemed contrary to public interest . . . is illustrated by Congressman Celler's floor statement, entered into the Congressional Record during the Act's debate, wherein he noted that:
>
> > [W]e are convinced that a strengthened [firearms control system] can significantly contribute to reduc[ing] the danger of crime in the United States. No one can dispute the need to prevent drug addicts, mental incompetents, persons with a history of mental disturbances, and persons convicted of certain offenses from buying, owning, or possessing firearms. This bill seeks to maximize the possibility of keeping firearms out of the hands of such persons.

---

right" to "exclude" the mentally ill); Carlton F.W. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L. J. 1371, 1377 (2009) ("in eighteenth-century America, justices of the peace were authorized to lock up" the mentally ill); Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 28-29 (1868) (in addressing who is part of "the people" in whom "sovereignty is vested," explaining that "[c]ertain classes have been almost universally excluded," excluding the mentally ill and felons).

> *Huddleston* [*v. United States*, 415 U.S. 814, 828 (1974)] (internal quotation marks & citation omitted).

*United States v. Cheeseman*, 600 F.3d 270, 279 (3d Cir. 2010); *see also Endsley*, 2023 WL 6476389, at *5 ("[T]he very real risk to public safety posed by the combination of unlawful drug use and firearms was evidently a primary motivation behind Congress's enactment of § 922(g)(3). This motivation aligns with this Nation's historical tradition of banning dangerous people from possessing guns.").

Congress had ample reason to conclude that gun possession by unlawful drug users, as a class, poses a serious risk of danger to others. Unlawful drug users "may reasonably be viewed as . . . less likely than the general population (due at least to altered mental states both while under the influence and while in withdrawal) to handle a firearm responsibly." *Lewis*, 2023 WL 4604563, at *13; *see also Wilson v. Lynch*, 835 F.3d 1083, 1094 (9th Cir. 2016) ("It is beyond dispute that illegal drug users, including marijuana users, are likely as a consequence of that use to experience altered or impaired mental states that affect their judgment and that can lead to irrational or unpredictable behavior."); *United States v. Carter*, 750 F.3d 462, 469-70 (4th Cir. 2014) (finding "convincing" the government's argument "that drugs 'impair [users'] mental function . . . and thus subject others (and themselves) to irrational and unpredictable behavior'"). Plaintiffs do not appear to dispute that it is dangerous to use firearms while under the influence of unlawfully obtained controlled substances, including marijuana; they have previously stated that they "do not seek to be able to utilize firearms and ammunition while under the effects of medicinal marijuana." ECF No. 16, at 4. But the injunction they are seeking would have exactly that effect, preventing the government from enforcing § 922(g)(3) against them at all, regardless of whether they use firearms while under the influence of marijuana (or heroin, cocaine, or any other drug). *See* FAC, Prayer for Relief, § b. In addition, drugs such as marijuana impair a person's judgment,

including the ability to make decisions about whether it is safe to use firearms.  *See infra*, pp. 32-33.  Plaintiffs' contention that unlawful drug users who possess firearms do not pose danger to the public thus rests on the dubious notion that such unlawful drug users will exercise sound judgment while under the influence of judgment-impairing controlled substances.

Courts have widely recognized the common sense link between unlawful drug use (including marijuana use) and criminal behavior.  Unlawful drug users often "commit crime in order to obtain money to buy drugs" and "violent crime may occur as part of the drug business or culture."  *Harmelin* v. *Michigan*, 501 U.S. 957, 1002 (1991) (Kennedy, J., concurring in part and concurring in the judgment).  Because of the *unlawful* nature of their activities, drug users are more likely than law-abiding citizens to have dangerous confrontations (particularly if guns are involved) with drug dealers, law enforcement officers, and others—raising a concern of danger even beyond periods of actual intoxication.  It thus is no surprise that individual judges have suggested that "drug dealing" is "dangerous because [it] often lead[s] to violence," *Folajtar v. Attorney General*, 980 F.3d 897, 922 (3d Cir. 2020) (Bibas, J., dissenting), and that § 922(g)(3) aligns with a historically justified interest in "keeping guns out of the hands of those who are likely to misuse them," *Kanter v. Barr*, 919 F.3d 437, 465-66 (7th Cir. 2019) (Barrett, J., dissenting).

Finally, in terms of *how* the challenged provisions restrict exercise of Second Amendment rights, they serve only as a *temporary* prohibition, prohibiting firearm possession or receipt only during the period users of unlawful controlled substances are considered to present a risk of dangerousness.  *See supra*, p. 24.

It is therefore unsurprising that many courts have upheld § 922(g)(3) because it is analogous to the historical tradition of disarming groups of people who would present a danger with firearms.  As one court explained:

[T]he Government has shown that Section 922(g)(3) is "relevantly similar" to historical regulations aimed at preventing potentially dangerous persons from possessing and using firearms. The Government has shown that the "two metrics" identified by the Court in *Bruen* as relevant to determining whether historical analogs are similar to modern-day regulations are satisfied: the historical restrictions and Section 922(g)(3) comparably burden the Second Amendment right by categorically prohibiting certain persons from possessing firearms, and comparably justify the regulation as promoting public safety by keeping guns out of the hands of presumptively dangerous persons, namely, felons, intoxicated persons, and the mentally ill.

*Clements*, 2024 WL 129071, at *5 (citation omitted).[21]

Furthermore, the Court should not consider each historical law or category of historical law in isolation. In *Rahimi*, the Supreme Court concluded that "[t]aken together," two distinct regimes of historical laws (surety bond laws and going armed laws) demonstrated the constitutionality of § 922(g)(8). 144 S Ct. at 1901. Here, the historical laws disarming a wide variety of categories of people who presented danger with firearms, taken together with the historical laws that specifically restricted firearms rights on the basis of intoxication, "confirm what common sense suggests," *id.*, that Congress may disarm regular unlawful users of controlled substances.

B.     **The Challenged Provisions Are Constitutional As Applied**

The challenged provisions are constitutional, not just facially, but also as applied to individuals who (as Greene and Irey allege) do not unlawfully use controlled substances other than medical marijuana and are otherwise non-violent and law-abiding. *See* FAC ¶¶ 66, 74, 78, 90.

---

[21] *See also*, *e.g.*, *Davey*, 2024 WL 340763, at *5 ("Given this historical traditional of disarming dangerous people, the court concludes that § 922(g)(3) is consistent with this tradition."); *Fried*, 640 F. Supp. 3d at 1263 ("At bottom, the historical tradition of keeping guns from those the government fairly views as dangerous—like alcoholics and the mentally ill—is sufficiently analogous to modern laws keeping guns from habitual users of controlled substances."); *Grubb*, 2023 WL 6960371, at *4; *Endsley*, 2023 WL 6476389, at *5; *Bulltail*, 2023 WL 5458780, at *2; *Espinoza-Melgar*, 2023 WL 5279654, at *6; *Striplin*, 2023 WL 4850753, at *1; *Lewis*, 2023 WL 4604563, at *11-13; *Posey*, 655 F. Supp. 3d at 774.

As one court has already held, the same historical traditions that generally justify Sections 922(g)(3) and 922(d)(3) — the tradition of restricting firearms rights on the basis of intoxication and the tradition of disarming groups who would be dangerous with firearms — justify applying the statutes to medical marijuana users. *See Fried*, 640 F. Supp. 3d at 1258-63.

Plaintiffs cannot reasonably dispute that much like alcohol, the substance that triggered the historical intoxication statutes, marijuana causes significant mental and physical impairments that make it dangerous for a person to handle firearms. As one state medical board concluded in promulgating an informed consent form that physicians must use when authorizing individuals for medical marijuana use, "[t]he use of marijuana can affect coordination, motor skills and cognition, i.e., the ability to think, judge and reason," can cause numerous "[p]otential side effects," including "dizziness, anxiety, confusion, . . . impairment of short term memory, . . . difficulty in completing complex tasks, . . . inability to concentrate, impaired motor skills, paranoia, psychotic symptoms, . . . [and] depression," and may also "impair . . . judgment." Florida Board of Medicine, Medical Marijuana Consent Form 1-2, https://flboardofmedicine.gov/forms/medical-marijuana-consent-form.pdf. Some medical offices in Pennsylvania that certify patients for medical marijuana use the same language in their informed consent forms.[22] As the *Fried* court correctly recognized, "unlawful drug use (including marijuana use) causes significant mental and physical impairments that make it dangerous for a person to possess firearms." 640 F. Supp. 3d at 1262-63.

Given marijuana's impairing effects, it is lawful to apply Sections 922(g)(3) and 922(d)(3) to impose a temporary prohibition on medical marijuana users from possessing and receiving

---

[22] *See* PHA Adult Medicine, Medical Cannabis Use Consent Form, https://www.phaadultmedicine.com/_files/ugd/2e54b7_9a91354a3ec543e98af7f381ee5eee1b.pdf ; Center for Holistic Medicine, Medical Marijuana Consent, https://www.bewisebewell.com/storage/app/media/medical-marijuana-consent-form-2020.pdf.

firearms.  The contention that a person has not previously engaged in violent or criminal behavior (other than marijuana possession in violation of federal law) does not change the fact that marijuana use causes significant impairments that both render it unsafe to use a firearm and impair a person's judgment.  People who regularly use a substance that impairs the ability to think, judge, and reason "are analogous to other groups the government has historically found too dangerous to have guns."  *Id.* at 1263.

The fact that marijuana possession remains a federal crime further supports the conclusion that Congress may constitutionally determine that it would be dangerous to allow marijuana users (even medical marijuana users) to have access to firearms.  Although "[m]any people refer to" state medical marijuana programs as "'legalizing' medical marijuana," Pennsylvania and other jurisdictions "did no such thing," because "federal law still prohibits possession of marijuana— for medical purposes or otherwise."  *Id.* at 1255.  Plaintiffs are not "like [Bryan] Range," *Range v. Attorney General*, 69 F.4th 96, 106 (3d Cir. 2023) (en banc), *vacated by* 144 S. Ct. 2706 (2024), the individual that the Third Circuit held could not be disarmed for life based on a conviction for food stamp fraud in the 1990s, when he had not engaged in criminal activity for many years.[23] Greene regularly commits the federal crime of unlawful possession of a controlled substance and wishes to possess firearms while continuing to commit that crime, FAC ¶ 16; *see also* Greene Decl. ¶¶ 6-7, and Irey has declared his intention to commit that same crime while continuing to possess firearms, FAC ¶¶ 86-87.  Therefore, the application of Sections 922(g)(3) and 922(d)(3)

---

[23] The Supreme Court vacated the Third Circuit's decision in *Range* and remanded for reconsideration in light of *Rahimi*.  144 S. Ct. 2706.  The en banc Third Circuit is currently considering *Range* on remand, and the federal government has argued that in light of *Rahimi*, the Third Circuit should hold that 18 U.S.C. § 922(g)(1) can constitutionally be applied to Range. However, for the reasons explained in this brief, Plaintiffs' claims here would fail even if the Third Circuit comes to the same conclusion that it did in its prior *Range* decision.

to Plaintiffs is consistent with the "tradition of disarming those engaged in criminal conduct." *Fried*, 640 F. Supp. 3d at 1260.

In a supplemental authority notice filed shortly before this Court denied Plaintiffs' Motion for Preliminary Injunction, Plaintiffs argued that the Fifth Circuit's recent decision in *Connelly*, 2024 WL 3963874, supported their claims. *See* ECF No. 28. *Connelly* recognized that §§ 922(g)(3) and 922(d)(3) were facially constitutional because they could validly be applied to "ban[] presently intoxicated persons from carrying weapons" or prohibit transferring a firearm to a presently intoxicated person. 2024 WL 3963874, at *10.[24] Yet the court held that § 922(g)(3) violated the Second Amendment as applied to a criminal defendant who regularly used marijuana but who the government had not proven had possessed firearms at the precise moment she was intoxicated. *Id.* at *9-10.

Insofar as *Connelly* held § 922(g)(3) unconstitutional as applied, its analysis is inconsistent with *Rahimi*. *Connelly* principally reasons that because historical legislatures chose to disarm those who were currently "under the influence" of intoxicating substances, modern legislatures "at most" hold authority to disarm the same individuals. 2024 WL 3963874, at *10. *Rahimi* makes clear, however, that the Second Amendment permits Congress to enact laws that are "by no means identical" to their historical counterparts. 144 S. Ct. at 1901. The Fifth Circuit's contrary approach mistakenly "assumes that founding-era legislatures maximally exercised their power to regulate" and "forces 21st-century regulations to follow late 18th-century policy choices." *Id.* at 1925 (Barrett, J., concurring). *Connelly*'s demand for "overly specific analogues," *id.*, is particularly improper here, where historical laws regulated users of alcohol, a legal substance, while Section

---

[24] Although Defendants disagree with *Connelly*'s holding that the challenged provisions were unconstitutional as applied, the fact that even a case highlighted by Plaintiffs rejected a facial challenge underscores the futility of the facial challenge Plaintiffs bring here.

922(g)(3) applies only to individuals engaged in regular and ongoing violations of federal law. Although *Connelly* appeared to assign no weight to that distinction, history, precedent, and common sense all reflect that legislatures hold greater authority to disarm individuals who violate the law. *See supra*, pp. 14-15. In these and other respects, *Connelly* follows the rigid historical approach adopted by *Rahimi*'s lone dissenter but repudiated by the Court. *Compare Rahimi*, 144 S. Ct. at 1898-1903 (emphasizing that modern firearms laws need only "comport with the principles underlying the Second Amendment"), *with id*. at 1933-38 (Thomas, J., dissenting).

Instead of following the outlier decision in *Connelly*, this Court should follow the overwhelming weight of authority, *see supra*, n. 8, in rejecting Plaintiffs' constitutional challenges. *Rahimi* only strengthens the conclusion that the Second Amendment does not preclude Congress from disarming those who unlawfully use controlled substances. That includes those who, pursuant to a state medical marijuana program, unlawfully use marijuana, a drug whose impairing effects render it dangerous for a person to operate firearms.

## CONCLUSION

The Court should grant Defendants' Motion to Dismiss and dismiss the First Amended Complaint. The Court should dismiss SAF's claims for lack of subject-matter jurisdiction and should dismiss all Plaintiffs' claims for failure to state a claim.

Dated:  October 1, 2024

Respectfully Submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

BRIGHAM J. BOWEN
Assistant Director, Federal Programs Branch

*/s/ Jeremy S.B. Newman*
JEREMY S.B. NEWMAN (D.C. Bar #1024112)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel: (202) 532-3114
Fax: (202) 616-8470
Email: jeremy.s.newman@usdoj.gov

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

On October 1, 2024, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Western District of Pennsylvania, using the electronic case filing system of the court.  I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/ *Jeremy S.B. Newman*
JEREMY S.B. NEWMAN
Trial Attorney